**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :   Case No:

ARCESIUM LLC,                       :

                   Plaintiff,     :

    v.                            :   **COMPLAINT**

ADVENT SOFTWARE, INC. and SS&C   :
TECHNOLOGIES HOLDINGS, INC.,     :

                  Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     Arcesium LLC ("Arcesium") brings this complaint against Advent Software, Inc.

("Advent" d/b/a SS&C Advent) and SS&C Technologies Holdings, Inc. ("SS&C" and, together

with Advent, "Defendants").

**TABLE OF CONTENTS**

                                           Page

Introduction: Defendants' Anticompetitive And Unlawful Conduct ............................................. 3

Parties ........................................................................................................................................... 5

Jurisdiction And Venue ................................................................................................................. 5

Facts ............................................................................................................................................. 6

    Relevant Markets And Market Power ..................................................................................... 6

    Arcesium And The Arcesium Platform .................................................................................. 10

    Defendants' Market Dominance ............................................................................................ 12

    The 2015 Agreement: Arcesium Gains The Right To Sell Advent's Geneva Software
    To Arcesium's Customers, Including Broad Continuation Rights For The Use Of
    Geneva If The Agreement Ends ............................................................................................ 17

    Defendants Declare They Will Let The 2015 Agreement Expire, Then Demand
    Oppressive And Anticompetitive Terms To Renew It And Impede Arcesium's Efforts
    To Compete ........................................................................................................................... 21

    Defendants Purport To Terminate Arcesium's Continuation Rights, And Arcesium's
    Right To Support Its Own Customers ..................................................................................... 28

Defendants Make, Then Breach, An Agreement To Renew The Geneva License Of A Major Arcesium Customer ................................................................................................ 31

Causes Of Action ...................................................................................................................... 34

COUNT I Violation Of Section 1 Of The Sherman Act, 15 U.S.C. § 1 ..................................... 34

COUNT II Violation Of Section 2 Of The Sherman Act, 15 U.S.C. § 2 (Monopolization) ................................................................................................................... 37

COUNT III Violation Of Section 2 Of The Sherman Act, 15 U.S.C. § 2 (Attempted Monopolization) .................................................................................................................... 40

COUNT IV Violation Of Section 3 Of The Clayton Act, 15 U.S.C. § 14 ................................. 44

COUNT V Violation Of New York Donnelly Act, N.Y. Gen. Bus. Law. § 340 .................... 47

COUNT VI Breach Of Contract (2015 Agreement) ............................................................... 50

COUNT VII Breach Of Contract (Firm E Renewal Agreement) ........................................... 52

COUNT VIII Tortious Interference With Contract .................................................................. 53

COUNT IX Tortious Interference With Prospective Economic Advantage ........................... 54

COUNT X Unfair Competition And Unfair Trade Practices, N.Y. Gen. Bus. Law § 349 ....................................................................................................................................... 55

Prayer For Relief ....................................................................................................................... 56

Jury Demand ............................................................................................................................. 58

### Introduction: Defendants' Anticompetitive And Unlawful Conduct

1.      Defendants and Arcesium compete to provide middle- and back-office post-trade technology support solutions to asset managers, notably to major hedge funds and hedge fund administrators.  This lawsuit challenges Defendants' attempts to prevent and destroy competition in this industry.  Defendants' actions violate the antitrust laws, the laws against interference with business relations, and Arcesium's contractual rights.

2.      Defendants offer accounting software known as Geneva that is widely used by asset managers.  Arcesium and Advent entered into a "Reseller Agreement" in 2015 (the "2015 Agreement"), allowing Arcesium to resell Geneva by integrating it into the solutions that Arcesium offers its customers.  The 2015 Agreement eliminated the need for Arcesium's customers to negotiate with Defendants for their own licenses to use Geneva.  It also allowed Arcesium's customers to take advantage of Arcesium's superior post-trade solutions while relying on Arcesium for service and support of Geneva.

3.      Crucially, the 2015 Agreement grants Arcesium robust rights to continue providing Geneva and support for Geneva to its existing customers should the 2015 Agreement expire or be terminated (the "Continuation Rights").  The Continuation Rights were and are business-critical for Arcesium and its customers, because changing from one accounting software solution to another is extremely difficult and disruptive for an asset manager.  Such a change would disrupt not only the customer's portfolio accounting, but also its ability to perform post-trade tasks that draw on the customer's accounting information.  The Continuation Rights thus provide a critical contractual guarantee to Arcesium and its customers that they can avoid such difficulty and disruption.

3

4.     Defendants' publicly stated goal is to "take over the world" and be "the world's dominant platform" for post-trade technology solutions.[1]  Consistent with that goal, Defendants have adopted a strategy that seeks to undermine Arcesium's ability to compete and would destroy Arcesium's Continuation Rights.  Specifically:

- In October 2019, Defendants notified Arcesium they did not intend to renew the 2015 Agreement.

- Defendants then engaged in sham negotiations to renew the 2015 Agreement, proposing commercially unreasonable terms that were plainly impossible for Arcesium to accept—including a supracompetitive royalty fee and a provision that would prohibit Arcesium from marketing to current customers of Advent or SS&C.

- Following expiration of the 2015 Agreement, which triggered Arcesium's Continuation Rights, Defendants invented a pretextual claim that Arcesium had acted in violation of its Continuation Rights.  Defendants made this pretextual claim just as the critical license rights to Geneva were set to expire for both Arcesium and certain major customers of Arcesium.

- On that pretext, and without providing Arcesium an opportunity to cure the purported breach, Defendants unilaterally purported to terminate Arcesium's Continuation Rights; refused to issue license keys needed to access the software; and shut down access to a critical Geneva customer support portal.

- Defendants started proposing restrictions in other companies' Geneva licenses that would bar those companies from doing business with Arcesium.

5.     The actual and potential disruption caused by Defendants' unlawful conduct and breach of contract is enormous—for Arcesium, its customers, and the market.  In light of Defendants' conduct, Arcesium is compelled to ask the Court:

- to issue an injunction requiring Defendants to perform under the 2015 Agreement and specifically to respect Arcesium's Continuation Rights, including, but not limited to, by providing the license keys necessary to enable Arcesium's continued support of its existing customers;

---

[1] Hartford Business Journal, "SS&C enjoys success but wants billions more," March 21, 2011, https://www.hartfordbusiness.com/article/ssc-enjoys-success-but-wants-billions-more-windsor-software-behemoth-eyes-new-acquisitions (last visited June 7, 2020); *see also* SS&C October 27, 2016 Q3 2016 Earnings Call, *available at* https://seekingalpha.com/article/4016258-ss-and-c-technologies-holdings-ssnc-q3-2016-results-earnings-call-transcript.

- to issue an injunction barring Defendants from interfering with Arcesium's relationships with its current customers, and with its efforts to land new customers; and

- to award money damages to Arcesium based on Defendants' anticompetitive conduct, their interference with Arcesium's customer relationships, and their breach of the 2015 Agreement.

6.     The remedies Arcesium seeks are needed to maintain and restore fair competition, and to protect Arcesium, its customers, and the marketplace against Defendants' illegal and anticompetitive activities.  Arcesium is filing this Complaint today and anticipates seeking preliminary relief via motion in the near term.

## Parties

7.     Plaintiff Arcesium is a limited liability company incorporated in the state of Delaware, with its principal place of business at 1166 Avenue of the Americas, Fourth Floor, New York, New York 10036.

8.     Defendant Advent is a corporation incorporated in the state of Delaware, with its principal place of business at 600 Townsend Street, Suite 500, San Francisco, California 94103. Advent was purchased by SS&C on or around July 8, 2015, and is now a wholly-owned subsidiary of SS&C, doing business under the name SS&C Advent.

9.     Defendant SS&C is a corporation incorporated in the state of Delaware, with its principal place of business at 80 Lamberton Road, Windsor, Connecticut 06095.

## Jurisdiction And Venue

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises in part under the Sherman Act, 15 U.S.C. §§ 1, 2, and the Clayton Act, 15 U.S.C. §§ 13, 14.

11.     This Court has supplemental jurisdiction over Arcesium's state-law claims under 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendants because this suit arises out of their actions within and directed at this state.  In particular, and without limitation, both Advent and SS&C maintain offices in New York and in this District, where each Defendant regularly conducts business activities relevant to the matters alleged herein.  These activities include, on information and belief, marketing and business operations directed at customers and prospects located in New York.  Further, the dispute arises out of the 2015 Agreement, which was negotiated in New York and is governed by New York law.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here, and Arcesium is a citizen of and may be found in this District.

14.     The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

### Facts

#### *Relevant Markets And Market Power*

15.     The relevant markets (the "Relevant Markets") for purposes of this action are (1) the market for software that performs portfolio accounting and related tasks ("Portfolio Accounting Software"); and (2) the market for post-trade technology solutions ("Post-Trade Solutions").  The Relevant Markets are described in further detail below.

16.     There are two relevant sub-markets for each Relevant Market at issue here: (i) a sub-market for the provision of Portfolio Accounting Software and Post-Trade Solutions to hedge funds managing more than $5 billion in assets under management ("Complex Funds") and

(ii) a sub-market for the provision of Portfolio Accounting Software and Post-Trade Solutions to fund administrators ("Fund Administrators"), which are third-party service providers to which Complex Funds outsource certain of their investor-facing and non-investor-facing activities.[2] Complex Funds have high transaction volumes, deal with complex asset classes, transact with a variety of counterparties, and typically have a high employee headcount.[3]  Fund Administrators provide outsourced services that cater to these uniquely complex features of Complex Funds.

17.     The provision of Portfolio Accounting Software and Post-Trade Solutions to Complex Funds and Fund Administrators are relevant and distinct sub-markets for antitrust purposes due to the differentiated needs and preferences of these sophisticated customers.  For both Complex Funds and Fund Administrators, the high transaction volumes, complex asset classes, large number of interrelated trading entities and strategies, complicated reference data structures, multiple sources of inbound data, and large number of diverse financing agreements inherent to Complex Funds require complex solutions tailored for their needs.

18.     ***Portfolio Accounting Software*** provides customers with basic functionalities for accounting, allowing them to maintain accurate and reliable books and records.  Driven in part by regulatory obligations, Complex Funds must perform certain periodic, recurring, accounting activities with respect to the assets they trade on behalf of their investors, such as determining the daily net asset value of the investments held and conducting other basic accounting tasks. Accurate accounting books and records maintained using Portfolio Accounting Software ensure that Complex Funds can perform their investment-related services and fulfill their legal and regulatory obligations.

---

[2] Fund administrators protect the interests of a fund's investors by independently verifying the assets and valuation of the fund.

[3] The size of a fund as measured by AUM is a good proxy for a fund's complexity, including the need for sophisticated Post-Trade Solutions.

19.     For Complex Funds and the Fund Administrators that serve them, there is no substitute for Portfolio Accounting Software to perform these tasks.  Whereas a simple, typically smaller investment manager or simple fund administrator might be able to manually handle its portfolio accounting needs (e.g., using Microsoft Excel), manual accounting is neither practical nor feasible for Complex Funds and Fund Administrators based on their characteristics.  Upon information and belief, the vast majority of, if not all, Complex Funds and Fund Administrators use Portfolio Accounting Software.

20.     Defendants' Geneva is by far the leading Portfolio Accounting Software.  When SS&C acquired Advent in 2015, SS&C's CEO made clear that the acquisition was intended to capture Advent's "crown jewels," Geneva.[4]  Due to its central role as both a functional piece of technology automating accounting, and as the repository of the accounting data that is central to completing other post-trade tasks, Geneva commands high fees and is firmly entrenched within the operating systems of a large majority of Complex Funds and Fund Administrators.  Complex Funds rely on the portfolio accounting data generated by Geneva to make investment decisions and to evaluate the effectiveness of their investment strategies.

21.     ***Post-Trade Solutions*** are solutions that allow customers to perform post-trade tasks, including (i) portfolio accounting,[5] (ii) cash management, (iii) collateral management, (iv) data management and corporate action processing, and (v) reconciliation (collectively "Post-Trade Tasks").  Customers seeking Post-Trade Solutions execute Post-Trade Tasks in-house with software and platforms, by outsourcing them to third parties (that also use software and platforms), and in some cases, a combination of both.

---

[4] Brooke Southall, "SS&C buys Advent for the Geneva crown jewels so what happens to Black Diamond and Advent Axys?" RIABiz (February 2, 2015, 7:33 PM), https://riabiz.com/a/2015/2/3/ssc-buys-advent-for-the-geneva-crown-jewels-so-what-happens-to-black-diamond-and-advent-axys, (last visited June 7, 2020).
[5] Portfolio Accounting Software is a type of Post-Trade Solution.

22.     Post-Trade Tasks are essential for Complex Funds and for Fund Administrators, which perform these tasks for Complex Funds, in order to obtain and maintain accurate and reliable information regarding all of the trades made per day.  For Complex Funds and Fund Administrators, there are no reasonable substitutes for the Post-Trade Solutions that they require. Specifically, Complex Funds and Fund Administrators rely heavily, and in many cases entirely, on Post-Trade Solutions to perform Post-Trade Tasks quickly and efficiently.  Given the scale of assets under management for Complex Funds and Fund Administrators, manual performance of Post-Trade Tasks is neither feasible nor practical.  Complex Funds and Fund Administrators also would incur substantial costs and disruption if they were to seek to perform such work without Post-Trade Solutions, or if they were to switch to different providers for Post-Trade Solutions.

23.     Access to the relevant customer's portfolio accounting data is essential to perform Post-Trade Tasks.  Neither Complex Funds nor Fund Administrators—or others to whom they may outsource—can complete these Post-Trade Tasks without access to the relevant fund's portfolio accounting data.  Post-Trade Solutions obtain such accounting data via Portfolio Accounting Software, such as Geneva.  Because Complex Funds and Funds Administrators need accuracy and speed when handling a high volume of data, the interaction between the Portfolio Accounting Software and the other Post-Trade Solutions utilized by clients has to be automated – including the sending and receiving of information to and from the Portfolio Accounting Software – and the different pieces need to "speak" with each other directly to ensure accuracy, speed, and efficiency.  Without such close coordination, Post-Trade Solutions cannot properly and effectively function, particularly for Complex Funds and Fund Administrators given the high volumes of data they manage.

24.     The relevant geographic market for this action is the United States.  Complex
Funds and Fund Administrators prefer to acquire Portfolio Accounting Software and Post-Trade
Solutions from U.S.-based companies because U.S. companies generally possess superior
expertise regarding U.S. tax and other regulatory requirements.  To the extent that Defendants
and Arcesium provide Portfolio Accounting Software and Post-Trade Solutions to their
customers on a global scale, on information and belief, the relevant markets, market shares, and
market dynamics with respect to competition in the United States discussed herein apply to the
same extent worldwide.

### *Arcesium And The Arcesium Platform*

25.     Founded in 2015, Arcesium is the owner, licensor, and developer of a proprietary
technology and software platform (the "Arcesium Platform").

26.     Complex Funds and Fund Administrators contract with Arcesium for its middle-
and back-office Post-Trade Solutions.  The Arcesium Platform is a comprehensive and fully-
integrated technology and software platform designed to solve the Post-Trade Task challenges
faced by Complex Funds and Fund Administrators.  The Arcesium Platform offers a real-time
integration with order management systems and automated oversight of third-party
administrators, among other services.  Arcesium's proprietary software is configured to integrate
with an individual customer's existing systems and infrastructure to offer customers a unified
solution for their entire post-trade process.

27.     The Arcesium Platform is designed to handle all Post-Trade Tasks other than the
accounting function for customers.  In 2015, Arcesium partnered with Advent to license
Advent's portfolio accounting software, Geneva; this meant Arcesium could offer a single,
integrated solution where Portfolio Accounting Software (and the critical accounting data it

housed) was deployed alongside, and seamlessly integrated with, the Arcesium Platform to handle all aspects of the customer's Post-Trade Task needs. Arcesium sought this partnership with Advent since Advent was the industry's leading provider of Portfolio Accounting Software, and its Geneva software had become an industry standard.

28.     The Arcesium Platform can draw on the customer's information and data stored in Portfolio Accounting Software to rapidly provide customers with information and reports regarding the customer's investment positions that cannot be generated without the Arcesium Platform. The Arcesium Platform offers customers a unique and highly-valuable solution for their Post-Trade Tasks that far exceeds the capabilities and functionality of Portfolio Accounting Software like Geneva alone. Numerous Arcesium customers that previously relied on Geneva alone chose to contract with Arcesium to host, manage, and make the Geneva software available as part of the Arcesium Platform, from facilities that Arcesium owned or controlled.

29.     Unlike Geneva, which most customers use solely for its accounting function, Arcesium delivers critical information within its environment and across its customers' post-trade ecosystems in a reliable, consistent, and completely transparent way. By creating a single, authoritative source, Arcesium eliminates inconsistencies between disparate systems, uncertainties about which is the "right" data, and the need for customers to maintain large in-house teams to manage their information and run reconciliations across different business segments or functions.

30.     Arcesium also offers a variety of other solutions and optimizations that Geneva users seek. For example, Geneva requires specific methods of data input, which make it difficult for Geneva to handle high volumes of data efficiently. As another example, firms with multiple

sources of data that need to be booked into their accounting systems struggle with converting that data into the highly specific formats required by Geneva.

31.     Arcesium solves these problems.  The Arcesium Platform automates the process of inputting and retrieving bulk data into and from Geneva.  Arcesium's solutions also are able to access stored data instantaneously and calculate critical data sets in real time, eliminating the reliance on slow accounting runs (like those run by Geneva) for time-sensitive information.

32.     Arcesium's solutions allow its customers to reduce operational burdens and drive efficiencies, which leads to a reduction in operational costs.

33.     The enhanced and complex capabilities of Arcesium make it a natural option for the most complex and sophisticated customers.  Arcesium's solutions are designed to work with and around Defendants' Geneva software (or other Portfolio Accounting Software) to solve problems that arise for firms with high transaction volumes, complex asset classes, a large number of interrelated trading entities and strategies, multiple sources of inbound data, and a large number of diverse financing agreements.  For this reason, Arcesium's target customers are typically Complex Funds and Fund Administrators.

### *Defendants' Market Dominance*

34.     Founded in 1983 and publicly traded since 1995, Advent had, by late 2014 and early 2015, become a dominant provider of Post-Trade Solutions.

35.     Advent has been owned since 2015 by SS&C, the world's largest administrator for hedge funds and private equity funds and leading provider of Post-Trade Solutions.  SS&C offers a full range of software and outsourcing solutions across securities accounting, front-to-back office operations, performance and risk analytics, regulatory reporting, and healthcare information processes.  SS&C dominates, controls, manages, and operates Advent to the extent

that there is a unity of interest between the parties and Advent is SS&C's alter ego.  SS&C is using its alter ego as an instrumentality or conduit to accomplish its own anticompetitive objectives.

36.     SS&C has, through acquisitive and unlawful behavior, sought to expand its control and dominance to all aspects of the post-trade technology environment.  Indeed, SS&C has boasted of its Geneva acquisition:  "We . . . now own the means of production for our service level that we really jealously guard . . . because that's the bedrock of everything we do."[6]  SS&C's CEO has boasted that SS&C's acquisitions have positioned it "to dominate in the markets we chose."[7]

37.     Advent's Portfolio Accounting Software, Geneva, is widely used by asset managers for accounting functions and has become the industry standard for portfolio accounting.  Through Geneva, accounting is performed, trades are processed, dividend and interest accruals are calculated, income is paid, costs are amortized, securities are priced, corporate actions are processed, and portfolio performance is calculated.  In exchange for license fees, Advent provides "license keys"—essentially passcodes—required to enable access to Geneva's various functions.

38.     Through Geneva, Defendants dominate the market for Portfolio Accounting Software.  Many Complex Funds and Fund Administrators strongly prefer to use Geneva as their Portfolio Accounting Software.  Indeed, most of Arcesium's customers rely on Geneva to maintain their portfolio accounting data.

---

[6] *See* SS&C July 29, 2015 Q2 2015 Earnings Call, available at
https://t1se.thomsonone.com/eventcapsule/eventcapsule.aspx?m=t&cid=116983&eid=5763270&source=undefined
&search=&stype=iPhrase (last visited June 7, 2020).

[7] *See* SS&C Aug. 9, 2012 Q2 2012 Earnings Call, available at
https://t1se.thomsonone.com/eventcapsule/eventcapsule.aspx?m=t&cid=116983&eid=4868664&source=undefined
&search=&stype=iPhrase (last visited June 7, 2020).

39.     Complex Funds may use Geneva either through a license of their own, or through a license acquired by the Fund Administrator or Post-Trade Solutions provider that they use. Approximately 70% of Complex Funds have a license for Geneva and approximately 70% of the top 20 Fund Administrators use Geneva.[8]

40.     Defendants' dominance of Portfolio Accounting Software is not limited to the Geneva product.  Defendants also offer additional Portfolio Accounting Software separate from Geneva, including Advent Axys, Advent Portfolio Exchange, HiPortfolio, PORTIA, and Global Wealth Platform.  These platforms increase and enhance Defendants' share and power in the market for Portfolio Accounting Software.

41.     Geneva users cannot easily switch to different Portfolio Accounting Software. Because Geneva is integrated into its users' systems, it is extremely expensive, time-consuming and disruptive to replace it.  A customer seeking to transition to new Portfolio Accounting Software may take more than one year and hundreds of thousands of dollars to convert its internal systems over to another system.  The transition also may interrupt a customer's access to other systems and Post-Trade Solutions that it relies upon on a daily basis.  As SS&C openly touts, these "high conversion costs can create barriers to adoption of new products or technologies."[9]  These switching costs create substantial barriers to entry and expansion for potential competitors of Defendants.  Geneva customers faced with price increases implemented by Defendants must choose either to pay the substantially higher prices for Geneva or to incur

---

[8] Hedge Fund Alert, Top Administrators of Single-Manager Hedge Funds, May 8 2019, available at https://www.hfalert.com/rankings/rankings.pl?Q=116 (last visited June 7, 2020).  According to 2019 rankings prepared by Hedge Fund Alert, these top 20 fund administrators account for 90% of assets under management by fund administrators. *Id*.
[9] SS&C Form 10-K for the Fiscal Year Ended December 31, 2019, at 15, available at http://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_SSNC_2019.pdf (last visited June 7).

business disruption and hundreds of thousands of dollars in switching costs to transition to another accounting software solution.

42.     The severity of switching costs allows Defendants to charge top dollar for Geneva.  Defendants' published financials bear this out:  Since Defendants' 2015 acquisition, Advent's EBITDA margin increased from 36% to 50%—a higher margin than Google or Facebook.

43.     Defendants possess market power and/or monopoly power in the Portfolio Accounting Software market.  Defendants have the power to control prices, diminish output, and exclude competition in the Portfolio Accounting Software market, as evidenced by the following, described further herein:  (i) Defendants' dominant market share in the Portfolio Accounting Software market; (ii) the barriers to entry in the Portfolio Accounting Software market, including high switching costs; (iii) Defendants' unjustified non-renewal and subsequent breach of the 2015 Agreement; (iv) Defendants' refusal to honor their contractual obligations relating to Arcesium's Continuation Rights; (v)  Defendants' purported termination of Arcesium's ability to use Geneva to aid its customers; and/or (vi) Defendants' coercion of customers not to do business with Arcesium through exclusionary contracts and arrangements.

44.     In addition to their Portfolio Accounting Software, Defendants offer a host of other Post-Trade Solutions through various business lines, including software and outsourcing solutions.  These include the Post-Trade Solutions provided by SS&C GlobeOp, a fund administrator offering financial technology products and services, as well as Defendants' Recon and Evare products, among others.  Defendants also seek to eliminate competition through acquisition, including 17 "strategic and complementary acquisitions" in the past 5 years.[10]

---

[10] SS&C Acquisitions, https://www.ssctech.com/about-us/acquisitions.

45.     Defendants are the largest provider of Post-Trade Solutions in the United States, and their Post-Trade Solutions control a predominant share of the market.  GlobeOp boasts that it is the "industry's largest fund administrator," and Defendants' other Post-Trade Solutions (including Geneva) saturate the market.  Defendants offer a range of solutions, and in some cases, more than one solution to the same customer.  As one industry commentator interviewing SS&C's CEO put it:  "everybody that I talked to said you can't get away from paying SS&C. You're now the #1 market share leader."[11]

46.     In addition to Arcesium's head-to-head competition with Defendants, Fund Administrators pair with Arcesium to compete against SS&C's wholly owned fund administrator firm, GlobeOp.  These Fund Administrators team up with Arcesium to make themselves a more attractive, competitive option than GlobeOp for Complex Funds.  Access to Arcesium's enhanced capabilities enables these Fund Administrators to compete with Defendants in offering customers Post-Trade Solutions.  As described herein, Defendants' anticompetitive behavior seeks, among other things, to prevent direct competition from Arcesium, and competition from Fund Administrators supported by Arcesium.

47.     Defendants possess market power and/or monopoly power in the Post-Trade Solutions market, and the above-described layers of competition only serve to enhance Defendants' power within that market.  Defendants have the power to control prices, diminish output, and exclude competition in the Post-Trade Solutions market, as evidenced by the following conduct, described further herein:  To compete in the market for Post-Trade Solutions, firms like Arcesium require access to Portfolio Accounting Software like Geneva.  Defendants can and do (i) deny competing providers of Post-Trade Solutions the ability to integrate with or

---

[11] Transcript, SS&C Technologies Holdings Inc. at Credit Suisse Technology, Media and Telecom Conference, Nov. 29, 2017.

draw on the accounting data in Geneva in providing those solutions; (ii) restrict or prevent Complex Funds from allowing Geneva to be integrated with a third party's Post-Trade Solutions; and (iii) restrict or prevent Fund Administrators from using Post-Trade Solutions that draw on Geneva in furtherance of their services to Complex Funds.  In addition, Defendants maintain a dominant market share in the Post-Trade Solutions market, which is further enhanced and fortified by barriers to entry, including high switching costs, which can make it extremely expensive, time-consuming, and disruptive to replace Post-Trade Solutions.

48.     Defendants' ownership of Geneva means that companies seeking to compete with Defendants' Post-Trade Solutions would have to deal with their largest competitor in order to license Geneva, creating a barrier to entry into the relevant market.  Such control provides Defendants the ability to withhold access to Geneva's software to foreclose competition from other providers of Post-Trade Solutions like Arcesium.  Defendants' conduct restricts (a) Post-Trade Solutions providers from competing for business from Complex Funds and Fund Administrators, and (b) Fund Administrators and Arcesium from jointly competing against GlobeOp for business from Complex Funds.

49.     Defendants' significant offerings and entrenchment in the markets for Portfolio Accounting Software and Post-Trade Solutions afford them monopoly and/or market power in each market.

### The 2015 Agreement: Arcesium Gains The Right To Sell Advent's Geneva Software To Arcesium's Customers, Including Broad Continuation Rights For The Use Of Geneva If The Agreement Ends

50.     In March 2015, Arcesium and Advent entered into the 2015 Agreement, after negotiations in New York between Arcesium and Advent representatives.  During negotiations, but before the 2015 Agreement was signed, SS&C announced its intention to acquire Advent.

17

Both Defendants knew at the time the 2015 Agreement was signed that Arcesium would use the Geneva software in offering Arcesium's products and solutions to asset manager customers.

51.     Sections 3.1 and 3.2 of the 2015 Agreement provide Arcesium the license to use the Geneva software as necessary to host and manage it on behalf of Arcesium's customers.  In relevant part, the 2015 Agreement provides Arcesium with a license to "to load, install, access, execute, perform, display, view, store and otherwise use the Products, in object code form only, on hardware and other equipment owned or contractually controlled by Reseller at or from any Reseller or Authorized Vendor site or data center."  These rights include the ability of Arcesium to create "production, test, development . . . and such other environments as are reasonably necessary to provide access to" Geneva to customers.

52.     To access both the customers' production copies and development copies of Geneva, Arcesium utilizes license keys.  Arcesium's separate development license keys enable use of the software in a technical environment that is separate from the various customers' production environments.  This ensures that the customers' data is unaffected by the testing work that Arcesium performs in conducting development work.  Without the development license keys, Arcesium cannot access the development copies, and cannot service its customers in the manner they demand and require.  Without the customer production license keys, neither Arcesium nor the customer itself can use the Geneva production environments (i.e., the customer's actual copy of Geneva and the data within).

53.     Since the 2015 Agreement took effect, Arcesium regularly and accurately represented itself as an authorized reseller of the Geneva software, routinely choosing to promote Geneva over other Portfolio Accounting Software.  The 2015 Agreement was profitable for

Advent too, which earned millions of dollars in licensing fees without incurring additional marketing expense.

54.     The 2015 Agreement provided for an Initial Term of five years ending on January 10, 2020.  It also provided for automatic renewal for successive one-year terms unless either party provides 90 days' notice of non-renewal, or terminates for cause.

55.     Crucially, under the 2015 Agreement, Arcesium (and by extension, its customers) enjoys robust Continuation Rights regardless of whether the 2015 Agreement simply expires or is terminated for cause.  In the case of non-renewal, or if Arcesium terminates due to a breach by Defendants, then "***Customers with a then-existing Customer Agreement with [Arcesium] (a 'Current Customer') may continue to use the Product(s) pursuant to the terms of their Customer Agreement and this Agreement for the duration of the initial term and any renewal term of such Customer Agreement***" and "***Advent shall continue to provide Support Services pursuant to the terms of this Agreement for all Current Customers for the duration of the initial term and any renewal term of such Customer Agreements***." (emphases added).

56.     The provision that Continuation Rights continue for "any renewal term" of such Customer Agreement was and is a key element for which Arcesium successfully bargained, and to which Advent agreed, in 2015.  This provision requires that Arcesium's and its customers' access to Geneva continue without limitation beyond the term of the 2015 Agreement, for so long as Arcesium continues to pay applicable license fees to Advent.  The Continuation Rights provision also stated that, following the expiration or termination of the 2015 Agreement, Arcesium would be precluded from "promoting, marketing or offering to sell" Geneva while the Continuation Rights remained in place for Arcesium's then-existing customers.

19

57.     The 2015 Agreement further provides that if Defendants terminate the 2015 Agreement due to a material breach by Arcesium, then the Continuation Rights are essentially the same, except that the Continuation Rights last only for the current term of the customer's contract with Arcesium plus "the first annual unilateral auto-renew" by the customer.

58.     Each customer that obtains a license for Geneva through Arcesium also signs an ordering document (the "Ordering Document").  The 2015 Agreement provides that, if an "Ordering Document . . . expires for any reason," the customer enjoys Continuation Rights so long as it maintains a customer agreement with Arcesium.  This provision ensures that each customer that obtains its Geneva license through Arcesium will not have their businesses disrupted even if that customer's individual Ordering Document (as opposed to the 2015 Agreement in its entirety) ends for any reason.

59.     The Continuation Rights thus require Advent, upon Arcesium's payment of the applicable fees, to issue to Arcesium the license keys that Arcesium needs to continue operating the software on behalf of its customers.  The Continuation Rights also require Advent to maintain support for Geneva, including through a support portal that Arcesium uses to log support requests on behalf of its customers.  Nowhere in the 2015 Agreement is Advent granted any authority to simply terminate the Continuation Rights.

60.     These Continuation Rights are critical to Arcesium, its customers, and the market because changing Portfolio Accounting Software is a complex, time-consuming process, typically requiring at least a full year of lead time.

61.     The 2015 Agreement is governed by New York law, and provides that if one party materially breaches any provision, the aggrieved party must provide written notice of the breach and allow a 30-day cure period prior to terminating the 2015 Agreement.

62.    In the 2015 Agreement, Arcesium bargained for the right to get a court order requiring specific performance by Advent.  Section 17.12 specifies that "any violation or threatened violation of Section 3 (License)," among other sections, "may cause irreparable injury to the other Party for which monetary damages may not be an adequate remedy and that each party will be entitled to seek injunctive relief in addition to any other damages or equitable relief for any breach of the above."

### Defendants Declare They Will Let The 2015 Agreement Expire, Then Demand Oppressive And Anticompetitive Terms To Renew It And Impede Arcesium's Efforts To Compete

63. From March 2015 until late 2019, Defendants maintained their licensing relationship with Arcesium as a voluntary and profitable course of conduct.  During that time, Arcesium's customers and Arcesium depended on the functionality provided by Geneva for their day-to-day business.

64.    Nonetheless, on October 1, 2019, with the Initial Term of the 2015 Agreement set to expire in January 2020, Defendants provided notice of non-renewal to Arcesium, with a stated expiration date of January 10, 2020.

65.    Arcesium then attempted good-faith negotiation of renewal terms with Defendants.  Although Defendants purported to be willing to renegotiate a renewal of the 2015 Agreement, their proposed renewal was conditioned on Arcesium agreeing to contractual obligations that would have been impossible for it to fulfill.

66.    Specifically, Defendants conditioned renewal of the 2015 Agreement on an interrelated series of predatory terms that worked in concert to effectively take Arcesium out of the marketplace, while still guaranteeing SS&C millions of dollars in payments that would have to come from Arcesium's own coffers, rather than as proceeds of Geneva re-sales:

a.      that Arcesium refrain from marketing its services to any current customer of Advent or its affiliates, including SS&C; and

b.      that Arcesium refrain from marketing Geneva to service providers, including fund administrators and prime brokers.

67.      Taken together, the practical effect of these terms was that Arcesium would have to surpass historic Geneva re-sale volumes by at least 100%, do so while marketing only to a small fraction of its original potential customer base, and all while suffering dramatic revenue reduction caused by the Defendants' narrowing of the market for Arcesium's own offerings.

68.      Given Defendants' ubiquitous presence in the market, the renewal terms Defendants sought to impose would have operated to foreclose Arcesium from working with nearly all of its potential customers, while still requiring Arcesium to pay supracompetitive royalties.

69.      Arcesium is not the only target of Defendants' predatory behavior.  SEI Global Services, Inc. ("SEI"), a direct competitor of SS&C, recently filed a complaint alleging Defendants' improper termination of SEI's Geneva license as part of an anticompetitive effort to eliminate competition from Fund Administrator SEI.  *See* Am. Compl., *SEI Global Services, Inc. v. SS&C Advent & SS&C Technologies Holdings, Inc.*, No. 20-cv-01148-CFK (E.D. Pa. filed May 14, 2020).  The allegations in the SEI complaint—including Defendants' abrupt termination of a preexisting profitable contractual relationship and offer to renegotiate a contract renewal on draconian terms, including a 40%+ increase in rates—indicate that Defendants are employing the same pretextual and anticompetitive conduct in support of their domination of and attempts to further dominate the Relevant Markets.

22

70.     Like SEI, Arcesium rejected Defendants' one-sided renewal terms, and the 2015 Agreement expired on January 10, 2020.

71.     By refusing to renew the 2015 Agreement and terminating the Continuation Rights, Defendants will forego profits they receive from license fees paid under the 2015 Agreement and the additional customers that Arcesium's marketing of Geneva yields, in order to achieve an anticompetitive end; suppressing the competition Defendants face from Arcesium's superior products by foreclosing Arcesium from access to customers in the market for Post-Trade Solutions.  Upon information and belief, Defendants' actions are motivated by an intent to obtain or maintain market or monopoly power in the Relevant Markets.

72.     Left unchecked, Defendants' conduct will further their market and/or monopoly power in the Relevant Markets, with Defendants having the ability to impose anticompetitive price increases on their customers, while reducing the quality of Post-Trade Solutions available to customers by denying customers access to Arcesium's unique offering.  Last fall, shortly after issuing its notice of non-renewal of the 2015 Agreement to Arcesium, SS&C indicated on an earnings call that it expected to accelerate growth of its core business to "over 6% in Q4," as a result of, among other things, "going through our entire client base . . . about prices increases and making sure that . . . we can maximize our opportunity in our current client base . . . ."[12]  During its February 12, 2020 earnings call, SS&C stated that "the biggest opportunity for [price increases] is in some of our outsourcing businesses, where we haven't in the past been as diligent, so that includes funds, services and others."[13]  In its most recent regulatory filings, Defendants acknowledged their intention to "increase revenues generated by acquired products

---

[12] *See* SS&C November 1, 2019 Q3 2019 Earnings Call, available at https://seekingalpha.com/article/4301301-ss-and-c-technologies-holdings-inc-ssnc-ceo-bill-stone-on-q3-2019-results-earnings-call.
[13] *See* SS&C February 12, 2020 Q4 2019 Earnings Call, available at https://seekingalpha.com/article/4323712-ss-and-c-technologies-holdings-ssnc-ceo-bill-stone-on-q4-2019-results-earnings-call.

and services by leveraging our existing products and services, larger sales capabilities and client base."[14]

73.     Separate from Defendants' anticompetitive refusal to deal with Arcesium, Defendants also have entered into and/or proposed contracts, agreements, or other arrangements with their customers—both Complex Funds and Fund Administrators—restricting (i) the purposes for which these customers can use Geneva, (ii) the third parties with whom the customers can utilize the software, and (iii) the methods that customers may use to integrate other software with Geneva.  As explained below, these contracts, agreements, or other arrangements have included:

- conditioning Firm A's  access to Geneva on Arcesium not "having any role that would allow them to access, use, interface with, create derivative works from, or modify derivative works based on Geneva"; [15]

- upon information and belief, including restrictions in Firm B's license to use Geneva that bar Arcesium or another competitor of Defendants from using Geneva for the purposes of providing middle-office solutions; and

- upon information and belief, informing another Geneva licensee, Firm C, that it could not work with Arcesium.

As a result of Defendants' conduct, Arcesium has lost potential contracts and business.

74.     Firm A is a prospective customer of Arcesium that expressed interest in using Geneva in combination with Arcesium's products.  In response, Arcesium informed Firm A that it was no longer an authorized reseller of Geneva, that any arrangement whereby Arcesium supported a Geneva instance for the customer would require Advent's approval, and that it

---

[14] SS&C Form 10-K for the Fiscal Year Ended December 31, 2019, at 8, available at
http://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_SSNC_2019.pdf (last visited June 7, 2020).
[15] The names of Firm A and certain other Arcesium customers are omitted from this Complaint for reasons of business confidentiality.  Once an appropriate protective order is in place, Arcesium is prepared either (1) to produce in discovery the names of those firms whose names have been redacted, or (2) to file under seal a version of the Complaint that includes the names of the firms redacted here.

therefore should speak with its parent company (which already had a license for the Geneva software) and/or directly with Defendants about obtaining a license for the Geneva software.

75.     Firm A contacted Defendants directly regarding an Arcesium solution that would include a license for the Geneva software.  In response, Defendants informed Firm A that they would deny Firm A all means of using Geneva unless Firm A stopped working with Arcesium. Defendants specifically stated that they could not approve of Arcesium "having any role that would allow them to access, use, interface with, create derivative works from, or modify derivative works based on Geneva."

76.     Despite Defendants' anticompetitive conduct, including their intentional and malicious interference with Arcesium's prospective customer relationships, Arcesium attempted to pursue a business solution with Defendants rather than immediately seek a legal remedy.  An Arcesium executive contacted an Advent executive in a good-faith effort to discuss referrals and "one-off" arrangements that the companies could employ as they moved forward doing business independent of one another.  This good-faith effort by Arcesium even included introducing the Chief Operating Officer of Firm A to SS&C in order to facilitate a direct relationship between Defendants and the prospective customer, but Defendants have refused to deal with Arcesium.

77.     This was not the first time that Defendants attempted to coerce prospective customers not to select Arcesium for their Post-Trade Solutions needs.  In August 2018, when Arcesium was negotiating with Firm B, Firm B reviewed its Geneva contracts before engaging Arcesium.  Firm B subsequently informed Arcesium that its contract with Defendants included a broad restriction on using Geneva for the purpose of providing middle-office solutions—the precise products and solutions offered by Arcesium.  Concerned about the implications of breaching its contracts with Defendants, Firm B declined to engage Arcesium.

25

78.     Similarly, beginning in the last quarter of 2018, Arcesium was engaged in discussions with Firm C regarding Arcesium's Post-Trade Solutions.  Firm C used Geneva, but did not have an enterprise license that would have allowed it to run its own instance of Geneva in order to use Arcesium.  Upon information and belief, Firm C approached Defendants about pricing to obtain such a license and was told that Defendants would not grant Firm C a license to host with Arcesium, and that Defendants intended to cancel Arcesium's contract when it was up for renewal in 2020.  Ultimately Firm C did not engage Arcesium.

79.     Separately, when Firm D wanted to purchase Geneva through Arcesium as a reseller, Defendants claimed that Firm D did not fit within the types of customers covered by the 2015 Agreement's license fee schedule, and instead sought to charge Arcesium supracompetitive prices for the license.  Arcesium was forced to agree to the supracompetitive prices in order to win the Firm D account.  As a result, Arcesium now pays more for Firm D's Geneva license than the amount of annual gross revenue that Arcesium earns from the Firm D account.

80.     Defendants' exclusionary agreements or arrangements actually and/or effectively prohibit customers from dealing completely or in significant part with Arcesium.  In addition to the above, Defendants have entered into and/or demanded similar exclusive dealing arrangements with other Complex Funds and Fund Administrators, including terms that explicitly state that licensees shall not allow Arcesium to access Geneva or any Geneva API or intellectual property, directly or indirectly.

81.     Defendants' actions were part of their larger scheme to dismantle Arcesium's business.  They were made for the sole purpose of inflicting harm on Arcesium and restricting Arcesium's ability to compete with Defendants.  Defendants, through their exclusionary conduct, have substantially foreclosed, and will foreclose, Arcesium from the Post-Trade Solutions

market.  Defendants' conduct improperly has caused and will continue to cause customers to cease or refrain from dealing with, or restrict purchases from, Defendants' competitors, including Arcesium.  Defendants' termination of Arcesium's Continuation Rights and Defendants' exclusive dealing agreements will cause Arcesium to lose the majority of its customers and would preclude Arcesium's access to at least 60-70% of the relevant markets for Post-Trade Solutions.

82.     As a result of the exclusive dealing contracts and arrangements described above, the following has occurred:

a.     Arcesium has lost significant business from potential customers, who have terminated negotiations of a relationship and/or contract with Arcesium; and

b.     Arcesium is informed and believes, and on that basis, alleges, that if Defendants' exclusive dealing contracts, or exclusive dealing arrangements, or both, continue, Arcesium will lose additional business or be prevented from obtaining additional business.

83.     No legitimate business reason justifies Defendants' conduct.  Defendants did not engage in their conduct to increase output, enhance efficiency, lower prices, improve quality, or make the Relevant Markets more competitive.

84.     Defendants' actions will cause severe harm to competition and customers in the Relevant Markets, in the form of increased prices and diminished output.  Defendants' Post-Trade Solutions are inferior to Arcesium's.  Arcesium offers its customers a single accurate source for all of their most critical financial information and data (including portfolio accounting data) on a thoughtfully designed platform.  Arcesium's customers are able to obtain their accounting reports, operating reports, collateral reports, and more from a single source.  This

27

allows customers to save time that would be spent reconciling data within their own environments.  Arcesium ensures consistency against all other parts of a customer's post-trade data ecosystem, providing customers with efficiencies and confidence in their data.

### Defendants Purport To Terminate Arcesium's Continuation Rights, And Arcesium's Right To Support Its Own Customers

85.     Following Defendants' notice of non-renewal, and prior to January 10, Arcesium instructed its sales staff to cease all promotion and marketing of Geneva licenses.  Arcesium personnel were instructed to tell prospective customers that asked about Geneva that Arcesium cannot supply a Geneva license and that the customer should contact Defendants or another authorized seller of the software to acquire the requisite licenses and permissions.

86.     After the 2015 Agreement expired, Arcesium complied with these restrictions. Since January 10, if a prospective customer asked about Geneva or an Arcesium solution that involves interaction with Geneva, Arcesium has been careful not to claim that it has the ability to obtain or provide a license for Geneva.

87.     On April 13, 2020, Defendants sent Arcesium a letter on SS&C letterhead, falsely alleging that Arcesium had breached the 2015 Agreement "by continuing to market [Geneva] to multiple prospective Customers since the expiration of the Agreement."  Through this letter (the "'Termination' Letter"), Defendants purported to terminate "all" of Arcesium's rights under the 2015 Agreement, including the all-important Continuation Rights.  To this day, SS&C has failed to provide any details to support this assertion, because the assertion is meritless.[16]

88.     SS&C's "Termination" Letter arrived just ten days before the license keys for Arcesium's development copies of Geneva were set to expire.  Prior to April 13, 2020,

---

[16] Subsequent communications from Defendants to Arcesium came from SS&C on SS&C letterhead or on behalf of both SS&C and Advent, further demonstrating SS&C's domination and control of Advent.

Arcesium, to no avail, repeatedly had contacted Defendants seeking to obtain the renewed

license keys.  This repeated communication, and non-response from Defendants, was unusual;

since 2016, Defendants consistently had timely provided the requisite license keys.  This course

of conduct makes clear that, as early as March 2020, Defendants had decided to renege on

Arcesium's Continuation Rights.  The "Termination" Letter simply was a pretext to justify the

decision Defendants had already made.  To date, Defendants have refused to issue license keys

for Arcesium to unlock its development copies of Geneva.

89.     According to the "Termination" Letter, "[a]ll rights afforded to Arcesium under

the 2015 Agreement, including under section 3.1"—the core software licensing provision—"are

terminated."  The "Termination" Letter further stated that Arcesium's current customers "will be

permitted to continue to access and use [Geneva] strictly in accordance with the terms of the

Customer Agreements."  But, SS&C stated, "*this continued use is conditioned on Arcesium not*

*having any role in connection with servicing those customers or with a renewal or extension*

*of any such agreements*" (emphasis added).

90.     The "Termination" Letter was factually false.  Arcesium has diligently observed

the conditions of its Continuation Rights.  It has not marketed, promoted, or asserted a right to

sell Geneva since the 2015 Agreement expired on January 10, 2020.  Indeed, it would be foolish

and self-defeating for Arcesium to do so, since it could never consummate such a sale following

the expiration of its resale rights on January 10.

91.     The "Termination" Letter also was legally baseless in two respects:  first, it failed

to provide a required 30-day notice-and-cure period, and second, it purported to invent a harsh

and unsupported new remedy in the event of an uncured, material breach.  As to the first point,

if, as the letter claimed, Advent believed Arcesium had committed a "material breach,"  then

section 10.5 of the 2015 Agreement (which expressly survived the 2015 Agreement's expiration

in January 2020, and invoked the notice and cure provision of section 10.3) would govern the

parties' rights.  Section 10.5, in turn, refers to the process Advent must follow if it believes a

material breach has occurred:  it must provide written notice of the purported breach, and can

terminate only if Arcesium "fails to cure such breach within thirty (30) days following written

notice of such breach."  Defendants failed to provide proper notice or the contractually required

30-day cure period.

92.     Moreover, after receiving the "Termination" Letter, Arcesium—although it had

not breached—acted in an excess of caution to address the purported breach asserted by

Defendants in the "Termination" Letter.  Specifically, Arcesium reinforced its compliance with

the no-marketing aspect of the Continuation Rights by sending messages to its customers and

prospects, expressly reiterating that Arcesium had no right to offer them a new Geneva license

given the expiration of the 2015 Agreement.  Even accepting for argument's sake Defendants'

contention that there had been a breach, these messages and Arcesium's subsequent conduct

fully cured it.  Defendants accordingly are required to respect the Continuation Rights in full.

93.     As noted above, the "Termination" Letter was legally baseless in another

respect.  It purported to impose a harsh new limitation on Arcesium's Continuation Rights for the

alleged material breach:  that Arcesium "not hav[e] any role in connection with servicing [its]

customers or with a renewal or extension of any [customer] agreements."  This purported

limitation is itself a breach of contract, found nowhere in the 2015 Agreement but rather invented

by Defendants out of whole cloth as part of their anticompetitive strategy.  It has been part and

parcel of the 2015 Agreement since its inception that Arcesium would play an active role in

supporting its customers' instances of Geneva, including after any expiration or termination of

the 2015 Agreement.  The Continuation Rights were such a critical component of the 2015 Agreement that the parties agreed they would endure even if Arcesium breached (as Defendants now falsely claim it has).  If Arcesium had breached the 2015 Agreement (and it has not), then the Continuation Rights would continue only for the then-current term of the customer's contract with Arcesium plus "the first annual unilateral auto-renew" by the customer (typically one year).  This narrow limitation is the one and only remedy provided by the 2015 Agreement in the event that Arcesium breaches the contract and fails to timely cure the breach.

94.     Defendants also engaged in another form of self-help in direct contravention of their contractual obligations:  Within 24 hours of sending the "Termination" Letter, Defendants unilaterally shut off access to a support portal through which Arcesium submits help tickets when issues arise with Geneva.

### Defendants Make, Then Breach, An Agreement To Renew The Geneva License Of A Major Arcesium Customer

95.     Since sending the "Termination" Letter, Defendants also have made—and then broken—an agreement to continue the Geneva license of a major Arcesium customer, Firm E, pursuant to the Continuation Rights under the 2015 Agreement.  Firm E depends heavily on access to Geneva, via Arcesium, for the functionality and continuity of its core business operations.

96.     Agreements to renew a particular Arcesium's customer's Geneva license are customarily made via a simple exchange of emails between the Advent business team and the Arcesium business team.  On April 14, the Advent business team sent the Arcesium business team an email in the customary form, setting out pricing details and a proposed calendar term.  Advent stated in its email:  "***This offer*** is valid until 30 days prior to your contract renewal date.  If not accepted prior, ***this offer*** is null, and void and the renewal will assume current list price as

the next year's quote." (emphases added).  On April 15, 2020, Arcesium timely replied with a clear acceptance.

97.    Advent repeated the offer via a similar email on May 12, 2020, and Arcesium repeated its acceptance via reply email on May 13.  This second offer on May 12 was particularly notable because it came just one day after Defendants sent a letter to Arcesium stating, in relevant part, that they had not yet decided whether to renew Firm E's license key, and that they would be in touch with Arcesium regarding their decision.  The very next day, Defendants offered to renew Firm E's license key, and Arcesium promptly accepted that offer (together with the April 2020 renewal agreement, the "Firm E Renewal Agreement").

98.    Notwithstanding that Defendants' business team has twice offered to renew Firm E's license key (and Arcesium's business team has twice accepted), Defendants' lawyers have now disclaimed those contracts, claiming the most-recent offer to renew Firm E's license was both "automated" and "inadvertent."

99.    To date, Defendants have refused to issue renewed license keys for Firm E on the terms offered and accepted under the Firm E Renewal Agreement.  This constitutes not only a breach of the contract that Defendants have now twice formed with respect to Firm E, but also a breach of the Continuation Rights.  The Continuation Rights apply both to the overarching 2015 Agreement and any "Ordering Document," which is what Defendants renewed for Firm E.  That means that, so long as Firm E remains a client of Arcesium, it enjoys Continuation Rights to ensure that its access to Geneva is not disrupted.

100.    Firm E is not the only Arcesium customer at risk of losing its license keys—and thus access to critical data—in short order.  Firm F is another customer whose license keys soon will expire unless Defendants renew them.

101.    If SS&C and Advent continue to prohibit Arcesium from using Geneva, Arcesium and its customers will experience significant disruption and loss of income.  Loss of Arcesium's and its customers' access to the Geneva software would cause Arcesium to lose outright the majority of its existing customer revenue.  Because Geneva is so widely used, it also would foreclose Arcesium from servicing roughly 70% of potential Complex Fund customers and more than 60% of potential Fund Administrator customers.

**Causes Of Action**

**COUNT I**

*Violation Of Section 1 Of The Sherman Act, 15 U.S.C. § 1*

102.    Arcesium incorporates by reference all the preceding paragraphs.

103.    Defendants have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Defendants in the markets for Portfolio Accounting Software and Post-Trade Solutions, including through unlawful exclusive dealing arrangements with various customers, as alleged above.

104.    As alleged above, Defendants have induced or coerced various customers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and/or maintain monopoly power and/or market power for Defendants in the markets for Portfolio Accounting Software and Post-Trade Solutions.

105.    As alleged above, Defendants have conditioned the provision of their Portfolio Accounting Software over which they hold market and/or monopoly power on the condition that the customer will not engage Arcesium for Post-Trade Solutions.

106.    Defendants' exclusive dealing arrangements have and will have, in effect, substantially foreclosed channels of distribution that are necessary for Defendants' competitors, including Arcesium, to fully compete in the relevant market for Post-Trade Solutions.

107.    Defendants' conduct has had an anticompetitive effect in the relevant market for Post-Trade Solutions.

108.    Defendants possess market and/or monopoly power in the Relevant Markets. Defendants' product offerings—in particular, Advent's Geneva—are ubiquitous in the Portfolio

34

Accounting Software and Post-Trade Solutions markets.  As alleged above, Defendants' Geneva is used by approximately 70% of Complex Funds and more than 60% of Fund Administrators and Defendants' GlobeOp and related Post-Trade Solutions offerings are used by a substantial percentage of Complex Funds and Fund Administrators.

109.    Defendants have the power to control prices and exclude competition in the Relevant Markets, as evidenced, among other things, by their substantial market share and high barriers to entry in the Relevant Markets, by their ability to extract a supracompetitive price from Arcesium in connection with the Firm D account, by their non-renewal and termination of a long-term, profitable relationship with Arcesium, by their refusal to honor Arcesium's contractual Continuation Rights, and by their imposition of a new limitation on prospective and renewing Geneva customers that Arcesium not have any role in serving such customers.

110.    Defendants' exclusionary and anticompetitive conduct has had a substantial effect on interstate commerce.

111.    Defendants' exclusionary and anticompetitive conduct has harmed competition and injured consumer welfare by, among other things:

     a.     decreasing competition and the number of suppliers available to customers in the Post-Trade Solutions market;

     b.     decreasing the quality of products and solutions offered to Portfolio Accounting Software and Post-Trade Solutions customers, who are unable to take advantage of Arcesium's superior product offering;

     c.     substantially raising entry barriers;

     d.     substantially foreclosing Arcesium and other competitors from access to customers in the Relevant Markets;

     e.     denying customers full and fair competition in the Relevant Markets; and

     f.     enabling Defendants to obtain or maintain market and/or monopoly power in the relevant markets for Portfolio Accounting Software and Post-Trade Solutions.

112.    Defendants' exclusionary and anticompetitive conduct has injured Arcesium by, among other things:

     a.     foreclosing it from access to potential customers, substantially decreasing its business volume and revenue, and decreasing the profitability of its business;

     b.     substantially reducing present and future opportunities for Arcesium to engage with, market to, and obtain business from, prospective new customers;

     c.     decreasing the profitability and value of Arcesium's business; and

     d.     increasing Arcesium's costs.

113.    The exclusive dealing arrangements constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

114.    Defendants' conduct has no legitimate business purpose or procompetitive effect, and the anticompetitive effects of Defendants' exclusive dealing arrangements outweigh any purported procompetitive benefits.

115.    As a direct and proximate result of Defendants' violations of the antitrust laws as alleged herein, (1) customers have been deprived of the full benefits of competition in the Relevant Markets; (2) Arcesium has been injured in its business and property in an amount to be determined at trial; and (3) Arcesium has suffered and is threatened with continued loss or damage to its business and property.  Arcesium has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.

116.    Arcesium has no adequate remedy at law, and Defendants' unlawful conduct will continue unless enjoined.

## COUNT II
### *Violation Of Section 2 Of The Sherman Act, 15 U.S.C. § 2 (Monopolization)*

117.    Arcesium incorporates by reference all the preceding paragraphs.

118.    Defendants possess monopoly power in the market for Portfolio Accounting Software.  Defendants' product offerings—in particular, Advent's Geneva—dominate the Portfolio Accounting Software market.  As alleged above, Defendants' Geneva is used by approximately 70% of Complex Funds and more than 60% of Fund Administrators.

119.    Defendants have the power to control prices and exclude competition in the Portfolio Accounting Software market, as evidenced, among other things, by their substantial market share and high barriers to entry in the Relevant Markets, by their ability to extract a supracompetitive price from Arcesium in connection with the Firm D account, by their non-renewal and termination of a long-term, profitable relationship with Arcesium, by their refusal to provide Arcesium with its contractual Continuation Rights, and their imposition of a new limitation on prospective and renewing Geneva customers that Arcesium not have any role in serving such customers.

120.    Defendants' non-renewal of the 2015 Agreement and purported termination of the Continuation Rights constituted a unilateral decision to terminate Defendants' prior voluntary and profitable course of dealing with Arcesium.  By refusing to renew the 2015 Agreement and purporting to terminate the Continuation Rights, and denying Arcesium the ability to serve its customers with Geneva, Defendants will forego profits they would earn from the relationship with Arcesium and its customers, with no economic justification, in order to achieve their

anticompetitive end.  Defendants have willfully maintained their monopoly power in the Portfolio Accounting Software market.

121.    Defendants have further used their monopoly power in the market for Portfolio Accounting Software in a predatory, exclusionary, and anticompetitive manner to monopolize and exclude competitors from the market for Post-Trade Solutions, including, but not limited to, by means of exclusive dealing agreements and/or arrangements.

122.    In an attempt to eliminate competition from Arcesium, Defendants have entered into exclusive arrangements with customers on the condition that customers not use the solutions provided by Arcesium.  Upon information and belief, Defendants have conditioned the sale or use of a license for Geneva to a prospective customer, Firm A, on the customer's agreement to not use solutions provided by Arcesium, and conditioned contracts with Firm B and Firm C on those firms not doing business with Arcesium and/or other competitors.

123.    Through their anticompetitive conduct described herein, Defendants have willfully acquired and maintained their monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

124.    Defendants have engaged in these practices to (1) unlawfully maintain and enhance their monopoly in the Portfolio Accounting Software market and keep prices high; and (2) stifle competition and eliminate customer choice through exclusionary practices designed to keep Arcesium and other competitors from competing, or from operating with software and/or information needed to serve as viable competitors in the Relevant Markets.

125.    Defendants' exclusionary and anticompetitive conduct has had a substantial effect on interstate commerce.

126.   Defendants' exclusionary and anticompetitive conduct has harmed competition and injured consumer welfare by, among other things:

a.   decreasing competition and the suppliers available to customers in the Post-Trade Solutions market;

b.   decreasing the quality of products and solutions offered to customers in the Relevant Markets, who are unable to take advantage of Arcesium's superior product offering;

c.   substantially raising entry barriers;

d.   substantially foreclosing Arcesium and other competitors from access to customers in the Relevant Markets;

e.   denying customers full and fair competition in the Relevant Markets; and

f.   enabling Defendants to obtain or maintain market or monopoly power in the Relevant Markets.

127.   Defendants' exclusionary and anticompetitive conduct has injured Arcesium by, among other things:

a.   foreclosing it from access to potential customers, substantially decreasing its business volume and revenue, and decreasing the profitability of its business;

b.   substantially reducing present and future opportunities for Arcesium to engage with, market to, and obtain business, from prospective new customers;

c.   decreasing the profitability and value of Arcesium's business; and

d.   increasing Arcesium's costs.

128.   Defendants' conduct alleged in this Complaint constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Defendants' conduct has no legitimate

business purpose or procompetitive effect, and the anticompetitive effects of Defendants'
conduct outweigh any purported procompetitive benefits.

129.    As a direct and proximate effect of Defendants' exclusionary and anticompetitive
conduct as alleged here, (a) customers have been deprived of the full benefits of competition in
the Relevant Markets, and competition has been substantially lessened in the Relevant Markets;
(b) Arcesium has been injured in its business and property in an amount to be determined at trial;
and (c) Arcesium has suffered and is threatened with continued loss or damages to its business
and property.  Arcesium has suffered and will suffer injury of the type the antitrust laws were
designed to prevent.

130.    Arcesium has no adequate remedy at law, and Defendants' unlawful conduct will
continue unless enjoined.

### COUNT III
### *Violation Of Section 2 Of The Sherman Act, 15 U.S.C. § 2 (Attempted Monopolization)*

131.    Arcesium incorporates by reference all the preceding paragraphs.

132.    Defendants possess monopoly and/or market power in the market for Portfolio
Accounting Software.  Defendants' product offerings—in particular, Advent's Geneva—
dominate the Portfolio Accounting Software market.  As alleged above, Defendants' Geneva is
used by approximately 70% of Complex Funds and more than 60% of Fund Administrators.

133.    Defendants possess market power in the markets for Post-Trade Solutions.  Upon
information and belief, Defendants' Post-Trade Solutions offerings, including GlobeOp, are used
by a substantial percentage of Complex Funds and Fund Administrators.

134.    Defendants' power to control prices and exclude competition in the Relevant
Markets is evidenced, among other things, by their substantial market share and high barriers to
entry in the Relevant Markets, by their ability to extract a supracompetitive price from Arcesium

in connection with the Firm D account, by their non-renewal and termination of a long-term,

profitable relationship with Arcesium, by their refusal to provide Arcesium with its contractual

Continuation Rights, and their imposition of a new limitation on prospective and renewing

Geneva customers that Arcesium not have any role in serving such customers.

135.    Defendants engaged in conduct yielding anticompetitive effects in order to

(a) maintain and enhance their market power and to obtain or maintain monopoly power in the

Relevant Markets and keep prices high; and (b) stifle competition and eliminate customer choice

through exclusionary practices designed to keep Arcesium and other competitors and potential

competitors from competing, or operating with software and/or information needed to serve as

viable competitors in the Relevant Markets.

136.    Defendants have willfully, knowingly, intentionally, and with the specific intent

to do so, attempted to monopolize the markets for Portfolio Accounting Software and Post-Trade

Solutions.  This intent is demonstrated by Defendants' ending their long-term contract with

Arcesium without cause, their failure to honor their clear contractual obligations, their imposition

of a new limitation on prospective and renewing Geneva customers that Arcesium not have any

role in serving such customers, and their attempt to preclude Arcesium's current and prospective

customers from doing business with Arcesium.  Defendants have acted with the purpose of, and

the conscious objective of, acquiring the power to control price and exclude competition in the

Portfolio Accounting Software market and the Post-Trade Solutions market.

137.    Defendants' non-renewal of the 2015 Agreement and purported termination of the

Continuation Rights constituted a unilateral decision to terminate Defendants' prior voluntary

and profitable course of dealing with Arcesium.  By refusing to renew the 2015 Agreement and

purporting to terminate the Continuation Rights, Defendants will, with no economic justification,

41

forego profits that they would earn from the relationship and license fees with Arcesium and its customers, in order to achieve their anticompetitive end.

138.    Similarly, in an attempt to eliminate competition from Arcesium, Defendants have entered into exclusive arrangements with customers on the condition that customers not use the solutions provided by Arcesium.  Upon information and belief, Defendants have conditioned the sale or use of a license for Geneva to a prospective customer, Firm A, on the customer's agreement not to use solutions provided by Arcesium, and conditioned contracts with Firm B and Firm C on those firms not doing business with Arcesium and/or other competitors.

139.    There is a dangerous probability that Defendants will succeed in obtaining a monopoly and harming competition in the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

140.    Defendants' conduct alleged in this complaint constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

141.    Defendants' exclusionary and anticompetitive conduct has had a substantial effect on interstate commerce.

142.    Defendants' exclusionary and anticompetitive conduct has harmed competition and injured consumer welfare by, among other things:

        a.    decreasing competition and the suppliers available to customers in the Post-Trade Solutions market;

        b.    decreasing the quality of products and services to customers in the Relevant Markets;

        c.    substantially raising entry barriers in the Relevant Markets;

d.      substantially foreclosing Arcesium and other competitors from access to customers in the Relevant Markets;

e.      denying customers full and fair competition in the Relevant Markets; and

f.      enabling Defendants to obtain or maintain market or monopoly power in the Relevant Product Markets.

143.    Defendants' exclusionary and anticompetitive conduct has injured Arcesium by, among other things:

a.      foreclosing Arcesium from access to potential customers; substantially decreasing its business volume and revenue; and decreasing the profitability of its business;

b.      substantially reducing present and future opportunities for Arcesium to deal with customers in the Relevant Markets;

c.      decreasing the profitability and value of its business; and

d.      increasing Arcesium's costs.

144.    Defendants' conduct has no legitimate business purpose or procompetitive effect, and the anticompetitive effects of Defendants' anticompetitive behavior outweigh any purported procompetitive benefits.  Any possibility that any procompetitive effects would result from Defendants' conduct is nonexistent or remote.

145.    As a direct and proximate result of Defendants' violations of the antitrust laws as alleged herein (a) customers have been deprived of the full benefits of competition in the Relevant Markets; (b) Arcesium has been injured in its businesses and property in an amount to be determined at trial; and (c) Arcesium has suffered and is threatened with continued loss or

damage to its business and property.  Arcesium has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.

146.    Arcesium has no adequate remedy at law, and Defendants' unlawful conduct will continue unless enjoined.

**COUNT IV**
*Violation Of Section 3 Of The Clayton Act, 15 U.S.C. § 14*

147.    Arcesium incorporates by reference all the preceding paragraphs.

148.    Defendants have engaged in anticompetitive, predatory, and exclusionary behavior by ending their long-term 2015 Agreement with Arcesium without cause, by failing to honor their clear contractual obligations, and by attempting to preclude Arcesium's current and prospective customers from doing business with Arcesium.  Defendants have acted with the purpose, and the conscious objective, of acquiring and maintaining the power to control price and exclude competition in the Portfolio Accounting Software market and the Post-Trade Solutions market.

149.    Defendants possess market power and/or monopoly power in the Relevant Markets. Defendants' power to control prices and exclude competition in the Relevant Markets, is evidenced, among other things, by their substantial market share and high barriers to entry in the Relevant Markets, by their ability to extract a supracompetitive price from Arcesium in connection with the Firm D account, by their non-renewal and termination of a long-term, profitable relationship with Arcesium, by their refusal to provide Arcesium with its contractual Continuation Rights, and their imposition of a new limitation on prospective and renewing Geneva customers that Arcesium not have any role in serving such customers.

150.    Defendants' non-renewal of the 2015 Agreement and purported termination of the Continuation Rights constituted a unilateral decision to terminate Defendants' prior voluntary

and profitable course of dealing with Arcesium.  By refusing to renew the 2015 Agreement and
purporting to terminate the Continuation Rights, Defendants will, with no economic justification,
forego profits that they would earn from the relationship and license fees with Arcesium and its
customers, in order to achieve their anticompetitive end.

151.    Defendants have entered into exclusive dealing agreements relating to the
purchase of Portfolio Accounting Software and Post-Trade Solutions, in violation of Section 3 of
the Clayton Act, 15 U.S.C. § 14.

152.    Defendants' exclusive dealing arrangements have foreclosed and threaten to
foreclose a substantial amount of commerce in the Relevant Markets.

153.    Defendants' exclusive dealing arrangements have substantially lessened
competition in the Relevant Markets.

154.    The purpose of Defendants' unlawful exclusive dealing arrangements is to
eliminate, or at least substantially lessen, Defendants' competition in the Relevant Markets.

155.    Defendants' exclusionary and anticompetitive conduct has had a substantial effect
on interstate commerce.

156.    Defendants' exclusionary and anticompetitive conduct has harmed competition
and injured consumer welfare by, among other things:

a.    decreasing competition and the suppliers available to customers in the
Post-Trade Solutions market;

b.    decreasing the quality of products and solutions offered to customers in
the Relevant Markets, who are unable to take advantage of Arcesium's superior product
offering;

c.    substantially raising entry barriers;

45

d.      substantially foreclosing Arcesium and other competitors from access to customers in the Relevant Markets;

e.      denying customers full and fair competition in the Relevant Product Markets; and

f.      enabling Defendants to obtain or maintain monopoly power in the Relevant Markets.

157.   Defendants' exclusionary and anticompetitive conduct has injured Arcesium by, among other things:

a.      foreclosing Arcesium from access to potential customers, substantially decreasing its business volume and revenue, and decreasing the profitability of its business;

b.      substantially reducing present and future opportunities for Arcesium to engage with, market to, and obtain business from, prospective new customers;

c.      decreasing the profitability and value of Arcesium's business; and

d.      increasing Arcesium's costs.

158.   Defendants' conduct has no legitimate business purpose or procompetitive effect, and the anticompetitive effects of Defendants' exclusive dealing arrangements outweigh any purported procompetitive benefits.

159.   As a direct and proximate result of Defendants' violations of the antitrust laws as alleged herein, (1) customers have been deprived of the full benefits of competition in the Relevant Markets; (2) Arcesium has been injured in an amount to be determined at trial; and (3) Arcesium has suffered and is threatened with continuous loss or damage to its business and

property.  Arcesium has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.

160.    Arcesium has no adequate remedy at law, and Defendants' unlawful conduct will continue unless enjoined.

## COUNT V
### *Violation Of New York Donnelly Act, N.Y. Gen. Bus. Law. § 340*

161.    Arcesium incorporates by reference all the preceding paragraphs.

162.    Defendants have induced or coerced customers to enter into one or more contracts, agreements, arrangements, and/or combinations to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Defendants in the markets for Portfolio Accounting Software and Post-Trade Solutions, including through unlawful exclusive dealing arrangements with various customers, as alleged above, in violation of the Donnelly Act, New York General Business Law § 340.

163.    As alleged above, Defendants have conditioned the provision of their Portfolio Accounting Software over which they hold market and/or monopoly power on the condition that the customer will not engage Arcesium for Post-Trade Solutions.

164.    Defendants' exclusive dealing arrangements have and will have, in effect, substantially foreclosed channels of distribution that are necessary for Defendants' competitors, including Arcesium, to fully compete in the relevant market for Post-Trade Solutions.

165.    Defendants' conduct has had an anticompetitive effect in the relevant market for Post-Trade Solutions.

166.    Defendants possess market and/or monopoly power in the Relevant Markets. Defendants' product offerings—in particular, Advent's Geneva—are ubiquitous in the Portfolio Accounting Software and Post-Trade Solutions markets.  As alleged above, Defendants' Geneva

is used by approximately 70% of Complex Funds and more than 60% of Fund Administrators, and Defendants' GlobeOp and related Post-Trade Solutions offerings are used by a substantial percentage of Complex Funds and Fund Administrators.

167.    Defendants have the power to control prices and exclude competition in the Relevant Markets, as evidenced, among other things, by their substantial market share and high barriers to entry in the Relevant Markets, by their ability to extract a supracompetitive price from Arcesium in connection with the Firm D account, by their non-renewal and termination of a long-term, profitable relationship with Arcesium, by their refusal to honor Arcesium's contractual Continuation Rights, and by their imposition of a new limitation on prospective and renewing Geneva customers that Arcesium not have any role in serving such customers.

168.    Defendants' exclusionary and anticompetitive conduct has had a substantial effect on interstate commerce.

169.    Defendants' exclusionary and anticompetitive conduct has harmed competition and injured consumer welfare by, among other things:

a.      decreasing competition and the number of suppliers available to customers in the Post-Trade Solutions market;

b.      decreasing the quality of products and solutions offered to Portfolio Accounting Software and Post-Trade Solutions customers, who are unable to take advantage of Arcesium's superior product offering;

c.      substantially raising entry barriers;

d.      substantially foreclosing Arcesium and other competitors from access to customers in the Relevant Markets;

e.      denying customers full and fair competition in the Relevant Markets; and

48

f.      enabling Defendants to obtain or maintain market and/or monopoly power in the relevant markets for Portfolio Accounting Software and Post-Trade Solutions.

170.    Defendants' exclusionary and anticompetitive conduct has injured Arcesium by, among other things:

a.      foreclosing it from access to potential customers, substantially decreasing its business volume and revenue, and decreasing the profitability of its business;

b.      substantially reducing present and future opportunities for Arcesium to engage with, market to, and obtain business from, prospective new customers;

c.      decreasing the profitability and value of Arcesium's business; and

d.      increasing Arcesium's costs.

171.    Defendants' conduct has no legitimate business purpose or procompetitive effect, and the anticompetitive effects of Defendants' exclusive dealing arrangements outweigh any purported procompetitive benefits.

172.    As a direct and proximate result of Defendants' violations of the antitrust laws as alleged herein, (a) customers have been deprived of the full benefits of competition in the Relevant Markets; (b) Arcesium has been injured in its business and property in an amount to be determined at trial; and (c) Arcesium has suffered and is threatened with continued loss or damage to its business and property.  Arcesium has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.

173.    Arcesium has no adequate remedy at law, and Defendants' unlawful conduct will continue unless enjoined.

## COUNT VI
### *Breach Of Contract (2015 Agreement)*

174.     Arcesium incorporates by reference all the preceding paragraphs.

175.     The 2015 Agreement is a legal, valid, and enforceable contract with clear and definite terms, including the Continuation Rights, that have been accepted by both Arcesium and Defendants.

176.     The 2015 Agreement is supported by consideration.

177.     The 2015 Agreement is supported by mutuality of obligation and remedy between the parties.

178.     Arcesium has performed every obligation and condition required under the 2015 Agreement.

179.     Defendants have materially breached the 2015 Agreement by failing to provide Arcesium with the opportunity to cure any alleged breach of the 2015 Agreement.

180.     Defendants have materially breached the 2015 Agreement by failing to provide Arcesium with the Continuation Rights to which it is entitled under the 2015 Agreement. Specifically, Defendants have cut off their support to Arcesium related to the Geneva software and have refused to provide the license keys that are necessary for Arcesium and its customers to access the Geneva software.

181.     Defendants also have materially breached the 2015 Agreement by failing to honor the Continuation Rights with respect to Firm E.  In particular, the 2015 Agreement provides that, in the event Firm E's Ordering Document expires or is terminated, Firm E nevertheless retains the right to use Geneva for so long as it pays the applicable license fees.  Defendants' refusal to renew the license key of Firm E therefore constitutes a breach of the 2015 Agreement.

50

182.     Defendants' breaches of the 2015 Agreement are intentional, knowing, and material.

183.     There is no adequate remedy at law for Defendants' non-performance.  Section 17.12 of the 2015 Agreement reflects the parties' prior agreement that injunctive relief would be appropriate under the 2015 Agreement.  As a direct and proximate result of Defendants' non-performance under the 2015 Agreement, Arcesium will incur substantial and irreparable harm if the Court does not require Defendants' performance of contractual obligations, including, but not limited to:  (a) loss of and damage to Arcesium's reputation, customer goodwill, and loyalty; (b) Arcesium's loss of business opportunities, customers, and relationships; (c) Arcesium's loss of profits and competitive advantage; and (d) attorneys' fees and costs incurred by Arcesium in connection with this action.

184.     Unless the Court orders Defendants to provide support to Arcesium for the Geneva software and provide the license keys, Arcesium will continue to suffer irreparable harm and other damages.

185.     Defendants' breach has left Arcesium without support for, or access to, critical software needed to run its business and perform under the contracts it has with its many customers.

186.     Defendants have no basis to refuse to perform their obligations under the 2015 Agreement.

187.     As a direct and proximate result of Defendants' breach of the 2015 Agreement, Arcesium has incurred, and will continue to incur, significant losses, fees, and expenses, the exact amount of which will be determined at trial.

<u>COUNT VII</u>
*Breach Of Contract (Firm E Renewal Agreement)*

188.    Arcesium incorporates by reference all the preceding paragraphs.

189.    The Firm E Renewal Agreement is a legal, valid, and enforceable contract with clear and definite terms that have been accepted by both Arcesium and Defendants.

190.    The Firm E Renewal Agreement is supported by consideration.

191.    The Firm E Renewal Agreement is supported by mutuality of obligation and remedy between the parties.

192.    Arcesium has performed every obligation and condition required under the Firm E Renewal Agreement and remains ready, willing, and able to satisfy any further obligations or conditions under the Firm E Renewal Agreement.

193.    Defendants have materially breached the Firm E Renewal Agreement by disclaiming that they have any obligations under it, and by failing to provide Firm E with a renewed license key for the 2020-2021 renewal term.

194.    Defendants' breach of the Firm E Renewal Agreement is intentional, knowing, and material.

195.    There is no adequate remedy at law for Defendants' non-performance.

196.    Because the Firm E Renewal Agreement is made pursuant to and interrelated with the 2015 Agreement, it incorporates the remedial provisions of the 2015 Agreement, including the right to injunctive relief.  Unless the Court orders Defendants to provide support to Arcesium for the Geneva software and provide the license keys, Arcesium will continue to suffer irreparable harm and other damages.

197.    Defendants' breach of the Firm E Renewal Agreement has left Arcesium without support for, or access to, critical software needed to run its business and perform under the contracts it has with its many customers.

198.    Defendants have no basis to refuse to perform their obligations under the Firm E Renewal Agreement.

199.    As a direct and proximate result of Defendants' breach of the Firm E Renewal Agreement, Arcesium has incurred, and will continue to incur, significant losses, fees, and expenses, the exact amount of which will be determined at trial.

## COUNT VIII
### *Tortious Interference With Contract*

200.    Arcesium incorporates by reference all the preceding paragraphs.

201.    Arcesium has legal, valid, and enforceable contracts with its many customers to provide a wide variety of products and solutions, including hosting, managing, and making available software and products needed for portfolio accounting.

202.    Defendants have knowledge of the legal, valid, and enforceable contracts that Arcesium has with its many customers.  The 2015 Agreement explicitly contemplates that Arcesium will enter into contracts with its customers and provide licenses and/or other technological solutions for the Geneva software.

203.    Defendants acted intentionally and maliciously in cutting off support for the Geneva software and refusing Arcesium the license keys needed to access Geneva.  When Defendants cut off support for and access to the Geneva software, they knew that Arcesium would be unable to conduct its business and perform under the contracts that it has with its customers.  Defendants acted maliciously, cutting off support and access while knowing Arcesium would be significantly and irreparably harmed.

53

204.     Defendants' purposeful and malicious conduct has rendered Arcesium's performance impossible as it pertains to those customers who are covered by the Continuation Rights by precluding Arcesium from (1) fully servicing those customers and (2) performing under the terms of the contracts it has with those customers.

205.     As a direct and proximate result of Defendants' tortious and malicious interference with Arcesium's contractual relationships, Arcesium has incurred, and will continue to incur, significant losses, fees, and expenses, the exact amount of which will be determined at trial.

206.     Through their failure to honor the contractually protected Continuation Rights, Defendants have tortiously, knowingly, and maliciously interfered with Arcesium's contractual relationships with its customers.

## COUNT IX
### *Tortious Interference With Prospective Economic Advantage*

207.     Arcesium incorporates by reference all the preceding paragraphs.

208.     Arcesium has prospective contractual relations with many Complex Funds and Fund Administrators to provide a wide variety of solutions, including hosting, managing, and making available software and products needed for investment accounting.

209.     Defendants have knowledge of Arcesium's prospective customers.  In fact, the 2015 Agreement explicitly contemplates that Arcesium will enter into contracts with its customers and provide licenses and/or service for the Geneva software.

210.     Defendants intentionally and maliciously refused to allow prospective customers to obtain a license for the Geneva software unless the prospective customers agreed to no longer use any Arcesium product or solutions.

54

211.    Defendants have taken these extreme and unfair actions in furtherance of their unlawful scheme to eliminate their competitors, and for the sole purpose of inflicting intentional harm on Arcesium.

212.    As a direct and proximate result of Defendants' tortious and malicious interference with Arcesium's prospective customers, Arcesium has incurred, and will continue to incur, significant losses, fees, and expenses, the exact amount of which will be determined at trial.

## COUNT X
### *Unfair Competition And Unfair Trade Practices, N.Y. Gen. Bus. Law § 349*

213.    Arcesium incorporates by reference all the preceding paragraphs.

214.    Defendants have engaged in unfair competition and unfair trade practices in violation of section 349 of the New York General Business Law due to their anticompetitive behavior, including the non-renewal of the 2015 Agreement and termination of support for and access to Geneva, and breach of the 2015 Agreement.  Defendants' non-renewal of the 2015 Agreement and subsequent termination of support for and access to Geneva, and Defendants' imposition of a new limitation on prospective and renewing Geneva customers that Arcesium not have any role in serving such customers is unlawful, unfair, and/or fraudulent and was done with the intent to eliminate Arcesium as a competitor of Defendants.

215.    Arcesium has been, and will continue to be, directly harmed by Defendants' unlawful, unfair, and/or fraudulent actions.

216.    In addition, Arcesium's customers and other competitors of Defendants will be harmed.  The customers will have fewer choices in providers of Post-Trade Solutions.  Given Defendants' anticompetitive conduct toward Arcesium, Arcesium expects that other competitors will similarly fall victim to Defendants' conduct unless Defendants are restrained.

217.     As a direct and proximate result of Defendants' unlawful, unfair, and/or fraudulent conduct, Arcesium has incurred, and will continue to incur, significant losses, fees, and expenses, the exact amount of which will be determined at trial.

**Prayer For Relief**

WHEREFORE, Arcesium prays for judgment against Defendants as follows:

218.     Preliminary and permanent injunctive relief, pursuant to law and pursuant to the 2015 Agreement, including as follows:

    a.     enjoining Defendants from further breaching the 2015 Agreement;

    b.     requiring specific performance of the 2015 Agreement according to its terms;

    c.     enjoining Defendants from cutting off access to and support for Geneva, and requiring that all access and support that has been cut off be restored and continued;

    d.     requiring Defendants to provide any and all license keys required for Arcesium to access copies of Geneva in order to service its clients including, but not limited to, license keys for development and production environments;

    e.     enjoining Defendants from further breaching the Firm E Renewal Agreement;

    f.     requiring specific performance of the Firm E Renewal Agreement according to its terms; and

    g.     enjoining Defendants from interfering with Arcesium's relationships with its current customers, and with its efforts to land new customers.

219.     A declaration, pursuant to 8 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that Arcesium is not in breach of the 2015 Agreement.

56

220.     An award of compensatory and punitive damages, disgorgement of profits, attorneys' fees, and costs to Arcesium in connection with Defendants' claims, in amounts to be proven at trial.

221.     An award of treble damages in connection with Counts I through IV, pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a).

222.     An award of pre- and post-judgment interest.

223.     Such other and further relief as the Court deems just and proper.

## Jury Demand

Arcesium hereby demands a trial by jury of all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: June 9, 2020

Of Counsel:

GORDON REES SCULLY MANSUKHANI, LLP
Brian E. Middlebrook
Richard L. Green* (*pro hac vice* admission to be sought)
One Battery Park Plaza
28th Floor
New York, NY 10004
(212) 269-5500
bmiddlebrook@grsm.com
rlgreen@grsm.com

*Resident in Glastonbury, Connecticut office*

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:    *Jeremy Feigelson*

Jeremy Feigelson
James J. Pastore
Michael Schaper
Megan K. Bannigan
Erica S. Weisgerber
Pooja A. Boisture
Matthew J. Sorensen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jfeigelson@debevoise.com
jjpastore@debevoise.com
mschaper@debevoise.com
mkbannigan@debevoise.com
eweisgerber@debevoise.com
pboistur@debevoise.com
mjsorensen@debevoise.com

*Counsel for Plaintiff Arcesium LLC*