**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ARCESIUM LLC,

                        Plaintiff,

    v.

ADVENT SOFTWARE, INC. and SS&C
TECHNOLOGIES HOLDINGS, INC.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No: 1:20-cv-04389 (MKV)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**APPLICATION FOR AN ORDER TO SHOW CAUSE FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

    A. Geneva ................................................................................................................... 4

    B. Arcesium ................................................................................................................ 5

    C. Arcesium's Continuation Rights Under The 2015 Agreement ............................. 6

    D. Defendants' Non-Renewal Of The 2015 Agreement And Purported Termination Of the Continuation Rights. ....................................................................................... 8

    A. Defendants Agree To Renew The Geneva License For The Firm E Account, But Renege. ................................................................................................................. 10

    B. Defendants' Unlawful Behavior Threatens Arcesium's Business, Both Imminently And Long Term. ................................................................................................... 13

ARGUMENT ....................................................................................................................... 14

I.  The Court Should Grant Preliminary Relief Because Arcesium Is Likely To Succeed On Its Claim For Breach Of The 2015 Agreement. .................................................. 14

    A. Arcesium Performed Its Obligations Under The 2015 Agreement, Including Under The Continuation Rights. ....................................................................................... 15

        1. Arcesium Did Not Market Geneva After The 2015 Agreement Expired. .................. 15

        2. Even If The Was A Breach, It Was Not Material. ....................................................... 17

        3. Even If There Was A Breach, Arcesium Took Steps That Amounted To A Timely And Effective Cure ............................................................................................... 17

    B. Defendants Breached The 2015 Agreement. ....................................................... 18

II.  Arcesium Is Likely To Succeed On Its Claim For Breach of The Firm E Renewal Agreement. ................................................................................................................... 20

III. Arcesium Will Suffer Irreparable Harm Absent Immediate Injunctive Relief. ...................... 21

IV. The Equities Favor Arcesium And Injunctive Relief Is In The Public Interest. ..................... 24

V.  Arcesium Also Satisfies The Alternative Standard For Preliminary Relief. .......................... 25

CONCLUSION ..................................................................................................................... 25

**Cases**

*AIM v. Int'l Trading v. Valcucine,*
2002 WL 1285557 (S.D.N.Y. 2002)..........................................................................14, 24, 25

*AIM Int'l Trading v. Valcucine,*
188 F. Supp. 2d 384 (S.D.N.Y. 2002).....................................................................14

*Bank of Am. N.A. v. PSW NYC LLC,*
29 Misc. 3d 1216(A), (Sup. Ct. N.Y. Cty. 2010).....................................................22

*Bausch & Lomb v. Bressler,*
977 F.2d 720 (2d Cir. 1992).....................................................................................19

*BDCM Fund Adviser v. Zenni,*
103 A.D.3d 475 (1st Dep't 2013)............................................................................17

*Citigroup Global Mkts. v. VCG Special Opportunities Master Fund,*
598 F.3d 30 (2d Cir. 2010).......................................................................................25

*Derven v. PH Consulting,*
427 F. Supp. 2d 360 (S.D.N.Y. 2006).....................................................................21

*Filmline (Cross-Country) Prods. v. United Artists Corp.,*
865 F.2d 513 (2d Cir. 1989).....................................................................................19

*Frank Felix Assocs., v. Austin Drugs,*
111 F.3d 284 (2d Cir. 1997).....................................................................................17

*Interphoto Corp. v. Minolta Corp.,*
295 F. Supp. 711 (S.D.N.Y 1969)...........................................................................24

*Intertek Testing Servs., N.A., v. Pennisi,*
2020 WL 1129773 (E.D.N.Y. 2020).........................................................................14

*Kolchins v. Evolution Markets.,*
31 N.Y.3d 100 (2018)...........................................................................................20, 21

*Kolchins v. Evolution Markets,*
128 A.D.3d 47, 60 (1st Dep't 2015).........................................................................20

*L & L Wings v. Marco-Destin.,*
676 F. Supp. 2d 179 (S.D.N.Y. 2009)................................................................14, 20

*Nemer Jeep-Eagle v. Jeep-Eagle Sales,*
992 F.2d 430 (2d Cir. 1993).....................................................................................24

*Point Prods. A.G. v. Sony Music Entm't*,
    2000 WL 1006236 (S.D.N.Y. 2000)...................................................................18

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990)...............................................................23, 25

*Rex Medical L.P. v. Angiotech Pharms. (US)*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010)...........................................................25

*SVS, Inc. v. Rabbit Ears Prods., Inc.*,
    1992 WL 91183 (S.D.N.Y. 1991)...............................................................17

*Tom Doherty Assocs., Inc. v. Saban Ent'mt, Inc.*,
    60 F.3d 27 (2d Cir. 1995)....................................................................24

*Travellers Int'l A.G. v. Trans World Airlines*,
    722 F. Supp. 1087 (S.D.N.Y. 1989)............................................................14

*Ulla-Majia, Inc. v. Kivimaki*,
    2005 WL 2429490 (S.D.N.Y. 2005)...........................................................17

Plaintiff Arcesium LLC ("Arcesium") respectfully submits this memorandum in support of its application for an order to show cause for a temporary restraining order and preliminary injunction against Defendants Advent Software, Inc d/b/a SS&C Advent ("Advent") and SS&C Technologies Holdings, Inc. ("SS&C" and, together with Advent, "Defendants").

## PRELIMINARY STATEMENT

Arcesium seeks an order preserving its rights to continue to serve its customers during the pendency of this litigation. In order to maintain this status quo, Defendants must continue to provide Arcesium with software license keys that will enable Arcesium to access licensed copies of "Geneva," Defendants' business-critical accounting software.

Arcesium is a leading provider of outsourced support solutions to hedge funds and other asset managers ("Post-Trade Solutions"). Post-Trade Solutions allow hedge funds and their administrators to perform critical functions such as calculating fund and account level profit and losses, determining margin levels, and performing fund- and investment-level risk management. Under a reseller contract in place since 2015 (the "2015 Agreement"), Arcesium procured licenses to Geneva on behalf of its customers. Arcesium then integrated its own products with Geneva to provide a seamless suite of Post Trade Solutions to Arcesium's customers. Today, well over 90% of Arcesium's revenue comes from customers that have Geneva integrated into their Arcesium solutions.

In 2015, recognizing that its customers would come to rely on Geneva and that replacing Geneva would be enormously time-consuming and disruptive, Arcesium bargained for and received strong contractual rights for continued use of Geneva even if – and regardless of how – the 2015 Agreement ended (the "Continuation Rights"). As additional protection, the 2015 Agreement included a notice-and-cure process that required Defendants to provide Arcesium

notice of any alleged material breach and 30 days in which to cure it. The parties also specifically agreed there would be a right to injunctive relief in any disputes about Arcesium's license rights to use Geneva to support its clients.

Arcesium now must invoke that right to injunctive relief, because Defendants are threatening to cause the very disruption that the 2015 Agreement forbids. They have declared Arcesium in breach of the 2015 Agreement on purely pretextual grounds – claiming that Arcesium has violated a restriction on marketing Geneva when Arcesium has done nothing of the kind. Without providing the contractually required opportunity to cure, Defendants have purported to terminate "all rights" of Arcesium under the 2015 Agreement, including the Continuation Rights. They have failed to honor their written commitment to extend the Continuation Rights as to one Arcesium customer, and are poised to do the same for others.

*Most time sensitive, Defendants have declared that they will no longer re-issue the periodically updated software "keys" that are essential to Geneva's functionality.* A key that Arcesium used to access its own copies of Geneva already has expired. Other keys are set to expire over the next several months, starting in July for two of Arcesium's most substantial customers. The result, if Defendants' specific performance is not compelled by the Court, will be – simply put – an enormous disruption to Arcesium's business that cannot be cured by a monetary damages award far down the road.

There is no mystery to the motive for Defendants' conduct. When Arcesium began negotiating with Advent in 2015, Advent was a standalone software company. As the negotiations concluded – but before the 2015 Agreement was signed – SS&C acquired Advent. Unlike Advent, SS&C competes with Arcesium across a broad range of offerings. SS&C now regrets the deal Advent cut with Arcesium because it interferes with SS&C's publicly stated goal

to "take over the world" and become "the world's dominant platform" in the market where the companies compete.  Although Arcesium's complaint seeks separate relief for Defendants' anticompetitive behavior, this application seeks relief only to avoid imminent, irreparable harm that will occur if Defendants persist in their refusal to issue license keys and support services that Arcesium needs to continue servicing its clients without interruption.

Such relief is critical because Arcesium is the heart and lungs of the hedge funds and other asset managers that it serves.  If Defendants are permitted to carry out their threat to abruptly withdraw Arcesium's access to Geneva, then Arcesium will be unable to provide critical solutions to its customers.  That level of disruption to Arcesium's customers will irrevocably damage Arcesium's reputation and goodwill – harms that are not compensable through monetary damages.  All the relevant legal factors favor swift relief:

- ***Arcesium is likely to succeed on the merits of its contract breach claims***:  Defendants' refusal to honor the Continuation Rights constitutes a clear and material breach of contract. Defendants' pretextual claim that Arcesium breached the terms of the Continuation Rights has no basis in law or fact.  Even if Defendants' claims were true (and they are not), any alleged breach by Arcesium was immaterial; Defendants failed to provide the requisite notice and opportunity to cure; and Arcesium took steps to adequately cure any purported breach. Arcesium's Continuation Rights remain in full force, and Defendants must perform. The same is true for the parties' recent clear and binding agreement to renew the license key of one particular Arcesium customer, which should be enforced.

- ***Arcesium faces imminent and irreparable harm from Defendants' contract breaches***: Defendants' wrongful termination of Arcesium's Continuation Rights will undermine the goodwill and strong reputation Arcesium has spent years building by depriving Arcesium's customers of portfolio accounting functions and data that are indispensable to a full range of Post-Trade Solutions and investment management activities Arcesium is contracted to perform.  Defendants' breach will not just inflict financial losses, but likely destroy Arcesium's relationships with its customers.

- ***The equities and the public interest favor Arcesium***:  While Arcesium and its customers will suffer grievous irreparable harm absent an injunction protecting the status quo, there is no comparable risk to Defendants.  They will simply have to perform under the terms of the 2015 Agreement for which they bargained and are being compensated.  As courts in this circuit routinely hold, enforcing valid contracts is in the public interest and imposes no hardship on the party required to comply with its obligations.

Arcesium respectfully requests that the Court order Defendants to perform their contractual obligations, including, but not limited to, issuing license keys as they come due for renewal. Because there is imminent harm – in particular, the loss of Geneva access as license keys expire – the Court should enter a temporary restraining order, and thereafter schedule an evidentiary hearing on Arcesium's application for a preliminary injunction.

## BACKGROUND

### A.    Geneva

Defendants are owners and licensors of the Geneva accounting software and a variety of Post-Trade Solutions. Declaration of Gaurav Suri, dated June 15, 2020 ("Suri Decl.") ¶¶ 5–6. Geneva is widely used by sophisticated hedge funds and fund administrators to perform back-office functions including determining the daily net asset value of the investments held and to conduct other portfolio accounting tasks that are required by market practice and by regulation. *Id.* ¶ 5. Geneva is by far the dominant portfolio accounting software on the market. *Id.*

The accounting data generated and stored by Geneva is among the most sensitive and important information maintained by hedge funds and fund administrators. *Id.* Such data is used not only for accounting, but also to perform many critical downstream tasks such as tracking and developing investment strategies and valuing and managing hedge funds' cash on hand, collateral, and other investments. *Id.* ¶¶ 3, 5.

Once a hedge fund or fund administrator chooses and implements a portfolio accounting software solution within its systems, switching to different software is time consuming, expensive, and extraordinarily disruptive to many of its vital day-to-day functions. *Id.* ¶ 8; Declaration of Bryan Dougherty, dated June 15, 2020 ("Dougherty Decl.") ¶¶ 18–21.

The Geneva software is owned by Defendants, so customers who wish to use it must acquire a license from Defendants or from another authorized reseller of the software. Suri Decl. ¶ 7. Licenses to Geneva are controlled by so-called "license keys," which are essentially time-limited passcodes issued by Defendants that are typically renewed annually (even if the ultimate agreed-upon licensing period is longer). *Id.* ¶ 9; Dougherty Decl. ¶ 11; Declaration of James Cicalo, dated June 14, 2020 ("Cicalo Decl.") ¶ 4. In other words, once a license key has expired, a licensee cannot access Geneva unless Defendants issue new license keys.

### B. Arcesium

Arcesium is a technology company that primarily serves hedge funds and fund administrators. Suri Decl. ¶ 2. Arcesium competes with Defendants in the market for Post-Trade Solutions. *Id.* ¶ 17. It provides an integrated technology platform (the "Arcesium Platform") that creates, processes, and analyzes all types of data related to the investment activities of hedge funds. Dougherty Decl. ¶¶ 2–3. The Arcesium Platform allows customers to perform mission-critical operations, including collateral management; data management and corporate action processing; reconciliation; and other crucial investment management functions (each, a "Post-Trade Task"). The Arcesium Platform is configured to integrate with an individual customer's existing trading systems and infrastructure to offer customers a unified solution for their post-trade processes. *Id.*

The Arcesium Platform also integrates portfolio accounting software like Geneva into its technology and sells it as part of the Arcesium Post-Trade Solutions. *Id.* ¶ 3. Access to Geneva is controlled through the use of a license key. *Id.* ¶ 11. Each of Arcesium's customers has a distinct license key. *Id.* In addition, until recently, Arcesium maintained its own license key that unlocked copies of the Geneva software in Arcesium's development environments (the "Dev Key"). *Id.* ¶¶ 15–16

The Arcesium Platform loads data from the customer and other sources into Geneva in order to perform complex accounting calculations. *Id.* ¶¶ 5–7. The Arcesium Platform further processes the results of those calculations to provide Post-Trade Solutions. Dougherty Decl. ¶ 6. Without the accounting data from, and calculation capabilities of, Geneva, substantially all of the Post-Trade Solutions Arcesium provides would become unavailable immediately. Suri Decl. ¶¶ 23–24; Dougherty Decl. ¶ 11.

### C. Arcesium's Continuation Rights Under The 2015 Agreement

Given the importance of portfolio accounting software to Arcesium's services, Arcesium entered into the 2015 Agreement with Advent in March 2015. The 2015 Agreement allowed Arcesium to (1) resell Geneva licenses to its customers as part of its offering of Post-Trade Solutions and (2) host and integrate the Geneva software into the Arcesium Platform for these customers, as well as for customers who procure their own licenses to Geneva. *See* Ex. A § 3 (granting Arcesium the right to "load, install, access, execute, perform, display, view, store and otherwise use" Geneva).[1] Under the 2015 Agreement, if one of Arcesium's customers wanted Geneva as part of its platform, it would enter into a "Customer Agreement" with Arcesium, and, for customers who did not already have a Geneva license, Advent would issue one on terms specified in a "Customer Order Acknowledgement" or "COA." *See id.* §§ 4.3, 6.7.

A COA constitutes an "Ordering Document" under the 2015 Agreement. *See id.* § 2 ("Ordering Document" defined as an "order acknowledgement . . . that specifies the Product to be licensed"). COAs typically automatically renew for one-year terms following their initial term unless either party provides advance notice of expiration (at which point, the Continuation Rights set forth in section 10.4, discussed below, would apply). *See id.* §§ 6.9, 10.4.

---

[1] References to "Ex. __" are to the exhibits attached to the Declaration of Matthew J. Sorensen, dated June 15, 2020.

The initial term of the 2015 Agreement ran from March 25, 2015 through January 10, 2020. With 90 days' notice, either party could elect not to renew. *Id.* at preamble, §§ 10.1–10.2. Either party could also terminate for cause, defined as a material breach of the Reseller Agreement that remains uncured after a 30-day notice-and-cure period. *Id.* §§ 10.3, 10.4, 10.5.

As both parties understood when the 2015 Agreement was negotiated, switching portfolio accounting software is enormously disruptive for hedge funds and fund administrators. Suri Decl. ¶¶ 14–15. A customer or its service provider must identify and select a new software vendor, and then input and rebuild integrated processes to allow them to interface effectively with the new software. Dougherty Decl. ¶ 18. If not transitioned seamlessly, a customer loses the ability to accurately monitor trading activities and risks dangerous data interruptions that threaten its ability to comply with, among other things, collateral maintenance covenants and regulatory obligations. Suri Decl. ¶ 30; Dougherty Decl. ¶ 18. As a result, it typically takes a year or longer and requires substantial expenditure of human capital to switch from one portfolio accounting solution to another. Suri Decl. ¶ 8; Dougherty Decl. ¶¶ 18–20.

To prevent a sudden loss of access to Geneva, the parties negotiated substantial protections for Arcesium and its customers. Suri Decl. ¶¶ 14–15. In particular, if the 2015 Agreement or an Ordering Document expires, section 10.4 provides Continuation Rights for Arcesium's "then-existing" Geneva licensee customers. Ex. A § 10.4. The Continuation Rights allow those customers to "continue to use [Geneva] pursuant to the terms of their Customer Agreement and this Agreement" and permit Arcesium to continue to host and integrate the customer's Geneva software for specified periods: in the case of expiration of the 2015 Agreement or an Ordering Document, the rights could continue to renew indefinitely; and in the case where Defendants terminated the agreement for cause due to Arcesium's material breach,

the rights last only through the initial "breach" term plus "the first annual unilateral auto-renew" following the termination (typically a period of one year). *Id.* §§ 10.4, 10.5. Sections 10.4 and 10.5 survive expiration or termination of the 2015 Agreement. *See id.* § 10.7. These Continuation Rights were critical because customers would not purchase an Arcesium solution without assurance that their access to Geneva would be uninterrupted. Suri Decl. ¶ 15.

**D.** **Defendants' Non-Renewal Of The 2015 Agreement And Purported Termination Of the Continuation Rights.**

From March 2015 to early 2020, Defendants have received millions of dollars in Geneva licensing fees pursuant to the 2015 Agreement. *Id.* ¶ 16. Arcesium and its customers have depended on Geneva's functionality to execute Post-Trade Tasks. Today, over 90% of Arcesium's revenue comes from customers who use Geneva in their Arcesium Platform. *Id.*

On October 1, 2019, Defendants provided notice of non-renewal to Arcesium, effective January 10, 2020. Ex. B. Arcesium thereafter attempted to negotiate renewal, but Defendants proposed commercially unreasonable and supracompetitive terms. Suri Decl. ¶¶ 18–19. Given these unreasonable demands, the 2015 Agreement expired on January 10, 2020, triggering the Continuation Rights under section 10.4 and, in accordance with those rights, Defendants renewed the Geneva license key for one Arcesium customer in February 2020. Declaration of David Nable, dated June 15, 2020 ("Nable Decl.") ¶¶ 7–9; 12.

Pursuant to the Continuation Rights, Arcesium was and is entitled to, among other things, the Dev Key that unlocked the copies of the Geneva software that Arcesium used for development purposes. Ex. A §§ 3.1, 10.4, 10.5. Since the inception of the 2015 Agreement, Defendants renewed that Dev Key annually each April. Cicalo Decl. ¶ 4. In March 2020, Arcesium contacted Defendants regarding renewal. *Id.* ¶ 13. Rather than automatically renewing the key as in the past, Defendants instead claimed the parties had "terminated the

reseler license which is where the developer license was attached to," but promised to follow up regarding the renewal of the Dev Key. *Id.* ¶¶ 7–8, 13; Ex. C at 3. Arcesium followed up on at least five occasions. *Id.* Defendants never responded. Cicalo Decl. ¶ 13.

Instead, on April 13 – the same day that Arcesium last inquired about renewal of the Dev Key – Defendants sent Arcesium a purported termination letter (the "Termination Letter"), falsely accusing Arcesium of breaching the 2015 Agreement "by continuing to market [Geneva] to multiple prospective Customers since the expiration of the [2015] Agreement." Ex. D at 1. Defendants failed to provide any details regarding the alleged breach, nor did they provide the contractually required opportunity to cure. *See* Ex. A §§ 10.3, 10.4.

In their letter, Defendants purported to terminate "[a]ll rights afforded to Arcesium under the 2015 Agreement, including under section 3.1" – the core software licensing provision. Ex. D at 1. The Termination Letter acknowledged the Continuation Rights, but asserted, in direct contravention of section 10.4, that such rights were "conditioned on Arcesium not having any role in connection with servicing those customers or with a renewal or extension of any such agreements." *Compare* Ex. D at 2 (asserting this condition) *with* Ex. A §§ 10.4, 10.5 (containing no such condition). Soon after, Defendants unilaterally shut off a support portal through which Arcesium has submitted help tickets when issues arise with Geneva. Dougherty Decl. ¶ 16. The following week, Arcesium's Dev Key expired. *Id*.

The allegations in the Termination Letter are baseless. Defendants have not provided any details regarding the alleged breach, nor could they since no breach occurred. When it became clear that the 2015 Agreement would not be renewed, Arcesium instructed its sales staff to cease all promotion and marketing of Geneva licenses. Nable Decl. ¶ 10. Specifically, staff was instructed to tell prospective customers who were interested in Geneva that Arcesium could not

supply a Geneva license, and that they should contact Defendants or an authorized reseller of the software. *Id.* ¶¶ 10–11; Ex. H. For example, Arcesium informed a prospective customer, Firm A, that Arcesium could not sell it a Geneva license, and instead put Firm A representatives in contact with Advent. Nable Decl. ¶ 12. When Firm A contacted Advent, Defendants refused to deal with Firm A if Arcesium had any role that would allow or require Arcesium to interact with Geneva. *Id.* ¶ 14.

Acting in an excess of caution, on May 6, 2020, Arcesium issued written instructions to its sales team reiterating (1) the prohibition on initiating discussion with prospective customers about Geneva; and (2) the direction that, in response to inquiries about Geneva, team members were to clearly state that the prospective customer must contact Advent in order to secure Geneva licensing rights.[2] *Id.* ¶ 17; Ex. H. Arcesium also issued a statement to all prospective customers with which it had engaged since the 2015 Agreement expired, stating, in relevant part, that Arcesium "do[es] not promote, market or sell Geneva," that its "Geneva reseller license expired in January," and that for "any new customer who is interested in having Geneva as part of an Arcesium solution, that would require the new customer to get its own Geneva license directly from Advent." Nable Decl. ¶ 18; Ex. I.

### A. Defendants Agree To Renew The Geneva License For The Firm E Account, But Renege.

One particular Arcesium customer that uses Geneva, Firm E, has a Geneva key that is set to expire in a matter of weeks, on July 10, 2020. Suri Decl. ¶ 25; Nable Decl. ¶ 27. Despite

---

[2] In addition, Arcesium revised its written marketing materials, which were generated and distributed during the period when the 2015 Agreement was active to remove a reference to Arcesium's ability to integrate with leading third-party accounting systems. None of these marketing materials mentions Geneva, Advent, or any specific software, brand, or intellectual property owned by a third party. Nable Decl. ¶ 19; *see* Exs. P, Q.

purporting to terminate the Continuation Rights on April 13, Defendants sent Arcesium what they referred to as an "offer" to renew the license key of Firm E on April 14, 2020 ("April 14 Offer"). The offer was sent through the customary renewal channel: an email from Defendants' sales representative to Arcesium's account manager. Cicalo Decl. ¶¶ 9–11; Ex. E at 1. Arcesium accepted that offer on April 15. Cicalo Decl. ¶ 9; Ex. E at 1. Just two days later, through a letter from counsel, Defendants reiterated their view that Arcesium breached the 2015 Agreement, but suggested a business discussion to achieve a commercial resolution. Ex. G at 1.

Unable to reach a business resolution, and facing the imminent expiration of Firm E's license key in July, Arcesium's counsel contacted Defendants' counsel on May 7 to discuss the Termination Letter and to request confirmation that Defendants would renew Firm E's key. Ex. J. Defendants responded on May 11, 2020, stating that "Advent has until June 5, 2020 to decide whether to provide notice of non-renewal" for Firm E and that "Advent has not yet decided whether to renew and, in making that decision, Advent will consider how best to protect its intellectual property from misuse by third parties." Ex. K at 2.

The next day, on May 12, 2020, Advent again emailed Arcesium an offer to renew the Firm E license key for Geneva ("May 12 Offer"). Cicalo Decl., ¶¶ 10–11; Ex. L at 1. The May 12 Offer was identical to the April 14 Offer. Cicalo Decl. ¶ 10. The emails came from Tyler Rose, one of Advent's Renewal Sales Representatives, and were sent to James Cicalo at Arcesium, the vendor specialist responsible for interacting with Defendants on Customer Agreements and renewals. *Id.* ¶¶ 4–6. The email contained "Renewal Options for ARCESIUM LLC (89358)" for the "Term Date: 11-JUL-2020 to 10-JUL-2021." Ex. L. The email requested that Arcesium "review the below options for renewal and advise us at least 30 days prior to your contract renewal date of your selection." *Id.* Consistent with prior renewal proposals, the "Term

Options" included a one-year renewal for stated pricing.[3]  *Id.*  The message stated that "[i]n recognition of your loyalty, we are pleased to ***offer*** the following options for your renewal consideration."  *Id.* (emphasis added).  It ended:  "***This offer*** is valid until 30 days prior to your contract renewal date.  If not accepted prior, ***this offer*** is null and void and the renewal will assume current list price as the next year's quote."  *Id.* at 2 (emphases added).

On May 13, Arcesium responded via email, explaining that Arcesium "already replied that we would like to proceed with the renewal" and asking "is there additional info you need from us?"  Ex. L at 1.  A short time later, Arcesium sent Defendants a second email stating, "Further to the below, and for the avoidance of any doubt, ***we accept the renewal offer in your email below dated May 12, 2020***."  *Id.* at 3 (emphasis added).

On May 28, Arcesium, through its counsel, contacted Defendants by letter to note that, following the parties' confirmatory renewal exchange (the "Firm E Renewal Agreement"), "Arcesium will expect to receive the keys for [Firm E] before July 11."  Ex. M.  On May 29, Defendants attempted to disclaim the Firm E Renewal Agreement, alleging that the "automated email notice of renewal options" had been sent "inadvertently."  Ex. N.  Defendants also stated that "Arcesium's unilateral response (to which Advent never followed up with a confirming invoice) does not alter Advent's repeated and unequivocal communication. . . that the parties' Agreement, including Arcesium's license to any Advent intellectual property is terminated and Advent retains the right to not renew the [Firm E] license."  *Id.*  By letter dated June 4, 2020, Defendants confirmed their repudiation of the Firm E Renewal Agreement, stating, "Advent

---

[3] The exact price and certain other details of the commercial arrangements between the parties are redacted from public versions of Arcesium's court papers for reasons of business confidentiality.  Arcesium is filing, simultaneously, a letter motion seeking leave to file these and other confidential materials under seal.

hereby provides notice of Advent's intent not to renew the [Firm E] software license when the license terms expire on July 10, 2020." Ex. O. To date, Defendants have refused to honor the Firm E Renewal Agreement.

A similar situation is emerging for another Arcesium customer, Firm F, which has a Geneva key that is due to expire on July 21, 2020. On June 1, 2020, Defendants sent a renewal invoice via email to representatives of both Firm F and Arcesium. Nable Decl. ¶ 21. On June 3, 2020, Firm F paid the invoiced amount. *Id.* ¶ 22. To date, Defendants still have neither issued Firm F the license key nor committed to doing so. *Id.* ¶ 23.

**B.  Defendants' Unlawful Behavior Threatens Arcesium's Business, Both Imminently And Long Term.**

The harm to Arcesium from Defendants' breaches is concrete, severe, and imminent: the Geneva license keys for Firms E and F expire on July 10 and 21, 2020, respectively, and the keys for three more Arcesium customers expire in August, September, and November 2020. Suri Decl. ¶ 23, 30. Further, Defendants' refusal to renew Arcesium's Dev Key and provide access to support services imperils Arcesium's ability to service all of its customers. *Id.* ¶ 22; Dougherty Decl. ¶ 16. Absent an injunction compelling Defendants' compliance with the Continuation Rights, Arcesium and its customers will lose access to Geneva. Defendants' actions will cause Arcesium irreparable harm from its inability to provide Post-Trade Solutions to current customers – customers that rely on those solutions to complete core business operations. Because of the length, expense, and disruption of a transition to a new service, customers will be forced to find a new Post-Trade Solutions provider that is able to integrate with Geneva (likely SS&C). Nable Decl. ¶¶ 24, 26. This will not only immediately begin to erode Arcesium's goodwill, with that erosion becoming grievous over time, but it will inflict indeterminate losses to Arcesium's product line and business as a whole. Suri Decl. ¶ 29. It is precisely because this

harm is not redressable by monetary damages that the parties stipulated, in the 2015 Agreement, that such harm would be deemed "irreparable" and that the party suffering the harm "may be entitled to seek injunctive relief." Ex. A § 17.12.

## ARGUMENT

Preliminary relief should issue here because Arcesium will suffer irreparable harm absent an injunction and has proven a likelihood of success on the merits, or, at the minimum, has established the existence of sufficiently serious questions going to the merits of the case and a balance of hardships tipping decidedly in its favor. *AIM v. Int'l Trading v. Valcucine*, 2002 WL 1285557, at *3 (S.D.N.Y. 2002). The standard for granting a temporary restraining order and a preliminary injunction are identical. *AIM Int'l Trading v. Valcucine*, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002).

## I. The Court Should Grant Preliminary Relief Because Arcesium Is Likely To Succeed On Its Claim For Breach Of The 2015 Agreement.

Defendants have breached the Continuation Rights. Arcesium will succeed on its claim of breach because it can and will establish (1) the existence of a contract; (2) its own adequate performance or readiness to perform under the contract's terms; (3) Defendants' breach; and (4) either damages or that damages are inadequate such that equitable relief is required. *L & L Wings v. Marco-Destin*, 676 F. Supp. 2d 179, 185 (S.D.N.Y. 2009); *Travellers Int'l v. Trans World Airlines*, 722 F. Supp. 1087, 1104–05 (S.D.N.Y. 1989). The first element is not in dispute: the 2015 Agreement is a valid and enforceable contract that expired on January 10, 2020. The parties agree that, following expiration of the 2015 Agreement, Arcesium was contractually entitled to certain Continuation Rights.

**A.** **Arcesium Performed Its Obligations Under The 2015 Agreement, Including Under The Continuation Rights.**

As set out below, (1) Defendants' claim that Arcesium breached is a pretextual, post-hoc justification for Defendants' anticompetitive behavior; (2) Defendants cannot show that any alleged breach was material; and (3) even if Arcesium breached section 10.4 of the 2015 Agreement (which it did not), it took steps amounting to a timely and effective cure.

**1.** **Arcesium Did Not Market Geneva After The 2015 Agreement Expired.**

Defendants' claim of breach is entirely pretextual. In October 2019, Defendants announced their intention not to renew the 2015 Agreement even though they had earned millions of dollars from it. Defendants then engaged in sham negotiations regarding a renewal, demanding a supracompetitive royalty and that Arcesium refrain from marketing to any company that already was a customer of SS&C or Advent. *See* Suri Decl. ¶¶ 17–19. Arcesium rejected these onerous terms, and the 2015 Agreement expired in January 2020, triggering the Continuation Rights pursuant to section 10.4.

In March 2020, Arcesium reached out to Defendants to arrange for the renewal of the Dev Key. Ex. C. Defendants' response is telling: they claimed that the "developer license was attached to" the 2015 Agreement, and noted that the "reseller license" had "terminated." Ex. D. Accordingly, no later than March 23, 2020, Defendants already had decided to renege on their obligations under the Continuation Rights.

Over the ensuing weeks, Arcesium contacted Defendants at least five times to obtain the Dev Key to which it was entitled and which generally was renewed in the ordinary course. Ex. C; Cicalo Decl. ¶ 13. The last such contact was on April 13, 2020, just seven days before the Dev Key's expiration. *See* Ex. C; Dougherty Decl. ¶ 16. Unable to delay any longer, on April

13, 2020, Defendants sent the Termination Letter purporting to immediately terminate Arcesium's Continuation Rights.  Ex. D.

The Termination Letter both lacks any detail regarding the purported breach, and disregards the 2015 Agreement's process for handling material breaches.  The Termination Letter states, in conclusory fashion, "that Arcesium violated its obligations under Section 10.4(a) by continuing to market the Product to multiple prospective Customers since the expiration of the Agreement."  *Id.*  The Termination Letter provides no details regarding the alleged breach and, despite repeated requests, Defendants steadfastly have refused to provide them.  *Id.*  That is because no breach occurred.  On its face, the claim makes little sense:  after the expiration of the 2015 Agreement, Arcesium had no ability to sell prospective clients a Geneva license.  Any promise to do so would be self-defeating.

Defendants' Termination Letter suffers from another flaw:  it disregards the process set forth in the 2015 Agreement for handling material breaches.  Section 10.5 – which expressly survived the expiration of the 2015 Agreement in January 2020 (*see* Ex. A, § 10.7) – describes the parties' rights "[i]f this Agreement is terminated by Advent pursuant to Section 10.3."  Section 10.3 states that the 2015 Agreement may be terminated for material breach upon "thirty (30) days written notice," but only if the breaching party "fails to cure such breach within thirty (30) days following written notice of such breach."  *Id*. § 10.3.

The scant detail provided in Defendants' Termination Letter would not have been adequate notice of a breach, had one occurred.  It failed to identify the parties to whom Arcesium allegedly marketed its ability to sell Geneva licenses, the nature of the misrepresentations, the harm that Defendants had suffered, or the time within which Arcesium had to cure the allegedly material breach.  *See, e.g.*, *SVS v. Rabbit Ears Prods.*, 1992 WL 91183, at *11 (S.D.N.Y. 1991)

(notice of breach letter found inadequate for lacking detail specifying supposed breach); *see also Ulla-Maija v. Kivimaki*, 2005 WL 2429490, at *4 (S.D.N.Y. 2005) (termination letter inadequate for failure to provide requisite 30-day cure period). Accordingly, this Court should reject as pretextual Defendants' claims of breach.

### 2. Even If The Was A Breach, It Was Not Material.

Defendants fail to establish the materiality of any alleged breach. Under New York law, a breach is material only if it goes to the "root of the agreement of the parties" and is "so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., v. Austin Drugs*, 111 F.3d 284, 289 (2d Cir. 1997).

The root of section 10.4 is to maintain critical Continuation Rights for Arcesium's current customers by setting the terms for Arcesium's continued hosting, integration, and reselling of Geneva to them. An alleged violation of a marketing restriction intended to reaffirm that Arcesium may no longer license Geneva to new customers is hardly "material" to that core bargain. *See BDCM Fund Adviser v. Zenni*, 103 A.D.3d 475, 476 (1st Dep't 2013) ("de minimis failure to comply with [a marketing restriction] is insufficient to support a cause of action for … damages" for material breach). Put another way, it is difficult to imagine how introducing a prospective customer to Advent *precisely because* Arcesium no longer could market or sell Geneva licenses could constitute a breach of section 10.4, much less a *material* breach. Accordingly, the Court should hold that, even if the referral of a customer to Advent somehow constituted breach of the 2015 Agreement, it was immaterial.

### 3. Even If There Was A Breach, Arcesium Took Steps That Amounted To A Timely And Effective Cure

Defendants' pretextual attempt to terminate the Continuation Rights also fails because Arcesium timely cured any alleged breach. Within 30 days of receiving the Termination Letter,

Arcesium once again instructed its sales team not to promote, market, or offer Geneva licenses to prospective customers, and issued written notices to all customers that Arcesium's reseller license expired and it does "not promote, market, or sell Geneva." Nable Decl. ¶¶ 17–18, Exs. H, I. These actions constitute reasonable, valid, and effective cure efforts to address any alleged harm. *See Trans World Metals v. Southwire Co.*, 769 F.2d 902, 906–907 (2d Cir. 1985) (holding nondefaulting party cannot terminate a contract with a party that has cured all alleged defaults within the contractually-secured cure period and allegedly-defaulting party cured within cure period); *Point Prods. A.G. v. Sony Music Entm't*, 2000 WL 1006236, at *3-4 (S.D.N.Y. 2000) (valid cure involves an effort to remedy any loss caused by the breach); *Karabu v. Pension Benefit Guar. Corp.*, 1997 WL 759462, at *11 (S.D.N.Y. 1997) (valid cure negates breach claim). Accordingly, even if there was a material breach, Arcesium timely cured it and therefore fully performed under the 2015 Agreement.

### B. Defendants Breached The 2015 Agreement.

Defendants have breached the 2015 Agreement in two respects. First, Defendants' improper termination of the Continuation Rights itself constitutes a breach of the 2015 Agreement. Second, Defendants have refused to issue the Dev Key and other license keys to which Arcesium is entitled, and cut off access to a support portal through which Arcesium submits support tickets on its clients' behalf.

Defendants' improper termination breached the 2015 Agreement. It is well-settled that an improper termination of a contract is itself a breach of that contract. *See Bausch & Lomb v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (party "committed a material breach by terminating the Agreement upon two days' notice in contravention of [agreement's] 30 day notice period."); *Filmline (Cross-Country) Prods v. United Artists*, 865 F.2d 513, 519 (2d Cir. 1989) (same).

Here, Defendants' Termination Letter was a pretextual, post-hoc attempt to justify an anticompetitive decision to renege on Arcesium's Continuation Rights. Both the timing of the letter (just days before the expiration of the Dev Key), and its contents (or lack thereof) establish the impropriety of the Termination Letter. Defendants ignored the plain language of the 2015 Agreement, which set forth a notice-and-cure process that Defendants should have followed if they genuinely believed that Arcesium had materially breached the 2015 Agreement. Ex. A § 10.3. Section 10.5, which governs the parties' rights in the event of a material breach by Arcesium, survived the expiration of the 2015 Agreement and specifically contemplates that Advent may terminate the 2015 Agreement "pursuant to Section 10.3" in the event of a material breach. *Id*. at § 10.5. Section 10.3, in turn, provides a 30-day cure period. *Id*. at § 10.3. Defendants not only ignored that provision in sending the Termination Letter, but also have failed to articulate any reason why Arcesium's actions would not have cured any alleged breach. There is good reason for that: there was no breach for Arcesium to cure. Defendants invented the claim to justify their decision to deny Arcesium its Continuation Rights.

But even if there was a breach (which there was not), such termination would have triggered Arcesium's rights and Advent's obligations under section 10.5, which provides Continuation Rights for the remainder of a customer's term plus the "first annual unilateral auto-renew by Customer." Ex. A § 10.5. At the very least, and under such circumstances, Arcesium's customers are entitled to one more term of their license keys to allow for an orderly and proper transition, and Arcesium is entitled to the Dev Key renewal to support these customers. Defendants must also continue to provide "Support Services" to Arcesium as part of the Continuation Rights. *See* Ex. A §§ 9, 10.4, 10.5; Suri Decl. ¶ 22. Defendants are in blatant

breach of the 2015 Agreement by failing to honor these bargained-for contractual rights, including by terminating support portal access.

## II. Arcesium Is Likely To Succeed On Its Claim For Breach of The Firm E Renewal Agreement.

The Firm E Renewal Agreement demonstrates exactly how the Continuation Rights are supposed to work. As previously envisioned and negotiated by the parties, Arcesium was offered a valid and binding renewal agreement, notwithstanding expiration of the 2015 Agreement. Arcesium accepted that offer, and a binding contract was formed. The facts establish a textbook example of contract formation by clear and unambiguous communications of offer and acceptance followed by Defendants' repudiation and material breach of the contract so formed. Arcesium will have no trouble establishing the elements of breach of contract for the Firm E Renewal Agreement. *See L & L Wings*, 676 F. Supp. 2d at 185.

The Firm E Renewal Agreement is a legally binding contract in light of the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds," and "the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Kolchins v. Evolution Markets*, 31 N.Y.3d 100, 106 (2018) (quotations omitted).

The May 12 Offer was sent to Arcesium by a "Renewal Sales Representative" at Advent via the typical channel and in the typical form by which renewals were offered in the past, including as recently as February 2020. *See* Cicalo Decl. ¶ 10; Nable Decl. ¶ 12; *Kolchins v. Evolution Markets*, 128 A.D.3d 47, 60 (1st Dep't 2015) (considering the parties' prior dealings); *see also Derven v. PH Consulting*, 427 F. Supp. 2d 360, 368 (S.D.N.Y. 2006) (considering parties' prior course of conduct to conclude enforceable contract created). The May 12 Offer used the objective language of an offer and invited Arcesium's acceptance, stating that "we are pleased ***to offer*** the following options for your renewal consideration," that "***[t]his offer*** is valid

until 30 days prior to your contract renewal date," and that "[i]f not *accepted* prior, **this offer** is null and void." *Kolchins*, 31 N.Y.3d at108. The offer contained all information to ascertain the terms of the offer and the parties' bargain: the subject matter, term of renewal, and price. *See* Ex. L.

Arcesium's response provided a clear, unambiguous, and unequivocal acceptance of the May 12 Offer, stating in plain English that "we would like to proceed with the renewal" and "[f]urther to the below, and for the avoidance of doubt, we accept the renewal offer in your email below dated May 12, 2020." *See id*; *Kolchins*, 128 A.D.3d at 59 (contract formed where accepting party said it "accept[ed]"). These facts support only one conclusion: Advent offered to renew the Firm E license on the terms it specified in its email, and Arcesium accepted that offer. An essentially identical analysis applies to the April 14 Offer and April 15 acceptance. Ex. E. Both exchanges created a legally enforceable contract. For all of the reasons discussed above, Arcesium has established that it is likely to succeed on the merits of this claim.

### III.     Arcesium Will Suffer Irreparable Harm Absent Immediate Injunctive Relief

Absent immediate injunctive relief, Arcesium will suffer concrete, imminent, and unquantifiable harm. Arcesium, which has already lost its Dev Key, has Geneva license key renewals for two customers coming due in July 2020 and three more in August, September, and November 2020. Suri Decl. ¶ 25. Without injunctive relief, Arcesium will lose access to the critical Geneva software and support needed to serve its customers.

As an initial matter, the parties stipulated that a violation of section 3 of the 2015 Agreement "*may cause irreparable injury . . . for which monetary damages may not be an adequate remedy and that each party will be entitled to seek injunctive relief . . . for any breach" of such rights.* *See* § 17.12 (emphasis added). It is well-established that such provisions are regarded as admissions that the movant will suffer irreparable harm. *See, e.g.*,

*Roswell Capital Partners v. Alternative Const. Techs.*, 2009 WL 222348, at *17 (S.D.N.Y. 2009) (irreparable harm provision tantamount to "admission").  Admissions like these "strengthen significantly" "[a] movant's demonstration of irreparable harm."  *Iannucci v. Segal Co.*, 2006 WL 8407380, at *3 (S.D.N.Y. 2006).  Accordingly, provisions for injunctive relief such as § 17.12 are "routinely enforced" by granting preliminary relief of the type Arcesium seeks here.  *Bank of Am. N.A. v. PSW NYC LLC*, 29 Misc. 3d 1216(A), at *12 (N.Y. Cty. 2010).

Putting § 17.2 aside, courts routinely find irreparable harm where the movant can demonstrate that, as a result of defendant's actions, it will likely suffer (1) loss of reputation and customer goodwill, (2) loss of revenue *or* (3) destruction of its entire business.  Any one of these risks on its own is sufficient to show irreparable harm.  Arcesium is exposed to all three.

*First*, Arcesium risks a serious loss of reputation and customer goodwill that no monetary damages can compensate.  If Arcesium and its customers were to lose access to Geneva without time to transition to a new provider, customers will lose access to approximately 70% of the services that Arcesium provides to them, all of which are necessary for accurate books and records.  Suri Decl. ¶ 26.  For instance, without access to Geneva, Arcesium and its customers would be unable to determine fund- and account- level profits and losses, calculate whether customers must post or are entitled to demand margin under their agreements with their counterparties, make fully-informed trading decisions, or perform effective risk management. *Id.*  Arcesium's hedge fund customers would also be unable to perform certain recurring, periodic accountings of their assets under management, including determining the daily net asset value of the investments they hold.  *Id.* ¶ 27.  Both hedge fund and fund administrator customers use Geneva and its data to prepare regulatory reports required by law.  *Id.*

The loss of Geneva and resulting inability to carry out these basic tasks would be severe to Arcesium and its customers.  Suri Decl. ¶¶ 27–30; Nable ¶¶ 24–28.  The inability to support these mission-critical functions for its customers would result in a substantial loss of customer goodwill that Arcesium has built up since its inception five years ago.  Suri Decl. ¶¶ 26–30.  If customers are forced to switch accounting portfolio systems or post-trade solutions providers abruptly they will face a costly, lengthy, and entirely disruptive undertaking.  *Id.* ¶ 8.  Arcesium will be deemed unreliable, and these customers will not return.  *Id.* ¶¶ 28–29.  The uncertainty generated by Arcesium's public loss of capability and the disruption to clients will drive away both current and potential customers.  *See* Nable Decl. ¶¶ 25, 28.  Arcesium's reputation will not recover.  *Id.* ¶ 22; *see Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 907-08 (2d Cir. 1990) ("[T]erminating the delivery of a unique product to [a movant] whose customers expect and rely on [the movant] for a continuous supply of that product almost inevitably creates irreparable damage to the goodwill of the [movant].").

**Second**, Arcesium is likely to lose significant revenues that it cannot recover.  Over 90% of Arcesium's revenue today is derived from customers who use Geneva.  *See* Suri Decl. ¶ 29.  Without the ability to continue using Geneva and fully service its customers– which can only occur if Defendants provide the requisite support services and license keys as they come up for renewal – nearly all of Arcesium's revenue is at risk.  *Id.*  Threatened losses of such magnitude are more than sufficient to show irreparable harm under the law of this Circuit.  *See, e.g.*, *AIM Int'l Trading v. Valcucine*, 2002 WL 1285557, at *6 (S.D.N.Y. 2002) (estimated loss of 55% of combined sales sufficient); *Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711, 724 n.8 (S.D.N.Y 1969) (estimated loss of 40%).

***Third***, the very existence of Arcesium's business is threatened by Defendants' refusal to honor the Continuation Rights. *See* Suri Decl. ¶ 24; *Tom Doherty Assocs., v. Saban Ent'mt*, 60 F.3d 27, 38 (2d Cir. 1995); *Nemer Jeep-Eagle v. Jeep-Eagle Sales*, 992 F.2d 430, 435 (2d Cir. 1993) ("[A] threat to the continued existence of a business can constitute irreparable injury."). Arcesium is not like a software retailer who sells Geneva alongside many other software products. Instead, Arcesium integrated Geneva into the entire Arcesium Platform and built a unique offering around that integrated solution. Suri Decl. ¶¶ 3, 9–11, 29, 30. Accordingly, "the damages caused by loss of the [Geneva] product will be far more difficult to quantify than where sales of one of many products is the sole loss." *Tom Doherty*, 60 F.3d at 38. "In such cases, injunctive relief is appropriate" because "the loss of a product will cause the destruction of a business itself or indeterminate losses in other businesses." *Id.*

## IV.    The Equities Favor Arcesium And Injunctive Relief Is In The Public Interest.

The balance of equities tips decidedly in Arcesium's favor. As discussed above, Arcesium and its customers will suffer irreparable harm absent an injunction preserving the status quo. Arcesium's customers will be seriously harmed if their principal service provider— Arcesium – cannot deploy Geneva for their portfolio accounting functions and use the integrated Geneva-Arcesium platform for other critical investment management activities. *See* Suri Decl. ¶ 27. Indeed, loss of access to Geneva would be extremely disruptive for Arcesium's customers, given the money and amount of time it would take to transition its current system. *Id*. ¶ 28.

At bottom, Arcesium, its customers, and their investors are all put at risk by Defendants' material breaches of the 2015 Agreement. If relief is granted, by contrast, Defendants will simply have to perform under the terms of the 2015 Agreement they previously bargained for and which has been profitable for them to date.

The public interest would be furthered – not harmed – by the issuance of the requested relief. Courts routinely hold that enforcing valid contracts is in the public's interest. *See Rex Medical v. Angiotech Pharms. (US)*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) ("The public has an interest in seeing that parties oblige by their contractual obligations."). That is particularly true as the preliminary relief sought here simply maintains the status quo by requiring Defendants to continue to perform their obligations under the 2015 Agreement. *Reuters*, 903 F.2d at 909 (enjoined supplier "need do only what it has done for the past five years" under parties' contract); *see also AIM Int'l Trading*, 2002 WL 1285557 at *6 (enjoined party not harmed where injunction merely required "continuation of their relationship with plaintiffs" under terms of their contract) (collecting cases).

## V.     Arcesium Also Satisfies The Alternative Standard For Preliminary Relief.

Arcesium also is entitled to temporary and preliminary relief under the alternative standard that (1) sufficiently serious questions exist going to the merits of its case and that these questions are fair ground for litigation, and (2) the balance of hardships tips in its favor. *Citigroup Global Mkts. v. VCG Special Opportunities Master Fund*, 598 F.3d 30, 38 (2d Cir. 2010). Because it has shown a convincing likelihood of success on the merits, Arcesium by definition also has raised substantial questions. And, as discussed above, the balance of hardships tips decidedly in Arcesium's favor. Preliminary relief should be awarded.

**CONCLUSION**

For the foregoing reasons, Arcesium respectfully requests that the Court enter a temporary restraining order promptly to prevent this irreparable harm, and thereafter should schedule expedited discovery and an evidentiary hearing for a preliminary injunction.

Dated: June 15, 2020

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: ___/s/ *Jeremy Feigelson*___

Of Counsel:

GORDON REES SCULLY MANSUKHANI, LLP
Brian E. Middlebrook
Richard L. Green* (*pro hac vice* admission
to be sought)
One Battery Park Plaza
28th Floor
New York, NY 10004
(212) 269-5500
bmiddlebrook@grsm.com
rlgreen@grsm.com

*Resident in Glastonbury, Connecticut office*

Jeremy Feigelson
James J. Pastore
Michael Schaper
Megan K. Bannigan
Erica S. Weisgerber
Pooja A. Boisture
Matthew J. Sorensen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jfeigelson@debevoise.com
jjpastore@debevoise.com
mschaper@debevoise.com
mkbannigan@debevoise.com
eweisgerber@debevoise.com
pboistur@debevoise.com
mjsorensen@debevoise.com

*Counsel for Plaintiff Arcesium LLC*

1006077750v1

26