**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ARCESIUM, LLC,

     Plaintiff,

               v.

ADVENT SOFTWARE, INC. and
SS&C TECHNOLOGIES HOLDINGS, INC.,

     Defendants.

Case No. 1:20-cv-04389

Hon. Mary Kay Vyskocil

Magistrate Judge Hon. Stewart D. Aaron

<u>ORAL ARGUMENT REQUESTED</u>

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A
TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ..................................................................................................3

      A.     Industry Background...........................................................................3

      B.     SS&C's Reseller Agreement With Arcesium ....................................4

      C.     Arcesium's Resold Customer Contracts ...........................................5

      D.     Arcesium's "Run Off" Rights For Resold Customers ................................6

      E.     Arcesium's Improper Marketing and Promotion of Geneva .......................7

      F.     SS&C Declares Arcesium in Material Breach...........................................8

      G.     SS&C's Subsequent License Negotiations ...................................9

ARGUMENT .....................................................................................................................10

I.     ARCESIUM HAS NOT SHOWN THAT IT WILL SUFFER
IRREPARABLE HARM ...................................................................................10

      A.     Arcesium's TRO Request Is Untimely And Its Claimed Urgency Is
Self-Inflicted ....................................................................................10

      B.     The HRA Does Not Create A Presumption Of Irreparable Harm .............12

      C.     Arcesium Cannot Premise Its Showing Of Irreparable Harm On
Supposed Injuries To Its Customers, And There Are No Such Injuries
In Any Event ......................................................................................13

      D.     Arcesium's Alleged Loss Of Business Is Not Irreparable Harm...............14

II.    ARCESIUM HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE
MERITS.............................................................................................................18

      A.     SS&C Has The Right Not To Renew Arcesium's Resold Customers'
Licenses............................................................................................18

B.   Arcesium Repeatedly Breached Its Obligation Not To Market And Promote Geneva ...................................................................................20

C.   Arcesium Is Not Likely to Succeed On The Merits Of Its Breach Of Contract Claim Concerning The Alleged Firm E Renewal Agreement. ...22

III.   THE BALANCE OF HARDSHIPS DOES NOT TIP DECIDEDLY IN ARCESIUM'S FAVOR....................................................................................24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

Page

**Cases**

*Bakers Aid v. Hussman Foodservice Co.*,
 830 F.2d 13 (2d Cir. 1987)..................................................................................13

*Bank of Am. N.A. v. PSW NYC LLC*,
 29 Misc. 3d 1216 (A) (N.Y. Sup. Ct. 2010) ........................................................13

*Biocon Ltd. v. Abraxis Bioscience, Inc.*,
 No. 16-CV-6894 (RMB), 2016 WL 5817002 (S.D.N.Y. Sept. 26, 2016) .........13, 14

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
 No. 18 Civ. 11932 (VM), 2019 WL 1949801 (S.D.N.Y. Apr. 18, 2019)...............15

*Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N.A., Inc.*,
 270 F. Supp. 2d 432 (S.D.N.Y. 2003).................................................................12

*Citibank, N.A. v. Citytrust*,
 756 F.2d 273 (2d Cir. 1985)................................................................................11

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
 607 F. Supp. 2d 600 (S.D.N.Y. 2009)......................................................18, 19, 20

*Derven v. PH Consulting, Inc.*,
 427 F. Supp. 2d 360 (S.D.N.Y. 2006)..................................................................24

*Dexter 345 Inc. v. Cuomo*,
 663 F.3d 59 (2d Cir. 2011)..................................................................................15

*Freeplay Music, Inc. v. Verance Corp.*,
 80 F. App'x 137 (2d Cir. 2003) ...........................................................................15

*Iannucci v. Segal Co.*,
 No. 06 Civ. 4720 (PKL), 2006 WL 8407380 (S.D.N.Y. June 26, 2006)...............13

*Kolchins v. Evolution Mkts., Inc.*,
 31 N.Y.3d 100 (2018) ...................................................................................23, 24

*Marisa Cristina, Inc. v. Freis*,
 646 F. Supp. 252 (S.D.N.Y. 1986).......................................................................22

*Moore v. Consol. Edison Co.*,
 409 F.3d 506 (2d Cir. 2005)..........................................................................10, 14

*Mostaghim v. Fashion Inst. of Tech.*,
   No. 01 Civ. 8090 (HB), 2001 WL 1537545 (S.D.N.Y. Dec. 3, 2001) ....................................16

*Neenan v. United States*,
   112 Fed. Cl. 325 (2013), *aff'd*, 570 F. App'x 937 (Fed. Cir. 2014) .........................................23

*Otoe-Missouria Tribe of Indians v. N.Y. Dep't of Fin. Servs.*,
   769 F.3d 105 (2d Cir. 2014)..........................................................................................10

*Roberts v. Atl. Recording Corp.*,
   892 F. Supp. 83 (S.D.N.Y. 1995)..................................................................................12

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999)...................................................................................10, 11

*Roswell Capital Partners v. Alt. Constr. Techs.*,
   No. 08 Civ. 10647 (DLC), 2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ...............................13

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010).........................................................................................25

*Semmes Motors, Inc. v. Ford Motor Co.*,
   429 F.2d 1197 (2d Cir. 1970).....................................................................................16

*Sinco Inc. v. Metro-N. Commuter R.R. Co.*,
   133 F.Supp.2d 308 (S.D.N.Y. 2001)............................................................................21

*Sterling v. Deutsche Bank Nat'l Tr. Co.*,
   368 F. Supp. 3d 723 (S.D.N.Y. 2019)..........................................................................14

*Stewart v. United States I.N.S.*,
   762 F.2d 193 (2d Cir. 1985).......................................................................................15

*Subaru Distribs. Corp. v. Suburu of Am. Inc.*,
   47 F. Supp. 2d 451 (S.D.N.Y. 1999)............................................................................16

*Sunni, LLC v. Edible Arrangements, Inc.*,
   2014 WL 1226210 (S.D.N.Y. Mar. 25, 2014) .............................................................15, 17

*Wechsler v. Hunt Health Sys., Ltd.*,
   330 F. Supp. 2d 383 (S.D.N.Y. 2004)..........................................................................22

*Zervos v. Verizon New York, Inc.*,
   252 F.3d 163 (2d Cir. 2001)........................................................................................14

iv

## INTRODUCTION

From its very founding in 2015, Arcesium affirmatively chose to link its own technology offerings to an SS&C product by signing a five-year contract to license and resell SS&C's Geneva software. Arcesium chose to piggyback on SS&C's many years of market-leading innovation rather than invest in developing its own technology that could stand up independently in the marketplace. The consequence of Arcesium's choice is that, with the expiration of the parties' license agreement in January 2020, Arcesium must now develop its own solutions without licensed access to Geneva. While it would no doubt be easier for Arcesium to continue operating under the expired 2015 contract, Arcesium cannot achieve that result simply by wishing it were so. Arcesium certainly is not entitled to the extraordinary and urgent assistance of a court-ordered TRO to alter the parties' agreement so that it may maintain access to Geneva in perpetuity.

The absurdity of Arcesium's contract position is apparent in its principal request for relief: an injunction to enforce Arcesium's so-called "continuation rights" by which SS&C would be *bound for eternity* to license the Geneva product to Arcesium. Never mind that the parties' contract nowhere uses the term "continuation rights" and, instead, expressly provides that SS&C may choose not to renew any customer license by providing 35 days' notice before the end of a license term. In their ordinary course of dealing, the parties referred to these as "run off" rights (not "continuation rights," the term made up by Arcesium for this litigation) because Arcesium's rights in fact "run off" as individual customer license terms end and if SS&C chooses to not renew them (as is SS&C's express contractual right).

Arcesium tries to distract from this dispositive fact by protesting (at length and with increasing desperation) that it is somehow entitled to perpetual "continuation rights" because Arcesium did not also breach the parties' contract by improperly promoting and marketing

Geneva to customers after Arcesium's license had expired. Although Arcesium in fact did just

that, this Court may quickly deny Arcesium's requested TRO on the face of the parties' contract

and without even reaching the question of Arcesium's breach. SS&C has an independent and

express contractual right to end customer licenses on 35 days' notice. That unambiguous right

does not depend on Arcesium's breach of the agreement. Rather, Arcesium's breach is a second

and independent ground for denying the TRO.

On the merits of the breach issue, the evidence presented—including by Arcesium—

conclusively establishes that Arcesium repeatedly and destructively pitched Geneva services to

its prospective customers months after Arcesium was expressly forbidden to do so by the parties'

agreement. Arcesium also breached the parties' agreement when Arcesium solicited for

employment SS&C's most senior Geneva sales expert—just two months after SS&C had given

notice of non-renewal and a matter of weeks before Arcesium's Geneva license was set to expire.

Not only was this conduct in blatant violation of Arcesium's contractual non-solicitation

obligations, but it also establishes beyond any doubt that Arcesium's decision to continue to

market Geneva after it no longer had a license to do so was deliberate and premeditated.

Finally, and critically for this application, Arcesium comes nowhere near proving the

urgent, imminent and irreparable harm required for a TRO. Arcesium's supposed emergency of

two customer licenses expiring in July simply does not exist because SS&C has in fact now

entered into direct license agreements with both of those customers; further, SS&C has agreed

that Arcesium ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███. More broadly, Arcesium's claim of irreparable harm on behalf of its third party customers

fails of its own weight, both because those customers are themselves not complaining (because

they have in fact not been harmed) and because in any event the law requires Arcesium to show irreparable harm to itself, not to third parties. As for Arcesium's own alleged harm, Arcesium falls back to claiming that its business may be utterly ruined without a Geneva license—an astonishing, unsupported, and speculative claim given that Arcesium has known for eight months now that its Geneva license would end. Yet the sky has not fallen, no third party customer has been cut off from Geneva, and Arcesium is in fact still in business (any diminution of which would present a classic claim for money damages, not for the emergency injunctive relief that Arcesium seeks).

<b>STATEMENT OF FACTS</b>

**A. Industry Background**

SS&C[1] provides computer software and services—including the flagship Geneva portfolio accounting product—to asset managers such as hedge funds and investment advisors, among other financial firms. Roley Decl. ¶ 3. The marketplace for asset management software and services is large, fragmented, highly competitive, and rapidly evolving. *Id.* ¶ 5. Geneva competes with many other portfolio management platforms, including BNY Mellon's Eagle, SimCorp, FIS' Sungard, Enfusion, and BlackRock's Aladdin, as well as prime brokers and financial services firms offering fund administration services, specialized fund administration providers, smaller providers of specialized applications and technologies and asset managers' own internal IT departments and solutions. *Id.*

SS&C distributes its products through two channels relevant here. First, SS&C licenses Geneva directly to customers. *Id.* ¶ 10. Each such direct customer has an individual license

---

[1] SS&C Technologies Holdings, Inc. is the parent company of wholly owned subsidiaries Advent Software, Inc. and SS&C Technologies, Inc (together, "SS&C").

3

agreement with SS&C setting forth the terms of the license such as when the license expires, how the parties can renew it, and who may access and use that customer's copy of Geneva. *Id.* Some direct customers also obtain related services—such as hosting and integration with the customer's other systems—from SS&C, while other direct customers obtain such services from third parties, including Arcesium. *Id.* ¶ 3, 7. If a direct customer wants to use a third party to perform services related to Geneva, it must negotiate with SS&C for third-party access as part of its Geneva license. *Id.* ¶ 10. Only authorized parties may access and use Geneva, which is the copyrighted intellectual property of SS&C. *Id.* ¶ 4. Second, SS&C has reseller agreements pursuant to which SS&C licenses Geneva to the resellers and vests them with the right to sublicense Geneva to customers. *Id.* ¶ 4, 7.

### B. SS&C's Reseller Agreement With Arcesium

On March 25, 2015, SS&C entered into a five-year Hosted Reseller Agreement with Arcesium (the "HRA"). Nathanson Decl. Ex. A.[2] Under the terms of the HRA, Arcesium received a license from SS&C to "load, install, access, execute, perform, display, view, store and otherwise use" Geneva. Ex. A § 3.1. This license enabled Arcesium not only to resell Geneva to customers, but also gave it the right to host and perform value added services for customers, Ex. A §§ 3.1, 6.1. Arcesium is one of many technology services companies that offer solutions to financial firms, including technical support, hosting, and value-added services. Roley Decl. ¶ 6.

When reselling Geneva, Arcesium was required under the HRA to enter into an agreement with the end customer containing terms attached to and made part of the HRA. Ex. A § 4.3 & Ex. C-1. The list of required terms contains a provision stating that the resold customer's

---

[2] References to Ex. are the exhibits attached to the affidavit of John Nathanson, dated June 25, 2020.

sublicense to use Geneva automatically terminates upon the termination of the HRA, in which

case it was contemplated that SS&C would enter direct licenses with the customer:

> Termination. The rights and license to the Software set forth in this Agreement shall automatically terminate upon the termination of Vendor's agreement with Advent Software, Inc. ("**Supplier**") that grants Vendor the rights to sublicense the Software to Client. Client may need to contact Supplier directly for continued use of the Software following termination of Vendor's agreement.

Ex. A Ex. C-1 §3. The HRA was set to expire by its terms on January 10, 2020, as long as SS&C

gave at least 90 days' advanced notice of its intent not to renew. Ex. A §§ 10.1, 10.2.

SS&C's goal in entering the HRA was to increase its revenues by encouraging Arcesium

to market Geneva to new customers. Roley Decl. ¶ 11. This arrangement proved unsuccessful

because Arcesium brought in very few customers that were accretive to SS&C's Geneva

revenue. Indeed, Arcesium had only four resold customers when the HRA expired. *Id.* ¶ 15.

Unwilling to continue a commercially flawed arrangement, SS&C notified Arcesium on

October 1, 2019 that it would not renew the HRA when the term expired on January 10, 2020.

Ex. F. This provided the requisite notice to terminate the contract set forth in Section 10.2 of the

HRA. Ex. A § 10.2. Over the next few weeks, SS&C offered to renew Arcesium's contract on

terms ████████████████████████████████████████

█████████████. Roley Decl. ¶ 13. Arcesium rejected SS&C's proposals, and in

November 2019, the parties agreed that they were not going to reach a renewal agreement. Ex.

G. On January 10, 2020, the HRA expired by its terms. Ex. A § 10.1.

### C. Arcesium's Resold Customer Contracts

Only four resold customer agreements existed as of January 10, 2020, the date the HRA

expired. Roley Decl. ¶ 15. Each of these customers has a Geneva license that will remain valid

until each customer's individual license (or renewal term of that license) expires. *Id.* ¶ 16. The

5

earliest license expiration among the four customers is July 10, 2020 for Firm E. Ex. B. The

other three customers are Firm M, Firm D, and Firm I. Roley Decl. ¶ 15, 19. These customers'

licenses expire between January 2021 and October 2022. Ex. C; Ex. D; Ex. E. All four resold

customers' licenses automatically renew unless either SS&C or Arcesium provides at least 35

days' notice prior to expiration. *E.g.*, Ex. B (Firm E license automatically renews "unless either

[Arcesium] or [SS&C] provides thirty five (35) days advance notice to the other party prior to

the expiration of the then-current term of its intent not to renew . . .").

### D.   Arcesium's "Run Off" Rights For Resold Customers

Upon the expiration of the HRA on January 10, 2020, Arcesium's Geneva license—and

its right to use, access, promote, or market Geneva and related software—terminated. Ex. A §

10.4. As relevant to this dispute, only a few provisions of the contract survive termination. Ex. A

§ 10.7. One of the surviving provisions is Section 10.4. Under Section 10.4, Arcesium's

obligation upon expiration of the contract is that it would immediately cease promoting,

marketing, or offering to sell Geneva. Ex. A § 10.4(a). Arcesium also promised not to "service

any party with [Geneva], or offer or provide access to [Geneva] to any party," except with

respect to the four existing resold customers. Ex. A § 10.4(a). SS&C included these prohibitions

in the HRA because it did not want Arcesium to promote Geneva in any way after the expiration

of the HRA. Roley Decl. ¶ 21. SS&C carefully monitors and controls the marketing of Geneva to

ensure that information disseminated to the market is accurate, complete, and consistent with

SS&C's marketing strategies, and so that prospective clients' expectations are appropriately set.

*Id.* These efforts are undermined if unauthorized parties market Geneva on their own. *Id.*

For its part, SS&C agreed under Section 10.4 to allow any existing resold customer to use

Geneva through the end of the customer's existing sublicense term and any renewal term, if

agreed. Ex. A § 10.4(b). SS&C further agreed that it would continue to provide support services to these customers until their Geneva sublicense terms ended. Ex. A § 10.4(c). Arcesium in its brief refers to these provisions as "Continuation Rights"—a term that appears nowhere in the HRA. When not engaged in litigation, Arcesium called these "run off rights" (and acknowledged in correspondence with SS&C that "the run-offs end"), Ex. H, which is a more accurate characterization because Arcesium's existing resold customers have the right to use Geneva only through the end of their current term (and any renewal term to which both parties agree), not to continue using Geneva in perpetuity. Ex. A § 10.4(b).

### E.   Arcesium's Improper Marketing and Promotion of Geneva

Arcesium did not abide by its obligations under Section 10.4. Although Arcesium has refused to disclose any information about its post-expiration efforts to market, service and access Geneva, *see* Ex. J (requesting such disclosure), SS&C has uncovered substantial evidence that Arcesium had been flouting these terms:

- One Geneva prospect, Firm J, informed SS&C in January 2020 that it was considering Arcesium in addition to SS&C for its portfolio accounting needs. Nolan Decl. ¶ 4. On March 10, 2020—two months after Arcesium was prohibited from marketing or promoting Geneva to new clients—Firm J inadvertently sent an email to SS&C that was meant for Arcesium. Nolan Decl. ¶ 5. In the email, Firm J reminded Arcesium to be sure to include Geneva pricing in its proposal to Firm J, indicating that Arcesium was improperly discussing a Geneva license as part of its offering to Firm J. *Id.*

- Another Geneva prospect, Firm A, informed SS&C in February 2020 that it planned to use Arcesium to host and integrate Geneva into its other systems. Bernardino Decl. ¶ 4. Firm A was very familiar with technical issues relating to Geneva, indicating that it was well along in discussions with Arcesium. *Id.* When SS&C informed Firm A that Arcesium was no longer an authorized Geneva licensee and no longer could use or access Geneva, Firm A was surprised, a clear indication that Arcesium had not advised Firm A that it no longer had a license. *Id.* ¶ 5. Over the next couple of months, Arcesium repeatedly encouraged Firm A to pressure SS&C to make an exception and allow Arcesium to continue to service Geneva, which SS&C declined. As a result of Arcesium creating the expectation that it could provide a Geneva solution, Firm A was disappointed

with SS&C when SS&C made clear that Arcesium was no longer authorized and no exceptions would be made. Bernardino Decl. ¶ 6; Roley Decl. ¶ 23-26. SS&C ultimately lost the business. Roley Decl. ¶ 27.

- In two other examples, financial firms who were Geneva prospects told SS&C in March and April 2020 that they understood they could obtain Geneva services from Arcesium. Kanwar Decl. ¶ 2-3. When SS&C informed the prospects that Arcesium was no longer a Geneva licensee, the prospects were surprised, indicating that Arcesium had continued to speak with them about Geneva even after its license expired. *Id.*

If there is any doubt as to whether Arcesium intended to continue to promote and offer Geneva following expiration of the HRA, such doubt is resolved by Arcesium's efforts to bolster its internal Geneva sales capacity even as its Geneva license was about to expire. In December 2019, two months after SS&C provided its notice of non-renewal, and when Arcesium knew that its Geneva license would expire in a few weeks, Arcesium improperly tried to hire SS&C's key Geneva sales executive. Nolan Decl. ¶ 6; Nolan Decl. Ex. A. Arcesium was looking to fill the position of "Sales Engineer," responsible for marketing and sales of Arcesium's solutions. *Id.* Arcesium interviewed the SS&C executive about his Geneva work, making clear that Arcesium wished to draw on that expertise if he were hired. *Id.* The employee declined the offer. *Id.* Arcesium's effort to poach SS&C's key Geneva employee was a blatant violation of the HRA, which prohibits Arcesium from soliciting SS&C employees during the term of the HRA and for one year thereafter. Ex. A § 17.9. Further, this solicitation demonstrates that Arcesium's decision to continue marketing Geneva following expiration of the HRA was deliberate and premeditated.

## F.  SS&C Declares Arcesium in Material Breach

On April 13, 2020, SS&C sent a letter to Arcesium declaring Arcesium in material breach of the contract based on Arcesium's continued marketing and offers of access to Geneva and related services. Ex. I. SS&C demanded that Arcesium disclose the identities of any prospects to which Arcesium had offered Geneva (a request to which Arcesium has never responded). *Id.*

8

SS&C terminated all of Arcesium's surviving rights under the HRA, including Arcesium's right to have its own Geneva development license. *Id.* SS&C expressly stated that Arcesium's four existing resold customers could continue to access and use Geneva, but Arcesium could not continue providing Geneva-related services that require a license. *Id.* While SS&C never cut off or threatened to cut off any customer's access to the Geneva support portal, Arcesium has feigned injury by pretending as if customers were no longer receiving service. Ex. J. To clarify, SS&C emailed Arcesium on April 22, 2020 to tell it that SS&C would address any Geneva-related support or technical issues for their four resold customers. Ex. L. The resold customers' access to Geneva and the support portal remain active to this day. Roley Decl. ¶ 29.

### G. SS&C's Subsequent License Negotiations

Much of Arcesium's TRO request is premised on the supposed business disruption that will befall two customers whose Geneva licenses are set to expire in July: Firm F (a direct customer of SS&C that uses Arcesium for Geneva-related services) and Firm E (a resold customer). SS&C has already entered into new license agreements with Firm F and Firm E and has provided them with new license keys. Roley Decl. ¶¶ 17, 32. As part of its new agreement with Firm E, ███████████████████████████████████████████████████████████████. *Id.* SS&C is likewise in discussions with Firm F ███████████████████████████. ████████. ████████████████████████████████. *Id.* In short, neither of these customers is at any risk of losing access to Geneva in the near-term.[3]

---

[3] Arcesium also refers in its submission to three customers whose license keys expire in August, September, and November 2020, which are Firm H (a direct customer), Firm I (a resold customer), and Firm D (a resold customer). Suri Decl. ¶ 25. Arcesium never mentioned these customers in correspondence leading up to its TRO motion. Further, Arcesium is confusing the duration of these customers' Geneva licenses with interim billing events by which SS&C ensures that the customers pay their annual license fees. The terms of these customers' Geneva licenses

## ARGUMENT

A TRO is an "extraordinary and drastic remedy" that should be granted only if the movant carries its burden "by a clear showing." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005). A movant is entitled to a TRO if it proves that (a) it will suffer irreparable harm absent the TRO and (b) either (1) it is likely to succeed on the merits of its claim or (2) sufficiently serious questions about the merits exist, plus a balance of the hardships tip decidedly in movant's favor. *E.g., Otoe-Missouria Tribe of Indians v. N.Y. Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014). Arcesium cannot carry its burden as to any of these elements.

## I. ARCESIUM HAS NOT SHOWN THAT IT WILL SUFFER IRREPARABLE HARM

Irreparable harm is the most important element in the TRO analysis. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). To prove irreparable harm, a movant must show that without a TRO it will suffer "an injury that is neither remote nor speculative, but actual and imminent," and one that cannot be remedied with money damages. *Id.* Arcesium does not come close to making the necessary showing.

### A. Arcesium's TRO Request Is Untimely And Its Claimed Urgency Is Self-Inflicted

Arcesium's several-month delay in filing this TRO request despite being aware of the challenged conduct is reason enough to deny the requested relief. As the Second Circuit has emphasized, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of

---

do not come up until September 2021 (Firm I), August 2022 (Firm H), and October 2022 (Firm D). *Id.*

those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."
*Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

Here, Arcesium concedes that it has known the facts underlying its claim for many
months. Arcesium admits that SS&C sent notice of its intent not to renew the HRA on October 1,
2019 and that the HRA expired by its terms on January 10, 2020. TRO Mem. at 8. The main
alleged breach underlying Arcesium's motion occurred on April 13, 2020, when SS&C
terminated Arcesium's post-expiration rights due to Arcesium's continued marketing of Geneva.
*See id.* at 13. Arcesium understood that it could no longer access its support portal on April 13,
2020 (however, each customer has its own support portal that remains active to this day), *id.* at 9;
that its development license was revoked on April 20, 2020, *id.* (citing Dougherty Decl. ¶ 16);
and, by early May, that SS&C would not commit to renewing the licenses of Firm E or Firm F
(the two customers with July license expirations), Ex. N.

Arcesium also was aware months ago of the alleged harm that it now characterizes as
urgent and irreparable. On April 16, 2020, Arcesium asserted that it would be irreparably harmed
by SS&C's supposed April 13, 2020 breach. Ex. J at 3. On May 7, 2020, Arcesium's counsel
again asserted that it would suffer irreparable harm if SS&C did not commit by a deadline of
May 11, 2020 to provide new license keys for the two customers with July expirations. Ex. M at
2. That date came and went without SS&C committing to give Arcesium new license keys.

All of these events—including the facts underlying Arcesium's claims and Arcesium's
assertions of irreparable harm—took place months ago, yet Arcesium waited until now to file
this motion. Arcesium's months long delay clearly establishes that any harm it claims to suffer is
neither urgent nor irreparable. *See, e.g.*, *Christopher Norman Chocolates, Ltd. v. Schokinag
Chocolates N.A., Inc.*, 270 F. Supp. 2d 432, 438 (S.D.N.Y. 2003) (movant's delay in requesting

11

relief after a contract was terminated established that injury was not irreparable); *Roberts v. Atl. Recording Corp.*, 892 F. Supp. 83, 87-88 (S.D.N.Y. 1995) (delay of 12 days after a self-imposed deadline precluded finding of irreparable harm).

### B. The HRA Does Not Create A Presumption Of Irreparable Harm

Arcesium emphasizes a provision in the HRA that it says creates a presumption of irreparable harm. TRO Mem. at 21-22. The plain language of this provision shows otherwise:

> Both Parties agree that any violation or threatened violation of Section 3 (License), Section 12 (Confidential Information), Section 15 (Ownership) and Section 18.9 (Non-Solicitation) of this Agreement *may cause* irreparable injury to the other Party for which monetary damages *may not* be an adequate remedy and that each party will be entitled *to seek* injunctive relief in addition to any other damages or equitable relief for any breach of the above.

Ex. A § 17.12 (emphasis added). As a threshold matter, Section 17.2 does not apply to Arcesium's claims because Section 17.2 is expressly limited to four specific provisions in the HRA, which do not include Section 10.4 on which Arcesium bases its breach of contract claim.[4]

Even if it did apply, Section 17.12 does not create a presumption of irreparable harm. It merely clarifies that either party *may* seek injunctive relief, *i.e.*, that the option of injunctive relief may be pursued, not that it is justified or admitted. This permissive language is categorically different from the language in the cases Arcesium cites, where the parties agreed that certain types of breaches *would in fact* constitute irreparable harm. *See Roswell Capital Partners v. Alt. Constr. Techs.*, No. 08 Civ. 10647 (DLC), 2009 WL 222348, at *17 (S.D.N.Y. Jan. 30, 2009) (contract terms "specify[ing] that a default constitutes irreparable harm");

---

[4] Section 17.12 includes a reference to the HRA license provision, Section 3.1. At the time of SS&C's alleged breach, the HRA had expired, and Section 3.1 did not survive termination. Ex. A. Thus, Arcesium did not have rights under that provision after January 10, 2020.

*Iannucci v. Segal Co.*, No. 06 Civ. 4720 (PKL), 2006 WL 8407380, at *3 (S.D.N.Y. June 26, 2006) ("Here, the Agreement states that plaintiff recognizes that a breach of the restrictive covenant would irreparably injure Segal."); *Bank of Am. N.A. v. PSW NYC LLC*, 29 Misc. 3d 1216 (A) (N.Y. Sup. Ct. 2010) (parties acknowledged that "a breach by any party hereunder would cause irreparable harm . . ."). And irrespective of the terms of the contract, courts must still make an independent evaluation of irreparable harm. *See Bakers Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987).

### C. Arcesium Cannot Premise Its Showing Of Irreparable Harm On Supposed Injuries To Its Customers, And There Are No Such Injuries In Any Event

Throughout its brief, Arcesium asserts that its inability to maintain perpetual access to Geneva will disrupt the business of its customers who use Arcesium for Geneva related services. *See, e.g.*, TRO Mem. at 1, 2, 3, 4, 7, 13, 22-23. But disruption to customers (even if true, which it is not) does not support Arcesium's request for a TRO because it would not be harm *to Arcesium. E.g.*, *Biocon Ltd. v. Abraxis Bioscience, Inc.*, No. 16-CV-6894 (RMB), 2016 WL 5817002, at *4 (S.D.N.Y. Sept. 26, 2016) (terminated prescription drug distributor could not establish irreparable harm by potential injuries to non-party patients). It is well settled that a party moving for a TRO must show "that *it* will suffer irreparable harm in the absence of an injunction." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 172 (2d Cir. 2001) (emphasis added). The moving party cannot premise its claim on the injuries to non-movants. *Moore*, 409 F.3d at 511 ("We also affirm the court's holding that the alleged harm to third parties did not provide plaintiff a basis for a preliminary injunction in this case."); *Sterling v. Deutsche Bank Nat'l Tr. Co.*, 368 F. Supp. 3d 723, 728 n. 9 (S.D.N.Y. 2019) ("To the extent that Plaintiff's claim of irreparable harm is premised on Defendants' attempts to collect rent from Plaintiff's

tenants, his claim fails because the harm caused by such behavior is to tenants, not to Plaintiff."); *Biocon*, 2016 WL 5817002 at *4 (collecting cases).

The customer harm that Arcesium predicts has no basis in reality in any event. Only two of its customers (Firm E and Firm F) have licenses that will expire any time soon (in July), and neither of those customers is at risk of suddenly losing access to Geneva. To the contrary, SS&C has entered into new licenses with each of these customers. Firm E ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. *See supra* at 9. Tellingly, neither these two customers nor any other has filed a declaration in support of Arcesium, much less moved for their own injunction to prevent their Geneva licenses from expiring. Similarly, even though Arcesium months ago lost its own Geneva development license key (which allows it to test and modify Geneva-related products) no customer has complained that its service has been disrupted. The lack of complaints is unsurprising because Arcesium does not need the development key for its resold customers to use Geneva effectively. Roley Decl. ¶ 30. The fact is that the customers' use of Geneva is entirely intact. *Id.* ¶ 29.

### D. Arcesium's Alleged Loss Of Business Is Not Irreparable Harm

Arcesium's contention that it will lose customer revenue when it no longer has a Geneva license amounts to "quintessentially compensable damages." *Sunni, LLC v. Edible Arrangements, Inc.*, 2014 WL 1226210, at *10 (S.D.N.Y. Mar. 25, 2014) (quoting *Freeplay Music, Inc. v. Verance Corp.*, 80 F. App'x 137, 138 (2d Cir. 2003)). This is especially so in the context of a lost revenue claim based on a finite number of customer contracts from which damages may be readily calculated. *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (affirming district court's finding of no irreparable harm where movant had at least a four year

business history from which any money damages could be calculated); *Stewart v. United States I.N.S.*, 762 F.2d 193, 199 (2d Cir. 1985) ("Mere injuries, however substantial, in terms of money, time and energy . . . are not enough to justify injunctive relief."); *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, No. 18 Civ. 11932 (VM),  2019 WL 1949801, at *3 (S.D.N.Y. Apr. 18, 2019) ("If a movant can calculate the harm caused by shuddering their entire business, or a substantial component of it, then there is no irreparable harm."). Nothing in Arcesium's submission justifies disregarding this common sense and well-established rule.

As an initial matter, Arcesium makes no distinction between its potential loss of business from SS&C's direct customers—as relevant here, Firm F and Firm H—and Arcesium's resold customers. The distinction is critical because Arcesium is not a party to SS&C's contracts with its direct customers and, as such, each of these direct customer's rights to Geneva have nothing whatsoever to do with the HRA. Roley Decl. ¶ 31; *see supra* at 4. Put another way, even if Arcesium were successful in enforcing run off rights under the HRA, SS&C would nevertheless have the absolute right to not renew a direct customer's license to which Arcesium is not a party and over which Arcesium has no say. Because any harm associated with Arcesium's loss of business from SS&C's direct customers is unrelated to Arcesium's claim for relief, such business losses may not support a claim of irreparable harm.[5] *See, e.g.*, *Mostaghim v. Fashion Inst. of Tech.*, No. 01 Civ. 8090 (HB), 2001 WL 1537545, at *2 (S.D.N.Y. Dec. 3, 2001) (irreparable harm must flow from violation alleged in the preliminary relief motion).

---

[5] To the extent Arcesium contends that its post-expiration rights under the HRA somehow apply to SS&C's direct customers, Arcesium is wrong. These rights extend only to customers with "Customer Agreements" existing at the time the HRA expires. Ex. A § 10.4. In turn, "Customer Agreements" are defined to include only Arcesium's resold customers. Ex. A § 4.3 (requiring Arcesium to use the terms listed in HRA Ex. C in its resold customer contracts, including language that Arcesium is sublicensing Geneva). *See also* Ex. A Ex. C-1.

15

Arcesium's position does not get any better when only considering its four resold customers who are subject to the HRA. Firm E is the only resold customer with an upcoming license expiration (in July) and, as explained above, SS&C has entered a new direct license with Firm E which allows Firm E ████████████████████████████████████████ ████████████████. With respect to the other two resold customers mentioned in Arcesium's application—Firm I and Firm D—Arcesium has not shown that either customer is at imminent risk of losing Geneva nor that Arcesium's revenue from these two particular customers is in any way material to Arcesium's overall business.  Indeed, in its complaint, Arcesium claims to be *losing money* on its Firm D contract.  Compl. ¶ 79.

Even if Arcesium's loss of customer revenue months or years from now could somehow be considered "imminent," Arcesium would have to show that such losses would "obliterate . . . its entire business." *Subaru Distribs. Corp. v. Suburu of Am. Inc.*, 47 F. Supp. 2d 451, 474 (S.D.N.Y. 1999) ("[N]otice of termination threatens irreparable harm when termination of the franchise would obliterate the dealer's entire business," citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)). Arcesium falls woefully short of this demanding standard as it has made no effort to quantify lost profits from the four resold customers or the effect that those lost profits would have on its business. *Sunni*, 2014 WL 1226210, at *11 (finding no irreparable harm where the movants relied only on their owner's self-serving statement that they would lose 60 percent of their customers but "submitted no evidence regarding their current capitalization, their annual or monthly profits, or their ability to withstand a significant loss in business, or even closure, for a short period of time").

As for the cancelled development license (to which Arcesium has not had access since April), Arcesium offers no details about the harm that might occur if it is not provided with a

16

new key, much less shown that its entire business will be "obliterated" if it does not get one. *See* Dougherty Decl. ¶ 16 (stating only that lack of a development license will "put important delivery deadlines for ongoing development work at serious risk and inhibit Arcesium's ability to support its customers."). Similarly, the fact that a significant percentage of Arcesium's business today relates to Geneva does not mean that it cannot make adjustments as the resold agreements expire over the next couple of years. Any claim that Arcesium's business will be "obliterated" is therefore unsupported and entirely speculative.

Finally, Arcesium's assertion of irreparable harm to its reputation and goodwill is simply a repackaging of its inadequate "destruction of business" theory. Arcesium's contention is premised on the false assumption that customers will "abruptly" be cut-off from Geneva "without time to transition to a new provider" and then blame Arcesium for being left in the lurch. TRO Mem. 22-23. Such a claim is baseless as (i) SS&C notified Arcesium in October 2019 that it would not renew the HRA and Arcesium has therefore had ample time to make transition plans with its customers; (ii) the HRA provides that the customer agreements terminate upon expiration of the HRA and that the customers may contract directly with SS&C, HRA Ex. C-1, which is exactly the procedure being followed with Firm E; (iii) the Firm E ███████████ ████████████████████████████████████████████; and (iv) Arcesium provides no evidence that the Geneva licenses for Firm I  and Firm D will be imminently disrupted or that these two customers are critical to maintaining Arcesium's reputation. In short, Arcesium's alleged harm to its goodwill and reputation is highly speculative, and it is wholly within Arcesium's control to manage the transition responsibly to reduce any such impact.

## II.   ARCESIUM HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS

Arcesium's claim that it has perpetual "continuation rights" to Geneva is contradicted by the plain language of the HRA, which allows for limited run off rights only for the duration of a resold customer's current license term, and any renewal of that term (which either party is free to decline). Separately, SS&C terminated any run off rights Arcesium might have had after the HRA expired when it discovered that Arcesium had repeatedly breached its promise not to market and promote Geneva.

### A. SS&C Has The Right Not To Renew Arcesium's Resold Customers' Licenses

Arcesium argues that Section 10.4 of the HRA allows it to provide Geneva to its resold customers "indefinitely" upon expiration of the HRA. TRO Mem. 7. Such an interpretation flies in the face of New York public policy against contracts of "indefinite duration." *See, e.g.*, *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 607 F. Supp. 2d 600, 603 (S.D.N.Y. 2009) (collecting cases). Even more importantly, Arcesium ignores that Section 10.4 allows limited customer run off rights only for "the duration of the initial term *and any renewal term*" of the customer's sublicense. Ex. A §10.4 (emphasis added). The HRA as well as the customer ordering documents all allow SS&C to choose *not* to renew a sublicense on 35 days' notice prior to the term expiration. *Id.* § 6.9.

The reference to "any renewal term" in Section 10.4 clearly means that, in the context of customer run off rights after the HRA is terminated, SS&C may choose not to renew a resold customer's sublicense when the initial license term expires. Not only is this the plain meaning of Section 10.4, but other provisions of the HRA also repeatedly refer to the expiration and non-renewal of resold customer licenses, *i.e.*, that they are *not* perpetual. *E.g.*, Ex. A § 6.7 (requiring Arcesium to transmit relevant terms of its customer agreements to SS&C, including the length of

the sublicense term); § 6.9 (customer license automatically renews "unless either [SS&C] or
[Arcesium] provides thirty five (35) days advance notice to the other party prior to the expiration
of the then-current term); *id.* ("If a Customer Initial Term (or any subsequent renewal term) *is*
*not renewed* for a Product, Reseller shall have no further right to service the Customer")
(emphasis added); Ex. A-1 (defining "Customer Term End Date"), Ex. C-1 (requiring a provision
in Arcesium's resold customer contracts that the customer's license terminates upon the
termination of the HRA); *id.* (resold customers "may need to contact [SS&C] directly for
continued use of the Software following termination of" the HRA). Notably, the customers'
ordering documents themselves characterize their sublicenses as "term" licenses and repeat that
either party may choose not to renew at the conclusion of a license term. *See* Exs. B, C, D, E..
Certainly, Arcesium has not identified clear and unambiguous contract language necessary to
establish a perpetual obligation. *Compania Embotelladora*, 607 F. Supp. 2d at 603.

Arcesium should not be surprised that, following termination of the HRA, its right to
sublicense Geneva to existing customers is not "indefinite." While Arcesium has adopted the
label "continuation rights" for purposes of this TRO request, when Arcesium was discussing
these rights in the ordinary course it referred to them as "run off rights" because it understood
that the customers can continue to use Geneva only until their terms "run off." *See* Ex. H.
Indeed, in correspondence on January 10, 2020—the very day the HRA expired—Arcesium
acknowledged in correspondence with SS&C that "the run-offs end." *Id.* That is also how the
resold customers see it: after SS&C sent a notice of non-renewal for the Firm E sublicense on
June 4, 2020, Firm E did not argue that its sublicense from Arcesium perpetually remained valid,
but instead negotiated a new direct license with SS&C, as contemplated by the HRA. Roley

Decl. ¶ 17. Arcesium's attempt via this TRO application to rob SS&C of its bargained-for termination rights has no basis in the HRA or New York law and must be rejected.

### B. Arcesium Repeatedly Breached Its Obligation Not To Market And Promote Geneva

An additional, independent ground to reject Arcesium's so-called perpetual "continuation rights" is that Arcesium itself breached its obligations under Section 10.4 of the HRA, and SS&C's performance is therefore excused.

Upon expiration of the HRA, Arcesium was required under Section 10.4 to "immediately cease promoting, marketing and offering to sell [Geneva] to prospective Customers" and Arcesium's "right to service any party with [Geneva], or offer or provide access to [Geneva]" to any new customers "shall terminate." Ex. A § 10.4. This provision was critically important for SS&C, which did not want unauthorized parties marketing and promoting a flagship product and the attendant risks of inconsistent messages, inaccurate information, and disruption of SS&C's own extensive Geneva marketing efforts. Roley Decl. ¶ 21.

Arcesium repeatedly and blatantly disregarded its post-termination obligations. In the three months after the HRA expired, SS&C was informed by not one but *four* separate prospective purchasers of Geneva that they were considering obtaining Geneva or Geneva services from Arcesium. *See supra* at 7-8. While the full story of Arcesium's misconduct is uniquely in its possession (and Arcesium has refused to disclose those facts to SS&C), SS&C has discovered ample evidence that Arcesium was pitching its Geneva capabilities to prospective customers after the January 10, 2020 expiration of the HRA. *Id.* In fact, Arcesium had clearly decided in December 2019 (after it received SS&C's notice of non-renewal) that it would continue marketing Geneva as evidenced by Arcesium's improper solicitation of SS&C's key Geneva sales executive. *Supra* at 8. There is no explanation for this outrageous conduct in direct

20

violation of the HRA other than that Arcesium made a conscious choice to disregard its contractual obligations to maintain its Geneva business after it was no longer licensed to do so.

Arcesium carefully avoids making any factual denial that it promoted and marketed Geneva after the HRA expired. Instead, Arcesium focuses on its efforts in May 2020—a full *four months* after the January 10, 2020 expiration date—to "cure" the breach by affirmatively informing customers that any Geneva license would require consent from SS&C. TRO Mem. at 10. But, contrary to Arcesium's argument, Section 10.4 of the HRA contains no notice and cure provision; Arcesium only had the right to a notice and cure period if SS&C terminated the HRA during the term of the agreement for material breach under Section 10.3. Section 10.3 did not survive expiration. Ex. A § 10.7. Accordingly, once the HRA expired—and the parties' conduct was governed by Section 10.4—no notice and cure process applied.

Further, Arcesium's supposed "cure" was ineffective and only exacerbated the breach. *See Sinco Inc. v. Metro-N. Commuter R.R. Co.*, 133 F.Supp.2d 308, 313 (S.D.N.Y. 2001) (party attempting to cure has the burden to prove the cure is effective). For example, Arcesium sent a script to its sales personnel that informed prospective customers: "We'd be happy to talk about including Geneva in your Arcesium solution if that's of interest and Advent is willing." Nable Decl. ¶ 17. This statement is exactly what the parties agreed to avoid as it created unrealistic expectations on the part of the customers that Arcesium (now an unauthorized, unlicensed party) could meet their Geneva needs and put SS&C in the untenable position of either reversing its decision not to renew the HRA or alienating the customer. Roley Decl. ¶ 26. Section 10.4 does not provide any exception for Arcesium's marketing efforts that shift responsibility for license decisions to SS&C; the point of Section 10.4 is that Arcesium must immediately cease *any*

21

promotion or marketing of Geneva, or offering to sell or provide access to Geneva. Arcesium clearly violated that obligation.

Finally, Arcesium's intentional and repeated breaches of Section 10.4 were unquestionably "material." Upon termination of the HRA, the parties' surviving obligations were narrow. As to Section 10.4—the applicable post-termination provision at issue here—Arcesium's *only* continuing obligation was to cease any promotion or marketing of Geneva, or offering to sell or provide access to Geneva. Not only did Arcesium disregard the one obligation it had (which it did in a deliberate, premediated manner, having improperly tried to recruit SS&C's top Geneva sales person), but the effect of the breach was precisely what SS&C had bargained to avoid. Roley Decl. ¶ 26. Arcesium's failure to comply with this important, bargained-for obligation goes to the "root" purpose of the HRA's post-termination provisions and excuses SS&C from any remaining obligations it may have had under the HRA. *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 417 (S.D.N.Y. 2004); *Marisa Cristina, Inc. v. Freis*, 646 F. Supp. 252, 254 (S.D.N.Y. 1986) ("[W]ith the breach fall all other parts of the contract") (internal quotation marks omitted).

### C.  Arcesium Is Not Likely to Succeed On The Merits Of Its Breach Of Contract Claim Concerning The Alleged Firm E Renewal Agreement.

Unable to demonstrate any breach by SS&C, Arcesium desperately attempts to convert an errant automated email reminder into a one-year renewal of the Firm E sublicense. TRO Mem. at 20-21. Arcesium's "gotcha" approach to contract interpretation is wrong on the merits. SS&C's automated email was not an offer to Arcesium because "[a]n offer does not exist unless the offeror manifests an intent to be bound." *Neenan v. United States*, 112 Fed. Cl. 325, 329 (2013), *aff'd*, 570 F. App'x 937 (Fed. Cir. 2014); s*ee Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 106 (2018) (whether an agreement exists "is not to be put on any single act, phrase

22

or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain."). Here, SS&C did not manifest an intent to be bound; in fact, the totality of the circumstances indicates just the opposite.

In the lead up to the inadvertent email, SS&C and its counsel had been telling Arcesium for weeks that Arcesium's rights to continue using Geneva to service customers had expired and that its surviving rights to service resold customers had been terminated because of Arcesium's breaches. Exs. I, K, M. In the face of these clear communications, it is not credible that Arcesium would have seriously thought that an obviously auto-generated email constituted an offer to renew on terms that would have allowed Arcesium to continue to use Geneva. Arcesium knows that too. Arcesium's haste to accept SS&C's inadvertent "offer" and the legalistic way in which its "acceptance" was drafted belies the notion that Arcesium believed that SS&C's email was a genuine offer to renew. Ex. O. Moreover, the day after being notified of this supposed "acceptance," SS&C's counsel explained that the email was accidental and did not constitute an offer. Ex. P. And, as Arcesium admits, the parties' prior course of dealing was that a license would be renewed, and license keys provided, only after SS&C generated an invoice and Arcesium made payment. Cicalo Decl. ¶¶ 5-8; Roley Decl. ¶ 19. None of that occurred, which was yet another signal that the email was unintentional and that no agreement was consummated.[6]

---

[6] Arcesium's two cited cases are distinguishable. In, *Kolchins*, the offeror sent a "congratulatory exclamation" after the offer was accepted. 31 N.Y.3d at 107. That is far from the case here where the opposite occurred: SS&C's counsel explained that the email was unintentional and did not constitute an offer. *Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360 (S.D.N.Y. 2006) does not support Arcesium either. In that case, the court looked at the parties' prior course of dealing to determine whether a contract existed.  Here, the parties' course of dealing involved SS&C

Even Firm E—whose sublicense was supposedly renewed—has not acted as if
Arcesium's position is correct. Instead of relying on the alleged renewal of the sublicense via
Arcesium, Firm E continued to negotiate and then entered a direct license agreement with SS&C.
Roley Decl. ¶ 17. Taken together, these events show that Arcesium alone clings to a desperate
argument that a quickly repudiated auto-generated email—that was contrary to everything SS&C
was telling Arcesium, the parties' previous course of dealing, and the customer's own actions—
constituted a legitimate offer. Simply put, no contract was made.

Further, notwithstanding Arcesium's incorrect interpretation of the law, under Firm E's
new direct license with SS&C,                                                        . Roley
Decl. ¶ 17. Even if Arcesium were correct that the renewal had occurred—which it has not—the
stakes, therefore,

That is
hardly the stuff of irreparable harm.

## III.   THE BALANCE OF HARDSHIPS DOES NOT TIP DECIDEDLY IN ARCESIUM'S FAVOR

The balance of the hardships do not tip "decidedly" in Arcesium's favor, nor would the
injunction preserve the status quo. TRO Mem. 24. In actuality, any hardship that Arcesium
imagines pales in comparison to the harm that a TRO would inflict on SS&C.

The status quo for more than two months has been that SS&C has terminated Arcesium's
rights to continue using SS&C's intellectual property for its resold customers, including because

---

invoicing Arcesium and payment. None of that took place, which demonstrates there was no
contract.

of Arcesium's repeated breaches. What Arcesium is asking for in this TRO application is an affirmative injunction to allow it to "indefinitely" exploit SS&C's intellectual property, not only with respect to the four resold customers sublicensed under the HRA but also with respect to SS&C's direct customers whose contracts have nothing to do with the HRA. As a practical matter, such an injunction would strip SS&C of any ability to establish the terms of use for one of its flagship software products—because the existing licenses would all now be artificially and perpetually frozen, with no opportunity for renegotiation or cancelation. A more onerous imposition on the constitutionally protected rights of an intellectual property owner is difficult to imagine. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (copyright holders have the right to license or not license their copyrighted work at their discretion, and protecting that right is in the public's interest).

Denial of the TRO, on the other hand, would maintain the status quo in which the four resold customers' Geneva licenses would gradually expire over the next few years and SS&C would be free to enter direct licenses on terms of its choosing. The devaluation of SS&C's intellectual property rights across the board easily trumps any discrete and gradual business loss that Arcesium speculates that it might suffer.

## CONCLUSION

For the foregoing reasons, this Court should deny Arcesium's TRO application.

Dated: New York, New York
      June 25, 2020

Respectfully submitted,

/s/ *Stephen R. Fishbein*
Stephen R. Fishbein
John A. Nathanson
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

25

Email:
    stephen.fishbein@shearman.com
    john.nathanson@shearman.com

John F. Cove Jr.
SHEARMAN & STERLING LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105-2997
Telephone: (415) 616-1139
Email:  john.cove@shearman.com

*Attorneys for Defendants Advent Software, Inc.*
*and SS&C Technologies Holdings, Inc.*