```
                                              ┌─────────────────────────────────┐
                                              │ USDC SDNY                       │
                                              │ DOCUMENT                        │
                                              │ ELECTRONICALLY FILED            │
                                              │ DOC #:_____          │
                                              │ DATE FILED: 3/31/2021           │
                                              └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARCESIUM, LLC,

                              Plaintiff,                    1:20-cv-04389 (MKV)

          -against-                                         **OPINION AND ORDER
                                                            GRANTING MOTION TO
ADVENT SOFTWARE, INC., and SS&C                             DISMISS**
TECHNOLOGIES HOLDINGS, INC.

                              Defendants,

---

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Arcesium, LLC brings this action against Defendants Advent Software, Inc. and SS&C Technologies Holdings, Inc. for violations of federal and state antitrust law as well as claims under state law for breach of contract, tortious interference, and unfair competition. Previously, Plaintiff, pursuant to the Parties' "Reseller Agreement," was authorized to sell licenses to use Defendants' portfolio accounting software called Geneva, which is widely used by various types of investment funds and portfolio managers. However, Plaintiff claims that Defendants wrongfully terminated the agreement and then extinguished certain residual rights that Plaintiff was entitled to exercise even after termination. Plaintiff alleges that the actions were part of a singular scheme to cut Plaintiff out of the market and to harm competition in the market for portfolio accounting and post-trade solutions for investment firms. Defendants moved to dismiss Plaintiff's Complaint on several grounds, including that Plaintiff failed to adequately establish antitrust standing and relevant markets effected by anticompetitive conduct. For the reasons that follow, Defendants' Motion to Dismiss is GRANTED.

## FACTUAL BACKGROUND

### A.    *Fact Giving Rise to the Dispute*

The facts as stated herein are drawn from Plaintiff's Complaint, ECF No. 1 ("Compl."),

and are assumed to be true for the purpose of the Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).

Plaintiff Arcesium is a financial services company that provides middle- and back-office

support for investment funds and fund administrators.  Compl. ¶ 26.  Specifically, since 2015,

Arcesium has marketed the Arcesium Platform (the "Platform"), which provides real-time

information and administration of a firm's investments, order management, and oversight of

administrators.  Compl. ¶¶ 25-26.  As designed, the Platform manages all of a firm's post-trade

activities, including reconciliation of accounts and cash and collateral management.  Compl. ¶¶

21, 27.  However, the Platform as designed did not include so-called "portfolio accounting

software."[1]  Instead, Arcesium partnered with Defendant Advent Software to license Advent's

proprietary portfolio accounting software, Geneva, and to incorporate it into the Platform.

Compl. ¶ 27.  Plaintiff alleges that Geneva is an industry standard portfolio accounting software.

Compl. ¶ 27.  Arcesium's Platform then integrates the other functionality of the Platform with

Geneva and eliminates firm's reliance on separate systems for their back-office solutions.

Compl. ¶¶ 31-32.

Advent, the company that developed Geneva, was purchased by Defendant SS&C in

2015, after Advent had already, according to Plaintiff, become "a dominant provider of Post-

---

[1] As described in Plaintiff's Complaint, "portfolio accounting software" provides firms with easily managed accounting tools to maintain the firm's books and records.  Compl. ¶ 18.  Portfolio accounting software also allows a firm to easily run reports required by various regulatory authorities.  Compl. ¶ 18.  Plaintiff alleges that "the vast majority, if not all, Complex Funds [defined as investment firms with more than $5 billion in assets under management] . . . use Portfolio Accounting Software."  Compl. ¶ 19.

Trade Solutions."[2]  Compl. ¶¶ 34-35.  Like Arcesium, SS&C also markets and sells Post-Trade

Solutions to investment firms.  Compl. ¶¶ 35, 40.  Plaintiff alleges that SS&C has used Geneva,

as the industry standard portfolio accounting software, and the threat to funds of losing access to

Geneva, in order to dominate the market and push out competitors.  *See* Compl. ¶¶ 38, 40.

As is done by most consumer software providers, Defendants provide individual funds

with a "license key" to enable Geneva to function on the fund's system.  Compl. ¶ 37.  Funds can

secure a license for Geneva either directly from Defendants or through an authorized reseller,

which may include the fund's administrator or provider of Post-Trade Solutions.  Compl. ¶ 39.

In March 2015, Arcesium entered into a Reseller Agreement with Advent allowing Arcesium to

incorporate Geneva into the Platform and sell the software to Arcesium's customers.  Compl. ¶¶

50-51; *see* Declaration of John Nathanson in Support of Motion to Dismiss, ECF No. 83, Ex. A

(the "Reseller Agreement).[3]  The Reseller Agreement expired by its terms in January 2020, with

automatic renewal.  Compl. ¶ 54; Reseller Agreement § 10.1.  But either party, with 90 days'

notice, could elect not to renew the agreement.  Compl. ¶ 54, Reseller Agreement § 10.2.  The

Reseller Agreement also could be terminated for cause, when there existed "a material breach of

the [Reseller Agreement] that remain[ed] uncured after a 30-day notice-and-cure period.  Compl.

¶¶ 54, 61; Reseller Agreement §§ 10.3.

---

[2] As defined in the Complaint, "Post-Trade Solutions" include software and systems designed to assist funds in executing "post-trade tasks, including (i) portfolio accounting, (ii) cash management, (iii) collateral management, (iv) data management and corporate action processing, and (v) reconciliation."  Compl. ¶ 21.  The Court understands Arcesium's Platform to be an example of a system that provides "Post-Trade Solutions."

[3] The Reseller Agreement was attached in full to the declaration of counsel submitted in support of Defendants' motion to dismiss.  The contract was filed under seal to protect confidential customer names and trade secret information.  *See* Order Granting Letter Motion to Seal, ECF No. 85.  However, throughout the publicly accessible briefs in this case, both Parties cite to numerous provisions of the Reseller Agreement.  The Court takes this to mean that the content of the agreement that was referenced or included in the briefs is not confidential or subject to sealing.  The Court references some of these citations and provisions in this Opinion.

The Reseller Agreement also provided for "Continuation Rights" for Arcesium and its then-existing customers in the event the Reseller Agreement expired.[4]  Compl. ¶¶ 55-60, Reseller Agreement § 10.4.  The Continuation Rights allowed any of Arcesium's customers to continue using Geneva, and provided that Advent would continue to provide support for these customers, for any period under their then-existing "Customer Agreement" with Arcesium or any renewal period agreed to by the Parties, as long as Arcesium continued to pay licensing fees to Advent.[5]  Compl. ¶¶ 55-56, 59, Reseller Agreement § 10.4.  However, if the Reseller Agreement was terminated for cause as a result of a material breach by Arcesium, the Continuuation Rights last only through the first renewal of a customer's agreement with Arcesium, functionally phasing out Arcesium's access to the Geneva software without immediately burdening customers.  Compl. ¶ 57.; Reseller Agreement § 10.5.  In any case, if the Reseller Agreement expired or was terminated, Arcesium was then prohibited from "promoting, marketing, or offering to sell" Geneva to anyone.  Compl. ¶ 56; Reseller Agreement §§ 10.4-10.5.

On October 1, 2019, Defendants provided to Arcesium notice of their intent not to renew the Reseller Agreement upon its termination in January 2020.  Compl. ¶ 64.  The Parties thereafter engaged in negotiations to renew or enter into a new agreement.  *See* Compl. 65-66.  Arcesium alleges that in exchange for a proposed renewal of the Reseller Agreement, Defendants sought to impose "predatory terms" to "effectively take Arcesium out of the marketplace," including limitations on Arcesium's marketing of the Platform and prohibitions on marketing

---

[4] Plaintiff labels these as "Continuation Rights" in the Complaint, but Defendants point out that the term does not appear in the Reseller Agreement at all.  *See* Memorandum of Law in Support of Motion to Dismiss, ECF No. 79, at 7.  Nonetheless, the Court employs the term here as used in the Complaint to refer to Arcesium's rights that survive the termination of the Reseller Agreement.

[5] As alleged, the Continuation Rights could extend in perpetuity, provided that Arcesium and its customer continued to renew their customer agreement.  Compl. ¶ 56.  However, Defendants point out that Reseller Agreement gives Defendants the ability to terminate a customer's sub-license to use Geneva on 35 days' notice.  *See* Memorandum of Law in Support of Motion to Dismiss, ECF No. 79, at 7 (citing Reseller Agreement § 6.9).

Geneva to certain groups of customers entirely.  Compl. ¶ 66.  Because the Parties were unable to negotiate a renewed Reseller Agreement, the existing contract expired on January 10, 2020. Compl. ¶ 70.

In April 2020, Defendants sent a letter to Arcesium stating that Arcesium was in breach of the Reseller Agreement "by continuing to market [Geneva] to multiple prospective Customers since the expiration of the Agreement."  Compl. ¶ 87.  The letter then purported to terminate all of Arcesium's rights under the Reseller Agreement, including the Continuation Rights that had survived the termination of the agreement in January.  Compl. ¶ 87.  Following receipt of the letter, SS&C terminated Arcesium's access to a Geneva support portal and did not renew Arcesium's Geneva developer license (which had allowed Arcesium to package Geneva into the Platform).  Compl. ¶ 94.

Arcesium contends that it did not market Geneva after the termination of the Reseller Agreement.  Compl. ¶¶ 86, 88, 91.  Plaintiff further alleges that following the termination of its continuation rights, it has lost business as customers have abandoned Arcesium's Platform in favor of Defendants' Post-Trade Solutions (because it is compatible with Geneva) or because customers' new agreements with Defendants preclude them from using Arcesium to service their Geneva software.  *See, e.g.*, Compl. ¶¶ 73, 75, 100.

**B.    *Procedural History***

Plaintiff filed this action in June 2020.  *See* Complaint, ECF No. 1.  The Complaint alleges that Defendants together, through their efforts to terminate the Reseller Agreement and deny Arcesium the Continuation Rights to which it was entitled, violated federal and state

antitrust laws, New York state business law, and committed several common law torts.[6] Specifically, by way of antitrust claims, the Complaint alleges violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, Section 3 of the Clayton Act, 15 U.S.C. § 14 , and the New York Donnelly Act, N.Y. Gen. Bus. L. § 340.  *See* Compl. ¶¶ 102-173.  In addition to the antitrust claims, the Complaint also alleges two breach of contract claims, two tortious interference claims, and an unfair trade practices claim under New York General Business Law Section 349.  *See* Compl. ¶¶ 174-217.

After the Complaint was filed but before Defendants responded to it, Plaintiff filed a motion for a temporary restraining order based on the allegations in the Complaint, seeking to require Defendants to provide renewed license keys for the Geneva accounts of certain Arcesium customers whose access either was about to or did expire.  *See* Proposed Order to Show Cause, ECF No. 20, at 2.  However, the Parties resolved the dispute without Court intervention, and the motion was withdrawn.  *See* Order, ECF No. 61.

In support of their motion to dismiss the Complaint, Defendants filed a memorandum of law [ECF No. 79] ("Def. Br.") and a declaration of counsel with exhibits [ECF No. 80].[7] Plaintiff opposed the motion by filing a memorandum of law [ECF No. 86] ("Opp.") and a declaration of counsel with exhibits [ECF No. 87].  Defendant then submitted a Reply Memorandum of Law [ECF No. 91] ("Reply") and a reply declaration of counsel [ECF No. 92].

---

[6] Multiple times throughout the Complaint, Plaintiff attempts to cast SS&C and Advent as a single entity following SS&C's purchase of Advent.  *See, e.g.*, Compl. ¶¶ 35, 87.

[7] Both Parties' legal memoranda and declarations are filed twice on the ECF docket, one in a publicly accessible redacted form and a second unredacted copy filed under seal.  *Compare, e.g.*, ECF No. 79 (Defendants' memorandum in support of the motion to dismiss in redacted public form), *with* ECF No. 82 (sealed filing of the unredacted version).  Throughout this Opinion, the Court uses the ECF docket numbers of the publicly accessible versions of the files.

After the motion was briefed, Defendants filed a letter directing the Court's attention to the decision in *SEI Global Services, Inc. v. SS&C Advent and SS&C Technologies Holdings, Inc.*, __ F. Supp. 3d __, 2020 WL 6262187 (E.D. Pa. 2020).  Plaintiff previously had cited the *SEI Global Services* case in support of its allegations in its complaint, since the facts there mirrored Plaintiff's allegations here.  *See* Compl. ¶¶ 69-70.  Defendants' post-motion letter advised the Court that the Pennsylvania district court had granted Defendants' motion to dismiss the *SEI Global Services* complaint with prejudice.  Defendants urged the Court to adopt the same reasoning here.  *See* Letter to Court dated October 26, 2020, ECF No. 96.  Plaintiff filed a letter in response, attempting to distinguish the *SEI Global Services* decision from this case.  *See* Letter to Court dated October 27, 2020, ECF No. 98.

**C.      Summary of Plaintiff's Antitrust Allegations**

A plaintiff in an antitrust action must define the relevant markets at issue in the case and particularize precisely what conduct they allege is anticompetitive.  *Cf. Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("[A] plaintiff initially must show that the challenged action had an actual adverse effect on competition as a whole in the relevant market.").  Therefore, before turning to the Parties' arguments regarding the motion to dismiss, it is useful to outline the specifics of Plaintiff's antitrust allegations.

Here, the Complaint alleges two relevant markets: 1) the market for Portfolio Accounting Software and 2) the market for Post-Trade Solutions.  Compl. ¶ 15.  While Arcesium does not compete with Defendants in the Portfolio Accounting Market, Arcesium does compete with Defendants in the market for Post-Trade Solutions (*i.e.* both Arcesium and Defendants market and sell Post-Trade Solutions platforms to firms and investment administrators).  Compl. ¶ 27.  Plaintiff alleges two submarkets within each market: 1) sales to funds with more than $5 billion

in assets under management (identified as "Complex Funds" in the Complaint), and 2) sales to "Fund Administrators," which provide outsourced services to "Complex Funds." Compl. ¶ 16. The Complaint contains no allegations regarding Defendants' market share in the Post-Trade Solutions market. However, Plaintiff does allege that Defendants, through the sale of Geneva, hold approximately a 70 percent market share among Complex Funds in the Portfolio Accounting Software market and a 60 percent market share among Fund Administrators in the Portfolio Accounting Software market. Compl. ¶¶ 39, 101.

Plaintiff alleges two types of actions which purportedly constitute anticompetitive behavior. First, Plaintiff alleges that Defendants engaged in anticompetitive behavior when they refused to renew the Reseller Agreement and did not offer terms for a renewed agreement that Plaintiff found favorable. Compl. ¶¶ 65-71. Plaintiff broadly defines this behavior as a "refusal to deal." Compl. ¶¶ 73, 120, 137. As other evidence of Defendants refusal to deal, Plaintiff points to Defendants' alleged breach of the Reseller Agreement and termination of Arcesium's access to Geneva in connection with Arcesium's alleged continued marketing and promotion of Geneva. Compl. ¶¶ 87-94. Plaintiff alleges that as a result of Defendants' refusal to deal, Defendants "will further their market and/or monopoly power in the Relevant Markets, with Defendants having the ability to impose anticompetitive price increases on their customers, while reducing the quality of Post-Trade Solutions available to customers by denying customers access to Arcesium's unique offering." Compl. ¶ 72.

Second, Plaintiff alleges that Defendants also have entered into "exclusive dealing arrangements" with customers as another form of anticompetitive behavior. In support of this assertion, Plaintiff alleges that some, but not all, of Defendants' license agreements for Geneva prohibit the customer from working with Arcesium or using Arcesium to manage the customer's

Geneva software.  Compl. ¶¶ 73-84.  Plaintiff alleges that as a result of this behavior, it "has lost significant business from potential customers" and that, if Defendants are allowed to continue entering into the agreements, Arcesium "will lose additional business or be prevented from obtaining additional business."  Compl. ¶ 82.  Plaintiff also alleges that, similar to the consequences of the refusal to deal, Defendants' exclusive dealing arrangements will lead to increased prices and lower quality products for consumers.  Compl. ¶ 84.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6), a plaintiff need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "'accept[] all of the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor.'"  *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019) (quoting *Giunta v. Dingman*, 893 F.3d 73, 78-79 (2d Cir. 2018)).  However, the Court is "'not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'"  *Id.* (quoting *In re Facebook Initial Public Offering Derivative Litig.*, 797 F.3d 148, 159 (2d Cir. 2015)).  When considering a motion to dismiss, the Court is limited to a "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n. 2 (2d Cir. 2016).

## ANALYSIS

Defendants raise several arguments in favor of dismissing Plaintiff's Complaint.  First, with regard to Plaintiff's federal antitrust claims, Defendants argue that Arcesium lacks antitrust

standing, *see* Def. Br. at 10-15, and has failed to allege monopolization and restraint of trade.

*See* Def. Br. at 15-29.  With respect to Plaintiff's state law claims, Defendants first argue that the

Court should decline supplemental jurisdiction over the claims.  *See* Def. Br. at 29-30.  Finally,

Defendants argue that if the Court does exercise jurisdiction, the state law claims here are

insufficiently pleaded.  *See* Def. Br. at 30-40.

## A.      *Plaintiff Lacks Antitrust Standing*

Because "Congress did not intend the antitrust laws to provide a remedy in damages for

all injuries that might conceivably be traced to an antitrust violation," *Associated Gen.*

*Contractors of Cal., Inc. v. Cal. St. Council of Carpenters (AGC)*, 459 U.S. 519, 534 (1983), a

plaintiff asserting antitrust claims must demonstrate that it has "antitrust standing."  *See IQ*

*Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019).  "To satisfy antitrust

standing at the pleading stage a plaintiff must plausibly allege two things: (1) 'that it suffered a

special kind of antitrust injury,' and (2) 'that it is a suitable plaintiff to pursue the alleged

antitrust violations and thus is an efficient enforcer of the antitrust laws." *Id.* (quoting *Gatt*

*Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)).   In this case, Plaintiff

has failed plausibly to allege both an antitrust injury and that it is an efficient plaintiff.

### 1)      *Plaintiff Does Not Allege an Antitrust Injury*

In the Second Circuit, courts employ a three-part test for determining whether a Plaintiff

has alleged an antitrust injury.  First, "the court 'must identify[ ] the practice complained of and

the reasons such a practice is or might be anticompetitive.'" *Id.* (quoting *Gatt Commc'ns*, 711

F.3d at 76) (alteration in original).  Then, assuming the Plaintiff has plausibly alleged some

anticompetitive behavior, the Court "must 'identify the actual injury the plaintiff alleges . . .

[which] requires us to look to the ways in which the plaintiff claims it is in a worse position as a

consequence of the defendant's conduct.'" *Id.* (quoting *Gatt Commc'ns*, 711 F.3d at 76)

(alterations in original).  In connection with this analysis, the plaintiff must explain why it is in a

"worse position" than it would have been absent the anticompetitive conduct.  *Id.* at 63.  Finally,

if a plaintiff has alleged both anticompetitive conduct and injury, the Court must "compare[] the

'anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges,'"

and determine whether the injury "flows from that which makes defendants' acts unlawful." *IQ*

*Dental Supply*, 924 F.3d at 63; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489

(1977).

### a.  Anticompetitive Conduct

First, Plaintiff's Complaint alleges that Defendants have taken anticompetitive action by

refusing to deal with Arcesium and by imposing exclusive dealing arrangements on customers to

prevent Arcesium from offering to integrate accounting information from Geneva into the

customer's platforms.  Compl.  ¶¶ 65-81; *see also* Opp. at 12.  While not all actions of the kind

Plaintiff alleges are anticompetitive, it is beyond dispute that refusals to deal and exclusive

dealing arrangements *may* give rise to antitrust liability.  *See, e.g.*, *Jefferson Parish Hospital*

*Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) ("Exclusive dealing can have adverse economic

consequences by allowing one supplier of goods or services unreasonably to deprive other

suppliers of a market for their goods."), *abrogated on other grounds by Ill. Tool Works, Inc. v.*

*Independent Ink, Inc.*, 547 U.S. 28 (2006); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507

F.3d 117, 125 (2d Cir. 2007) (discussing the kinds of refusals to deal that can be

anticompetitive).

Here however, Defendants' refusal to deal clearly is not anticompetitive.  The Supreme

Court has held that the antitrust laws do not displace the discretion of a private business to decide

on its own with whom it will deal. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)) (hereinafter "*Trinko*"). On its face, Plaintiff's "refusal to deal" simply is an unconsummated offer from Defendants (the creator of copyrighted software) to contract with Plaintiff on terms Plaintiff found unfavorable. Compl. ¶¶ 64-70. Plaintiff points to no authority that establishes this course of conduct as an antitrust violation. And indeed, this precisely is the kind of business decision Defendants are permitted to make as owners of Geneva. *Cf. Primetime 24 Joint Venture v. Nat''l Broadcasting, Co.*, 219 F.3d 92, 99 (2d Cir. 2000) ("It is beyond question that a good-faith [assertion of copyright] cannot violate the Sherman Act."); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) ("[A] copyright [] holder's "exclusive" rights . . . include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable.").

Instead, Plaintiff argues that this case falls into a "limited" exception to the general refusal to deal stemming from the Supreme Court's earlier decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *See Trinko*, 540 U.S. at 409 (describing the *Aspen Skiing* rule as a "limited" exception "at or near the outer boundary of [] liability."). The *Aspen Skiing* exception essentially is that a defendant's refusal to deal may be anticompetitive where the parties had previously been engaged in a voluntary, cooperative, and profitable venture that the defendant terminated and where the defendant's decision to do so cannot be explained by anything other than a desire to harm competitors. *See Aspen Skiing*, 472 U.S. at 608-611; *see also Trinko*, 540 U.S. at 408-09 (discussing *Aspen Skiing*).

Here, Defendants actions do not fit in that narrow exception.  While the Court has no information regarding the profitability of the Parties' Reseller Agreement, the facts that are alleged do not bring this case within the narrow *Aspen Skiing* window in which a refusal to deal can be said to be actionable anticompetitive conduct.  For example, *Aspen Skiing* relied heavily on the fact that the plaintiff and defendant were the only participants in the market and that the defendant refused to deal with plaintiff even at retail price.  *See Aspen Skiing*, 472 U.S. at 589, 593.  Here, Plaintiff makes no such allegations.  In fact, Plaintiff alleges that Defendants did attempt to engage with Plaintiff on renewal of the Reseller Agreement (albeit on terms that were less favorable to Plaintiff than the original Reseller Agreement).  Compl. ¶ 66.  More importantly, in contrast to the facts in *Aspen Skiing*, Plaintiff and Defendants are not the only participants in the relevant markets, here for Post-Trade Solutions and for Portfolio Accounting Software.  Plaintiff alleges that Defendants' Geneva software is used by 60-70 percent of relevant customers in the market for Portfolio Accounting Software.  Compl. ¶¶ 39, 101.  Thus, Plaintiff's own allegations, lead to a reasonable inference that other companies are providing services for the other 30-40 percent.  Additionally, Plaintiff makes no allegation that Defendants are the only other provider in the Post-Trade Solutions market, and instead affirmatively alleges the existence of other Post-Trade Solutions providers.  Compl. ¶ 39.  These distinctions strike at the heart of the *Aspen Skiing* exception to the general rule that refusals to deal are not anticompetitive.  Accepting Plaintiff's allegations as true, and absent any other applicable precedent, the Court cannot find that Defendants' refusal to deal with Arcesium was an anticompetitive action.

On the other hand, Plaintiff has alleged that Defendant has engaged in some anticompetitive conduct related to the exclusive dealing arrangements with customers.  *Jefferson*

*Parish*, 466 U.S. at 45 ("Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods.")  However, as discussed below, Plaintiff's allegations fail to adequately link this conduct with harm, which, in turn, deprives Plaintiff of antitrust standing.

### b.  *Injury Alleged By Plaintiff*

The Complaint also does not adequately allege an injury.  The Complaint includes allegations that Defendants' behavior will raise prices in the market, will lead to competitors' loss of business, and will deny consumers access to Arcesium's "superior" Post-Trade Solutions Platform.  Compl. ¶¶ 72, 82-84; *see also* Opp. at 12.  However, in the section of Plaintiff's Opposition directed to the antitrust injury issue, Plaintiff does not argue that Defendants' actions have raised prices.  *See* Opp. at 12-13.  This makes sense, however, since Plaintiff's complaint does not allege that prices in either the markets for Post-Trade Solutions or for Portfolio Accounting Software actually have risen.  Rather, the plaintiff alleges only that prices could rise.  Compl. ¶ 72 ("Defendants hav[e] the ability to impose anticompetitive price increases on their customers"); ¶ 84 ("Defendants' actions will cause severe harm to competition and customers in the Relevant Markets, in the form of increased prices . . . .").  These are not *factual* allegations, but instead are *speculative* and *conclusory* allegations that do not suffice to defeat a Rule 12(b)(6) motion to dismiss.  *Siegel*, 933 F.3d at 222  (The Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.").  In any event, loss of business by competitors (*i.e.* squeezing competitors out of the market) and market-wide decline in quality of products may be injuries for the purpose of the antitrust standing analysis.  *See N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 148 (S.D.N.Y. 2006) (noting that "the courts have repeatedly held that a decline in quality is among the injuries

that the antitrust laws were designed to prevent" and collecting cases).  Here too, Plaintiff's

allegations are at best conclusory, alleging not that competitors have lost business or that product

quality has declined, but only that these impacts could happen.

      This case cannot be maintained because there are no plausible allegations of market-wide

harm, as opposed to harm only to Plaintiff.  *See Capital Imaging Assocs., P.C. v. Mohawk Valley*

*Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole

market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in

general, not narrowly focused to protect individual competitors.").  Plaintiff's only attempt to

argue such harm is its allegation that its Platform was a superior product to other products on the

market.  *See* Opp. at 3, 12.  The Court is unaware of specific binding authority from the Second

Circuit, but finds persuasive authority from other Circuits holding that a plaintiff cannot simply

plead that its products are superior; in order to have antitrust standing a plaintiff must plead facts

that show how the quality of products in the market as a whole will decline because of

Defendants' conduct.  *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 456 (6th Cir. 2007) (en banc)

(To survive a motion to dismiss, plaintiff cannot state antitrust injury "by asserting an

unelaborated claim that it provides better services than its competitors.");  *see also Cap. Imagine*

*Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993) (requiring

"evidence that [plaintiff's] exclusion has, in fact, resulted in any decrease in quality of []

services" at the summary judgment stage).

      Here, Plaintiff's Complaint does not allege how Arcesium's Platform purportedly is

superior to Defendants' products or to any other Post-Trade Solutions platform available on the

market.  Instead, it simply makes the conclusory allegation that it is so.  *See* Compl. ¶¶ 2, 71.

Nor does Plaintiff explain any further in its Opposition.  *See* Opp. at 12-13 (stating that

Defendants are denying consumers "access to Arcesium's superior Post-Trade Solutions" without further explanation).  Meanwhile, the cases Plaintiff cites in its Opposition do not abrogate the need for more specific factual allegations.  Instead, those cases merely stand for the proposition that decrease in quality can be assumed where *all* competitors have been pushed out of the market, which is not the allegation here.  *See N.Y. Medscan*, 430 F. Supp. 2d at 144, 147 (injury occurred after eliminating "only viable competition"); *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 501 (S.D.N.Y. 2005) (injury occurred where defendants eliminated "the only significant competition").  As a result, Plaintiff has not alleged an injury for antitrust standing purposes.

### c.   *Whether the Injury Flows From Anticompetitive Conduct*

Even assuming an injury in the form of denying Plaintiff access to the market (either because of a price advantage or superior products), Plaintiff's allegations must show that the injuries it alleges "flow[] from that which makes [or might make] defendants' acts unlawful." *Id.* (quoting *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005) (second alteration in original).  In other words, the nature of Plaintiff's injury (or the market-wide harm they allege) must be caused by Defendants' anticompetitive actions and not by something else. Plaintiff has failed to allege the necessary causal relationship here.

As noted above, Plaintiff's complaints about Defendants' refusal to renew the Reseller Agreement does not allege anticompetitive action.  As was the case in *Gatt Communications*, Defendants exercised a contractual option in the Reseller Agreement, namely refusal to renew the agreement without cause.  *See* Compl. ¶¶ 64-70.  Like in *Gatt*, any harms that flow from that termination are not cognizable as antitrust injuries because Defendants were exercising their express contractual right.  *Gatt Commc'ns*, 711 F.3d at 76.

The facts of this case instead mirror those in the Second Circuit's *Port Dock* decision. There, the plaintiff, a distributor of crushed stone, sued a monopolist supplier of crushed stone who refused to deal with the plaintiff, after previously selling product to it. *Port Dock*, 507 F.3d at 120. The plaintiff and defendant also competed in the same distribution market, just as Plaintiff and Defendants here do in the Post-Trade Solutions market. *Id.* at 119-120. The Second Circuit affirmed the District Court's holding that the plaintiff in *Port Dock* did not allege an antitrust injury because the defendant's refusal to deal with the plaintiff was supported by a valid business reason (*i.e.* efficiency gains) and not simply by a motivation to monopolize distribution. *Id.* at 125. Here, Plaintiff alleges that Defendants hold a near monopoly on Portfolio Accounting Software, with Geneva becoming the "industry standard." Compl. ¶¶ 27, 37. Just as in *Port Dock*, Plaintiff's allegation leads to a conclusion that Defendants' attempt to consolidate distribution of Geneva within their Post-Trade Solutions offerings is not motivated by anticompetitive instincts, but instead was an "efficiency-enhancing" measure consistent with normal competition. *See* Def. Br. at 13-14. This conclusion also is consistent with the uniform view that termination of distributor agreements (like the Reseller Agreement between Plaintiff and Defendants here) is not an antitrust injury. *See, e.g.*, *Gatt Commc'ns*, 711 F.3d at 76-78 (2d Cir. 2013) (termination of distributor agreement not actionable as antitrust injury); *Apotex Corp. v. Hospira Healthcare Ltd.*, No. 18-cv-4903 (JMF), 2020 WL 58247, at *3-4 (S.D.N.Y. 2020) (allegations that a manufacturer breached exclusive supplier agreement so it could compete with supplier was not an antitrust injury).

Plaintiff also cannot allege that the exclusive dealing arrangements with Defendants' customers make Arcesium's participation in the market impossible or otherwise lead to anticompetitive harm. Any harm from the exclusive dealing arrangements is borne primarily by

the funds signing the agreements with Defendants who are restricted from contracting with

Arcesium if they so choose.  Harm to Arcesium only flows from this arrangement if this barrier

prevents Arcesium from accessing a "significant fraction" of the relevant market.  *Jefferson*

*Parish*, 466 U.S. at 45.  Plaintiff alleges fewer than five examples of lost business opportunities

and then asserts the conclusory statements that Defendants' agreements "preclude Arcesium's

access to at least 60-70% of the relevant markets."  Compl. ¶ 81.  Plaintiff does not, however,

adequately allege facts establishing that threshold or how Defendants actions have precluded it

from the market beyond the specific examples in the Complaint.  In fact, the Complaint

affirmatively alleges that firms use accounting software other than Geneva, which could lead to

the inference that Arcesium is not precluded from a significant portion of the market.  *See*

Compl. ¶¶ 39-40.  Absent allegations that adequately show Plaintiff has been substantially

excluded from the market as a result of the exclusive dealing arrangements, Plaintiff has not

shown injury flowing from anticompetitive conduct.

In sum, Plaintiff fails to allege that the harm it suffered stemmed from Defendants'

allegedly anticompetitive behavior.  As a result, Plaintiff has failed to allege an antitrust injury in

this case.[8]

### 2)      *Plaintiff Is Not An Efficient Enforcer*

Even if Arcesium had alleged an antitrust injury, it must also allege sufficient facts to

establish that it is an "efficient enforcer" of the antitrust laws.  *See IQ Dental Supply*, 924 f.3d at

65 (citing *Daniel*, 428 F.3d at 443).  The Second Circuit has established a four-part test for

---

[8] Plaintiff's allegations regarding the termination of Plaintiff's Continuation Rights also is not an antitrust injury because it flowed from Defendants' alleged breach of the contract and not from their refusal to deal or other exclusive arrangements.  However, there also is support that a breach of a contract that results in more competition for Plaintiff—like Defendants' actions had here—is *per se* not an antitrust violation.  *See Apotex Corp.*, 2020 WL 58247, at *4-5 (collecting cases).

determining whether a plaintiff is an efficient enforcer.  Specifically, the Court evaluates: "(1) 'the directness or indirectness of the asserted injury,' (2) 'the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement,' (3) 'the speculativeness of the alleged injury,' and (4) 'the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.'"  *Id.* (quoting *Daniel*, 428 F.3d at 443).  The Court need not give all of the factors equal weight.  *Id.*

      ***Directness of the Injury.***  In this case, Arcesium directly is affected by some of the alleged anticompetitive conduct.  Defendants' refusal to deal with Arcesium by refusing to renew the Reseller Agreement directly affects it.  Arcesium, however, is only indirectly affected by Defendants' exclusive dealing arrangements with other customers.  *See* Compl. ¶¶ 73-80.  While Arcesium certainly is deprived of business opportunities with those customers, the parties directly injured by the exclusive dealing arrangements (if any) are the customers who cannot contract with Arcesium.  Indeed, Arcesium alleges that certain firms that were interested in working with it were ultimately dissuaded from doing so due to Defendants' exclusive dealing.  *See* Compl. ¶¶ 78-79.  While indirect injury such as this is not dispositive, *IQ Dental Supply*, 924 F.3d at 65, the indirect nature of at least some of Plaintiff's injuries cuts against finding Plaintiff serving as an efficient enforcer.

      ***Sufficiently Motivated Plaintiff.***  Arcesium is not a sufficiently motivated plaintiff to satisfy the "efficient enforcer" test.  "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."  *In re Alum. Ware. Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016).  "Although the existence of more-motivated plaintiffs is not dispositive, the presence of plaintiffs who are better situated to

vindicate the antitrust laws is relevant to this second factor." *IQ Dental Supply*, 924 F.3d at 66

(citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688-89 (2d Cir. 2009)).

Here, Plaintiff's motivation to pursue this case is based primarily on the cancellation of the

Reseller Agreement (which, as the Court has noted, is cognizable if at all as a breach of contract,

and not as an antitrust claim), and Defendants exclusive agreements with investment funds and

managers.  In light of that, the funds themselves, who are the direct victims of Defendants'

alleged restraints on dealing, are the more motivated plaintiffs to bring this action.

   ***Speculative Damages.***  While "some degree of uncertainty stems from the nature of

antitrust law," "highly speculative damages is a sign that a given plaintiff is an inefficient engine

of enforcement." *Gelboim*, 823 F.3d at 779.  All of Plaintiff's alleged damages in this case are

highly speculative.  Despite Arcesium's arguments to the contrary, *see* Opp. at 15, any

calculation of damages in this case will necessarily turn on several assumptions about what third-

parties would have done if the circumstances were different.  While Arcesium has given several

examples of firms that considered contracting with it before being dissuaded by Defendants'

exclusive dealing, *see* Compl. ¶¶ 73-80, Plaintiff cannot represent what any of those Defendants

would have done in the alternative, and has not alleged that any firm would have contracted with

it but-for Defendants' actions.  Additionally, to the extent Arcesium continued to press its claims

in this case regarding Defendants' refusal to renew the Reseller Agreement, determination of

damages would also have to include calculations about how Arcesium would have used its resale

rights and how many new customers it might have attracted.  On the other hand, the damages of

directly affected firm would be the simpler calculation of the amount they overpaid for

Defendants' services.  Because Plaintiff's damages are far more speculative than better-situated

potential plaintiffs, this factor weighs against Plaintiff as well.  *See Gatt Commc'ns*, 711 F.3d at

79 (damages in a case concerning a terminated reseller agreement were "uncertain" because there was little proof of what business the plaintiff would have secured in the absence of the anticompetitive conduct).

 ***Duplicative Damages.*** This case presents minimal, but some, risk of duplicative damages.  As the Second Circuit noted was the case in *Gatt Communications*, surely another plaintiff could file suit against Defendants for the same scheme and be entitled to damages on the ground that it would have secured business Arcesium claims here.  *See Gatt Commc'ns*, 711 F.3d at 79-80.  If both cases then proceeded to judgment, there is a potential for duplicative damages.  Indeed, one such firm did file a similar suit to Plaintiff's in federal court in Pennsylvania, though its claims also were dismissed.  *See SEI Global Servs.*, 2020 WL 6262187.

 In light of all the factors, while there is some argument that Arcesium is directly affected by purportedly anticompetitive conduct, the weight of the factors militates in favor of finding that Arcesium is not an efficient enforcer of the antitrust laws on the facts of this case.  In light of this, and the Court's finding that Arcesium also has not alleged an antitrust injury, the Court finds that Arcesium has failed to plead facts sufficient to allege antitrust standing in this case and the motion to dismiss is therefore granted on that ground.

**B.** ***The Parties Other Arguments***

 Because the Court holds that Plaintiff's federal antitrust claims fail because Plaintiff has not pleaded antitrust standing, the Court does not reach the alternative arguments that Plaintiff's claims fail on the merits.  To the extent Plaintiff seeks leave to file an amended complaint in this action, Defendants are free to re-raise their substantive arguments in that context.

Because dismissal of the federal antitrust claims also eliminates the only federal claims in this case, there is no federal question jurisdiction.  The Court declines to exercise jurisdiction over Plaintiff's state law claims.  As a result, all of Plaintiff's claims in this case are dismissed.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss [ECF No. 78] is GRANTED on the ground that Plaintiff has not established antitrust standing in this case.  Specifically, because Plaintiff's claims largely rise out of its contract with Defendants, and Defendants' refusal to renew the contract, Plaintiff has failed to allege an antitrust injury.  Plaintiff also has not established that it is an efficient enforcer of the antitrust laws sufficient to assert the claims alleged in the Complaint.  In the absence of federal antitrust claims, the Court will not assert supplemental jurisdiction over the state law claims.

Because antitrust standing is a fact-intensive question, Plaintiff may be able to replead its complaint to remedy the deficiencies identified herein.  At this stage the Court cannot ascertain whether such amendment necessarily would be futile.  To the extent Plaintiff intends to move for leave to file an Amended Complaint, the motion (together with a blacklined copy of the proposed amended complaint) should be filed within thirty days of this Opinion and Order.

The Clerk of Court respectfully is requested to terminate the motion at ECF No. 78 and to close the case.

**SO ORDERED**

Date:  March 31, 2021
      New York, New York

**MARY KAY VYSKOCIL**
**United States District Judge**